UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

ONTARIO LOGAN-PATTERSON,     )
                                  )
             Plaintiff,       )
                                  )
v.                           )   Civil Action No. 3:24-cv-526
                                  )
TRAVIS SCOTT WYATT,         )
                                  )
             Defendant.     )

**DEFENDANT TRAVIS SCOTT WYATT'S**
**<u>BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

## **INTRODUCTION**

On the evening of December 11, 2023, Virginia State Trooper Travis Wyatt ("Trooper Wyatt") was running radar when a car sped past at over 100 miles per hour. Trooper Wyatt attempted to stop the car but the suspect refused to stop and instead led Trooper Wyatt on a high-speed pursuit. The suspect then crashed into another vehicle, exited his vehicle and ran. Trooper Wyatt chased the suspect on foot, getting within mere feet of him at times, before the suspect was able to run to the front door to Plaintiff's residence and make it inside. Trooper Wyatt, soon joined by other troopers, monitored the residence to ensure no one entered or exited. Plaintiff's mother appeared and confirmed that Plaintiff had recently returned home and was the only other person in the house. Plaintiff then emerged from the house, shirtless and out of breath, and Trooper Wyatt believed Plaintiff was the suspect based on Trooper Wyatt's observations during the foot chase.

The undisputed facts show that probable cause existed for Trooper Wyatt to detain Plaintiff and later seek the issuance of charges by an intake officer. The intake officer, an independent decisionmaker under Virginia law, likewise found probable cause. Thus, none of Plaintiff's constitutional rights were violated.

Plaintiff's claim that Trooper Wyatt detained and charged the wrong suspect, and the fact that charges against Plaintiff were ultimately dropped, are insufficient and immaterial as a matter of law to support Plaintiff's § 1983 and state law claims. Even assuming that Trooper Wyatt mistakenly identified Plaintiff as the suspect, the Constitution does not require police to conduct "an error free investigation" or "to investigate independently every claim of innocence" related to mistaken identity. *See Johnson v. Hammett*, No. CV ELH-18-1059, 2019 U.S. Dist. LEXIS 222466, at *24 (D. Md. Dec. 23, 2019) (internal quotation marks omitted) (quoting *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979)).

1

Moreover, even if Trooper Wyatt lacked probable cause in this matter, he is further shielded by qualified immunity because he reasonably believed he had probable cause. Summary judgment should be granted in favor of Trooper Wyatt.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    On December 11, 2023, just after 5:00 pm, while running radar on Chippenham Parkway at Hopkins Road, Trooper Wyatt observed a blue Dodge Charger traveling 102 miles per hour in a 60 mile-per-hour zone. Ex. 1, Wyatt Aff., VSP 000001.

2.    Exceeding the applicable speed limit by more than twenty miles per hour or exceeding a speed of 85 miles per hour is reckless driving in Virginia. Va. Code § 46.2-862.

3.    Trooper Wyatt began chase of the Charger and activated his emergency lights and siren as he reached State Route 1 and Dundas Road, but the Charger didn't stop. Ex. 1, Wyatt Aff.

4.    The ensuing pursuit reached speeds in excess of 120 miles per hour while the Charger weaved in and out of traffic, drove on the shoulder and ran stop signs. *Id.*

5.    Exiting northbound Interstate 95 at Maury Street, the driver of the Charger pressed on, making multiple turns through the streets of Manchester in Richmond, until he rear-ended an SUV stopped at a red light at Commerce Road and Maury Street. *Id.*

6.    At the time, Plaintiff lived with his mother at 304 East 9th Street in Richmond, in a row of duplex apartments adjacent to where the Charger rear-ended the SUV. Ex. 2, Logan-Patterson Dep., 10:14–19; Ex. 3, Patterson Dep. 11:2–4.

7.    As Trooper Wyatt arrived at the wrecked Charger, he saw the driver jump out of the vehicle and run south up Maury Street. Trooper Wyatt exited his vehicle and yelled "STOP!" at the suspect and initiated a foot pursuit. Ex. 4, Wyatt Dash Cam 1 at 8:50–9:10.

8.     Trooper Wyatt chased the suspect around the apartments. At one point during the chase, while facing Trooper Wyatt for two or three seconds from 15 to 20 feet away, the suspect told Trooper Wyatt that he wasn't going to jail.  Ex. 5, Wyatt Statement, June 18, 2024, VSP 000096; Ex. 6, Wyatt Dep., 44:1–13, 86:24–87:7.

9.     Over the radio, Trooper Wyatt described the suspect: "Black male, Army pants, ski mask on, white shirt." Ex. 4, Wyatt Dash Cam 1 at 10:47–55. By "ski mask," Trooper Wyatt was referring to an article of clothing on the suspect's head, which he thought looked like a ski mask but which could have been a durag.[1] Ex. 6, Wyatt Dep. 39:19–40:4. Regardless, the suspect's face was at least partially visible. *Id.* at 41:10–20; Ex. 3, Patterson Dep. 36:12–24. While chasing the suspect around the apartments, Trooper Wyatt briefly lost sight of the suspect but regained a visual on him when he came out from behind a dumpster in the parking lot. *Id.* at 35:12–36:10.

10.    The suspect took off again, and Trooper Wyatt again briefly lost sight of him. *Id.* at 36:17–22. As he made his way back to his patrol car, Trooper Wyatt regained a visual on the suspect, stating "He's at the car right now, he's at the car!" and observed the suspect remove a bag from the Charger's trunk. Ex. 4, Wyatt Dash Cam 1 at 11:12–23; *see also* Ex. 2, Logan-Patterson Dep. 42:3–5.

11.    Trooper Wyatt rounded the corner at Commerce and Maury, Ex. 4, Wyatt Dash Cam 1 at 11:21–23, and his foot pursuit resumed, with Trooper Wyatt chasing the suspect north on Commerce next to a fenced-in area between the road and the row of apartments where Plaintiff lived. Ex. 6, Wyatt Dep. 36:19–23. Trooper Wyatt observed the suspect duck behind a dumpster

---

[1] A "dorag," or "durag," is "a close-fitting, typically stretchable piece of cloth that is worn on the head (as to hold a hairstyle in place) and that usually has long ends which are tied in the back." *Dorag*, Merriam-Webster.com Dictionary, Merriam-Webster, https://tinyurl.com/3jt554jy, accessed Apr. 4, 2025.

with the bag in his hand and saw him grab an object from the bag and throw it underneath the dumpster. Ex. 6, Wyatt Dep. 37:1–2, 74:20–76:10.

12.      Trooper Wyatt and the suspect, separated by two sets of chain-link fencing, stopped and exchanged glances for two or three seconds. Ex. 6, Wyatt Dep. 36:17–37:3, 86:24–87:7, 104:2–14. Trooper Wyatt estimates they were approximately 25–30 feet apart. *Id.* at 104:2–14.

13.      Plaintiff and his mother admit that at one point the suspect ran in the direction of their residence—where their door was left wide open. Ex. 2, Logan-Patterson Dep. 24:13–22, 25:11–15; Ex. 3, Patterson Dep. 16:13–14, 32:6–33:2; *compare* Ex. 7 (Map showing Plaintiff's memory of location of himself (O), Trooper Wyatt (T), and suspect(S)), *with* Ex. 2, Logan-Patterson Dep. 27 (discussion of same).

14.      Wyatt pursued the suspect toward the apartments and observed the suspect run to the front entranceway of Plaintiff's residence at 304 East 9th Street, whereby the suspect disappeared. Trooper Wyatt concluded the suspect had entered the residence. Ex. 1, Wyatt Aff.; Ex. 6, Wyatt Dep. 37:2–5, 48:3–12 (explaining that while he didn't see the suspect cross the threshold of the front door, he saw the suspect "come back into the entranceway and there is only one door in that entranceway"); *see* Ex. 8, Photos of 304 East 9th Street.

15.      As he waited for backup to arrive, Trooper Wyatt monitored the residence to make sure no one else entered or exited. Ex. 1, Wyatt Aff.; Ex. 9, Wyatt Decl. ¶ 13; Ex. 10, C. Morris Decl. ¶ 6. While doing so, Trooper Wyatt notified other officers via radio that he was at the apartment complex. Ex. 4, Wyatt Dash Cam at 14:50–15:00. Trooper Wyatt can be heard stating to Trooper Chance Morris, who had just arrived, "He's at this apartment right here. Right here."

*Id.* at 16:35–40.[2] According to Plaintiff's mother, no one other than Plaintiff and his mother entered their home that evening. Ex. 3, Patterson Dep. 17:4–11, 35:14–20, 45:14–20. Wyatt and Chance Morris continued monitoring the apartment, standing in the front and back, to make sure no one entered or exited. Ex. 10, C. Morris Decl. ¶ 6.

16.     Meanwhile, other troopers arrived on the scene, including Trooper Seth Layton, a member of the Virginia State Police ("VSP") Canine ("K9") Team. Trooper Layton called out over the radio to units on scene but didn't hear an answer, and casted his dog, K9 Scar, along Maury Street. Ex. 11, Layton Statement, Jan. 1, 2024, VSP 000070; Ex. 12, Layton Decl. ¶ 5. K9 Scar led Trooper Layton along Maury Street, around the corner, through the alley, and between two apartments where two other troopers were standing. Ex. 11, Layton Statement at VSP 000070; Ex. 12, Layton Decl. ¶¶ 6–7.

17.     According to Trooper Layton, "It was very apparent that Scar was in-odor—that is, in the location of a fresh human scent—because his front feet were stepping very erratically, his nose was casting side-to-side in the air, and he was pulling very hard. Scar then led me through the two apartment houses, hugging bushes situated alongside the front porch of 304 East 9th Street, and button-hooked to the left around the front of 304 East 9th Street and led me onto the porch toward the door straight ahead." Ex. 12, Layton Decl. ¶¶ 7–8.

---

[2] In claiming that Trooper Wyatt lied about monitoring the Patterson home, Plaintiff alleges that Trooper Wyatt's dash cam shows he came back to his vehicle during this time period. Compl. ¶ 36. This is false. From the time Trooper Wyatt regained a visual on the suspect and rounded the corner at Commerce and Maury—giving chase again—to the time that he encountered Ms. Patterson at her back door, Trooper Wyatt never appears in his vehicle's dash cam. Trooper Wyatt can be seen rounding the corner at Commerce and Maury and continuing chase on his dash cam. Ex. 4, Wyatt Dash Cam 1 at 11:21–23. Trooper Wyatt's encounter and conversation with Ms. Patterson can be heard on Trooper Wyatt's dash cam audio beginning a little over 11 minutes later. *Id.* at 22:40. Trooper Wyatt never appears in his dash cam during this time period. *Id.* at 11:21–22:40.

18.    Minutes later, Trooper Wyatt saw Plaintiff's mother Lakita Patterson exit the back door of the residence. Ex. 5, Wyatt Statement, June 18, 2024, VSP 000096. Trooper Wyatt asked her whether she lived in an upstairs or downstairs unit. Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 7. She replied that it was all one unit, upstairs and downstairs, confirming that the back door from which she exited was part of the same apartment Trooper Wyatt had seen the suspect enter through the front door. Ex. 5, Wyatt Statement at VSP 000096; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 7. Trooper Wyatt told Ms. Patterson he had chased the suspect into her home. Ex. 3, Patterson Dep. 17:4–5.

19.    Trooper Wyatt then asked Ms. Patterson who was in her house, and Ms. Patterson replied that only she and her son were home and that he had come in five minutes ago. Ex. 3, Patterson Dep. 16:9–11, 17:4–11; Ex. 6, Wyatt Dep. 151:16–22; Ex. 5, Wyatt Statement at VSP 000096–97; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 7–8.

20.    Trooper Wyatt asked Ms. Patterson what her son had been driving and Ms. Patterson responded, "My son don't drive." Ex. 4, Wyatt Dash Cam 1 at 24:03–07; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 8. Ms. Patterson then stated that she had been outside watching them run and added, "I said fu** it, he's ain't going to catch him…and we both ran in the house…." Ex. 4, Wyatt Dash Cam 1 at 25:08–16; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 8. Trooper Wyatt asked to see Ms. Patterson's son and she called for Plaintiff to come downstairs. Ex. 4, Wyatt Dash Cam 1 at 23:44–55; Ex. 3, Patterson Dep. 17:12–14; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 8.

21.    Plaintiff came downstairs shirtless, breathing heavy, and sweating. Ex. 1, Wyatt Aff.; Ex. 2, Logan-Patterson Dep. 34:4–35:6; Ex. 3, Patterson Dep. 17:15–22. Trooper Wyatt asked

Plaintiff what he had been doing. Plaintiff replied that he had been doing the dishes and had watched Trooper Wyatt chase someone. Ex. 5, Wyatt Statement at VSP 000097; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 3. Trooper Wyatt identified him as the person who had been driving the Charger and who he had pursued to Plaintiff's residence. Ex. 1, Wyatt Aff.; Ex. 6, Wyatt Dep. 48:18–22, 157:13–16; Ex. 3, Patterson Dep. 18:11–12; *see also* Ex. 2, Logan-Patterson Dep. 36:21–22 (Trooper Wyatt asking Plaintiff why he "ran from him").

22.    Trooper Wyatt placed handcuffs on Plaintiff and escorted him to his vehicle. Ex. 5, Wyatt Statement at VSP 000097; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 3; Ex. 6, Wyatt Dep. 49:5–11. Trooper Chance Morris and Ms. Patterson followed. Ms. Patterson told Trooper Wyatt that her son was only 17 and again told Trooper Wyatt that she and her son had run in the house. Ex. 4, Wyatt Dash Cam 1 at 29:18–30:02.

23.    With Plaintiff secure in his vehicle, Trooper Wyatt joined Trooper Robert Morris, who was questioning the three passengers who had been riding in the Dodge Charger. Ex. 4, Wyatt Dash Cam 1 at 31:09–18. Trooper Wyatt asked the passengers who was driving and one of them answered, "Zay." *Id.* at 31:23–32. Pointing to Plaintiff sitting in the front seat of his vehicle, Trooper Wyatt asked the passengers if Plaintiff was the driver. Two of the passengers answered no, and the third showed no sign of disagreement with them. *Id.* at 31:33–39. In Trooper Wyatt's experience, refusing to identify a juvenile associate was common. Ex. 6, Wyatt Dep. 125:12–14.

24.    One of the passengers explained that they "met [the suspect] through a car club, and we were headed to a car meet. And then the lights came on, and he wasn't stopping." Ex. 4, Wyatt Dash Cam 1 at 31:44–52. Trooper Robert Morris asked, "How tall was the other dude?" The passenger answered, "It was similar build, but that…I promise you. [inaudible] I promise you." *Id.* at 33:39–45. Trooper Wyatt responded, "Who was the guy then? You kinda don't just ride with

someone you don't know." Another passenger responded, "In our community we ride with random people. That's how we met him … We just kinda met through the Internet, and then we were all headed towards the car meet and things took a turn.… " *Id.* at 33:50–34:22.

25.    Trooper Wyatt didn't think it was strange that a 17-year old juvenile could have been driving a car with three adult passengers. In Trooper Wyatt's experience, it was not uncommon for a 17-year-old to drive a stolen car with older passengers because juveniles receive less punishment in the courts. Ex. 4, Wyatt Dep., 68:14–69:10; Ex. 9, Wyatt Decl. ¶ 20. In investigating the Charger, Trooper Robert Morris determined that the vehicle was stolen. Ex. 14, R. Morris Statement, Jan. 21, 2024, VSP 000013; Ex. 15, R. Morris Decl. ¶ 10. Trooper Robert Morris also found a handgun in the front passenger seat of the Charger that was possessed by one of the passengers. Ex. 14, R. Morris Statement at VSP 000012; Ex. 15, R. Morris Decl. ¶ 6.

26.    Trooper Wyatt canvassed the area, returning to the dumpster he saw the suspect crouch behind. Ex. 5, Wyatt Statement at VSP 000097; Ex. 9, Wyatt Decl. ¶ 21. Trooper Layton found a gun underneath the corner of the dumpster, and Wyatt took possession of the weapon and secured it. Ex. 12, Layton Decl. ¶ 16; Ex. 16, Hana Statement, Jan. 19, 2024, VSP 000017; Ex. 17, Hana Decl. ¶ 11; Ex. 9, Wyatt Decl. ¶ 21.

27.    Trooper Wyatt returned to his vehicle and told Plaintiff he was not under arrest. Ex. 4, Wyatt Dash Cam 1 at 35:38–46; *see also* Ex. 6, Wyatt Dep. 114:2–5. Trooper Wyatt then began questioning Plaintiff. The following was one of their exchanges:

> Trooper Wyatt: "So right before it happened, you ran to your apartment complex?"
> Plaintiff: "Yeah. Technically it was a jog at first.…"
> Trooper Wyatt: "You jogged to your apartment. You passed your apartment and jogged back?"
> Plaintiff: "No. Because we came outside to be nosy. We came outside. We looked at him. And then we seen him running back."
> Trooper Wyatt: "You seen him running back where?"

> Plaintiff: "Towards our apartment, literally. And then he stopped, and he looked at our door. So we ran in, locked everything and then. Yeah."

Ex. 4, Wyatt Dash Cam 1 at 39:46–40:16. Notwithstanding this statement and Plaintiff's mother's statement, *supra* ¶ 20, that they "ran" back into their house Ms. Patterson would also tell Trooper Wyatt that her son was innocent because he couldn't run due to a knee surgery. Ex. 18, Patterson IA Interview Recording, Dec. 28, 2023, at 11:40–55.

28.     In another exchange, Plaintiff asked Trooper Wyatt whether he was going to jail now. Trooper Wyatt answered, "I don't know yet. I really don't know." Wyatt continued, "But you did it though, OK?... I mean, it kinda, it kinda, there's too many obvious clues. It's just too much, OK? I mean, you're driving a stolen car, OK?" Plaintiff responded, "I don't even know how to drive." Trooper Wyatt then stated, "Everyone should say that, alright." Ex. 19, Wyatt Dash Cam 2 00:01–00:30.

29.     Plaintiff consented to Trooper Wyatt performing a DNA swab. *Id.* at 11:25–29 (speaking to bystander: "I told them they can DNA swab me and everything."); *id.* at 13:09–15 (Trooper Wyatt: "Are you cool with getting swabbed." Plaintiff: "Yeah.").

30.     Trooper Wyatt decided to release Plaintiff due to his lack of familiarity with the process for arresting and charging juveniles. Ex. 6, Wyatt Dep. 49:18–50:4, 93:7–11. Trooper Wyatt alone made the decision to release Plaintiff; no other troopers disagreed with Wyatt's determination of guilt or told Wyatt to release Plaintiff.[3] After unhandcuffing Plaintiff, Trooper Wyatt attempted to perform a consensual buccal DNA swab on Plaintiff, but friends and family members on the scene physically and verbally intervened to prevent him from doing so. Ex. 6,

---

[3] Ex. 6, Wyatt Dep. 49:23–50:1, 83:3–5; Ex. 12, Layton Decl. ¶ 19; Ex. 10, C. Morris Decl. ¶ 10; Ex. 15, R. Morris Decl. ¶ 13; Ex. 17, Hana Decl. ¶ 15.

Wyatt Dep. 131:14–132:8; Ex. 20, C. Morris Statement, Jan. 18, 2024, at VSP 000014–15; Ex. 2, Logan-Patterson Dep. 79:18–80:10; *see also* Ex. 15, R. Morris Decl. ¶ 12.

31.    Trooper Wyatt was off duty on the first two days after the incident, December 12 and 13, 2023. After conferring with shift partners on the procedures for seeking issuance of a juvenile petition, Ex. 9, Wyatt Decl. ¶ 24, Trooper Wyatt went to the Chesterfield County Juvenile and Domestic Relations District Court to seek issuance of petitions for: unlawful failure to stop for a police officer after being given an activated light and siren signals; unlawful possession of a firearm while under the age of 18; and unlawful receipt of stolen property. Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 10; Ex. 21, Petitions, VSP 000020–22.

32.    The Chesterfield intake officer informed Trooper Wyatt, however, that the petitions should be filed in Richmond because the majority of the Incident had taken place there. Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 10. On December 15, 2023, Trooper Wyatt went to the Richmond Juvenile Detention Center to seek issuance of the petitions. *Id.* He provided the intake officer with his affidavit and the petitions. *Id.* He also provided her with a brief oral summary of what happened on December 11, 2023. *Id.*

33.    Trooper Wyatt's affidavit in support of the petitions stated as follows:

At approximately 1705 hours I was running stationary radar SB RT 150 at Hopkins Road when a Blue dodge Charger enter my radar in the middle lane 102 in a posted 60 MPH zone. I activated my emergency equipment SB RT 1 just south of Dundas Road. When I activated my lights, the driver took off at a high rate of speed and did a U-turn on NB RT. 1. He continued at a high rate of speed over 80 MPH in and out of traffic cutting vehicles off.

The driver later Identified as ONTARIO LOGAN-PATTERSON continued and enter SB RT 150 onto NB 1-95 at a speed over 120 MPH in and out of traffic and on the shoulder multiple times. The driver exited to Maury Street, went east on Maury Street, immediate left on East 3rd street, then went left on Everett Street, went through the stop sign at 4th street and took a left on commerce street. When he entered the intersection of Commerce and Maury he crashed in the rear end of another vehicle. He exited the vehicle and took off on foot on Maury towards

apartment complex. A foot pursuit was initiated for approximately 2 minutes around the apartment complex until I lost sight of him. I continued to my vehicle, and I approached the suspect a second time getting a bag out of the trunk. Another foot pursuit was initiated.

The pursuit continued down commerce road around a fenced in area. The suspect was seen ducking down behind a red dumpster with his bag in his hand, later what found to be a Black Glock semiautomatic gun loaded and 1 round in the chamber in the same area. After walking around the fence, he took off again towards the apartment complex and entered a single unit apartment. I stood by the apartment complex and made sure no one entered or exited the apartment for approximately 15 minutes. At that time the mother exited on the back porch and stated her son just got home and he was inside. The son came to the door with only pants on. I Identified him as the same person who was driving the vehicle and who took off on foot. The driver stated he was outside in the front and when he saw me, he jogged back inside the house. He was detained and later released to his mother.

The car was displaying a Texas tag of RVZ7907 which belongs on a 2010 gray Dodge Charger with a VIN of 2B3CA3CV3AH202560 that had the same altered VIN on the dashboard. The correct VIN for the vehicle is 2C3CDXGJ1GH321676 which was on the engine block as well as the door jam that belonged to that vehicle which was a Blue 2016 Dodge Charger stolen out of Spotsylvania.

Ex. 1, Wyatt Aff.

34.    Finding probable cause to have been established, the intake officer issued the petitions and provided Trooper Wyatt with copies. Ex. 21, Petitions, VSP 000020–22; Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production, at 10; Va. Code § 16.1-260(B).

35.    The next day, December 16, 2023, Trooper Wyatt called Ms. Patterson to inform her that Plaintiff had petitions outstanding and told her that she needed to take Plaintiff to the Richmond Juvenile Detention Center so that Plaintiff could turn himself in to the authorities. Ex. 13, Def.'s Answers to Pl.'s First Interrs. and Requests for Production at 9.

36.    Plaintiff was taken into custody at Richmond Juvenile Detention on December 20, 2023. He was released on home monitoring on January 11, 2024, when his matter was continued on his motion to explore exculpatory witnesses. The Commonwealth's Attorney's motion to

dismiss the charges against Plaintiff without prejudice was granted on February 29, 2024, after the Court denied the prosecution's motion to *nolle prosequi* over the objection of defense counsel.

37.     In Count I, Plaintiff brings § 1983 claims under the Fourth Amendment, asserting that Trooper Wyatt did not have reasonable suspicion to detain or probable cause to arrest Plaintiff on December 11, 2023. Compl. ¶¶ 46–50. Count II asserts a § 1983 malicious prosecution claim under the Fourth Amendment, asserting that Trooper Wyatt lacked probable cause to obtain legal process against Plaintiff, and materially represented or omitted facts from his supporting affidavit. *Id*. ¶¶ 51–58. Counts III and IV assert parallel state-law claims for false imprisonment and malicious prosecution. *Id.* ¶¶ 59–69.

## **LEGAL STANDARD**

### I.     **False Arrest and Malicious Prosecution**

The elements of a federal § 1983 false arrest claim and Virginia common law false imprisonment claim are substantially similar, requiring a plaintiff to show that he was seized without probable cause or "legal excuse." *English v. Clarke*, 90 F.4th 636, 646 (4th Cir. 2024) (citing *Massey v. Ojaniit*, 759 F.3d 343, 356 (4th Cir. 2014)) ("To establish a § 1983 claim based on a Fourth Amendment violation for false arrest, [a plaintiff] must show that he was seized by [the defendant] without probable cause."); *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 114 (2021) (citations omitted) ("To prevail in an action for false imprisonment, a plaintiff must prove that her liberty was restrained, either by words or acts that she would fear to disregard, and that there was no sufficient legal excuse to justify the restraint.").

Similarly, the elements of federal § 1983 and Virginia common law malicious prosecution claims "substantially overlap." *L.M. v. Graham*, No. 1:23-cv-1574, 2024 U.S. Dist. LEXIS 74197, at *10 (E.D. Va. Apr. 23, 2024). To succeed on a malicious prosecution claim under § 1983, "[a]

plaintiff 'must allege that the defendant[s] (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" *Id.* at *10–11 (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). On the other hand, "[t]o state a common law action for malicious prosecution under Virginia law, a plaintiff must establish, 'that the prosecution was (1) malicious; (2) instigated by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff.'" *Id.* at 11 (quoting *O'Connor v. Tice*, 281 Va. 1, 7 (2011)). Thus, malicious prosecution claims under Virginia common law require proof of one additional element beyond parallel § 1983 claims: malice. *Id.*

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Milla v. Brown*, 109 F.4th 222, 228 (4th Cir. 2024) (quoting *Haze v. Harrison*, 961 F.3d 654, 658 (4th Cir. 2020)). Thus, in considering a motion for summary judgment, the Court's role is "to determine whether there are issues to be tried." 10A Wright & Miller, Federal Practice & Procedure § 2712 (Westlaw 2024).

## <u>ARGUMENT</u>

The Court should grant summary judgment in Trooper Wyatt's favor. First, Trooper Wyatt possessed reasonable suspicion—indeed, probable cause—to detain Plaintiff, and probable cause to seek petitions for his arrest from a neutral intake officer. Second, Plaintiff's arrest was caused by the independent determination of an intake officer, and the undisputed facts show that Trooper Wyatt did not omit or misrepresent material facts. Rather, the facts Plaintiff disputes do not defeat

probable cause and, therefore, are not material. Finally, Trooper Wyatt's conduct did not violate "clearly established" law for purposes of a qualified immunity analysis.

**I.      Trooper Wyatt had reasonable suspicion to detain and probable cause to arrest Plaintiff.**

Plaintiff was not arrested on December 11, 2023, but rather was temporarily detained while officers on scene investigated the offense, before being released to his mother. Such a detention requires only reasonable suspicion that a crime was committed—though Trooper Wyatt had probable cause. Thus, Plaintiff's assertion that this detention was instead an arrest is of no legal consequence, as Trooper Wyatt possessed probable cause that a crime was committed by Plaintiff. Counts I and III therefore fail as Plaintiff was lawfully detained.

Officers may, with reasonable suspicion that a crime was committed, effect "a brief but complete restriction of liberty" for the time necessary to "verify or dispel the officer's suspicion." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). Fourth Circuit "decisions have recognized that 'drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest.'" *Id.* (quoting *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995)). Trooper Wyatt briefly detained Plaintiff while troopers investigated the crash, interviewed the passengers in the suspect vehicle, and spoke with Plaintiff and his mother regarding the offense. Statement of Undisputed Facts ("SUF") ¶¶ 22–30.  Plaintiff was told he was not under arrest, and was released after the investigative steps were taken. *Id.* ¶¶ 27, 30. Shortly after Plaintiff was released, Trooper Wyatt attempted to perform a consensual buccal DNA swab on Plaintiff, but family members prevented Trooper Wyatt from doing so. *Id.* ¶ 30. In short, Wyatt had reasonable suspicion to detain Plaintiff, and he then released him at the scene.

Based on the undisputed facts, Trooper Wyatt also had probable cause (and thus reasonable suspicion) to believe that Plaintiff was the driver of the eluding vehicle. "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (cleaned up). Put another way, "[p]robable cause is determined from the totality of the circumstances known to the officer at the time of the arrest." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *United States v. Garcia*, 848 F.2d 58, 59–60 (4th Cir. 1988)).

The Supreme Court has repeatedly stressed that "[p]robable cause 'is not a high bar.'" *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Id.* (cleaned up). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (cleaned up). "The probable cause standard does not demand any showing that such a belief be correct or more likely true than false." *Simmons v. Poe,* 47 F.3d 1370, 1379 (4th Cir.1995). Instead, it is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Humphries,* 372 F.3d 653, 657 (4th Cir.2004) (internal citation and quotation marks omitted). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown*, 278 F.3d at 367–68 (citing *Wong Sun v. United States*, 371 U.S. 471, 479 (1963)).

Trooper Wyatt's subjective rationale for why probable cause existed is irrelevant to the analysis. "[P]robable cause is an objective test" and thus courts "examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act." *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (citations omitted). But courts "do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *United States v. Walker*, 607 F. App'x 247, 253 (4th Cir. 2015) (internal citation omitted). Thus, the probable cause analysis consists of determining what facts were available to the troopers on scene, and whether a review of those facts constitutes probable cause.

Plaintiff does not dispute that probable cause existed to detain and pursue criminal charges against the driver of the Charger. Instead, Plaintiff disputes that it was reasonable for Trooper Wyatt to believe Plaintiff was the driver. Ex. 22, Pl.'s Second Supplemental Answers and Responses to Defendant Wyatt's First Interrogatories, at 20. In such a case where a plaintiff asserts he was mistakenly identified, "the relevant factor in determining whether a mistaken arrest is valid is not whether probable cause existed as to the actual arrestee but whether the officers' mistake of identity was a reasonable one." *Schultz v. Braga*, 290 F. Supp. 2d 637, 649 (D. Md. 2003). And "in Fourth Amendment cases, objective reasonableness is not a jury question—it is a question of law." *Armstrong v. Hutcheson*, 80 F.4th 508, 514 (4th Cir. 2023).

A number of undisputed facts establish probable cause. The car chase led to near Plaintiff's home. SUF ¶¶ 5–6. The suspect ran toward Plaintiff's home. *Id.* ¶¶ 13–14. Trooper Wyatt believed the suspect ran into Plaintiff's residence through the front door. *Id.* ¶ 14. Situated at an angle to the side of the house, Trooper Wyatt was able to see the suspect in the Plaintiff's front entryway and was able to see the entire entryway except for the front door itself. *See id.* ¶ 14. Troopers

arrived and monitored the home, and no one else entered or left. *Id.* ¶ 15. Plaintiff agrees that nobody other than himself and his mother entered the home. *Id.* ¶ 15. Plaintiff's mother emerged and informed Trooper Wyatt that the front and back door were part of the same apartment, that only her son was present with her, and that he had just returned home. *Id.* ¶ 18. After a VSP canine tracked to Plaintiff's door, Trooper Wyatt had an additional basis for believing Plaintiff was the suspect. *Id.* ¶¶ 16–17. From this information alone, any reasonable officer could conclude that Plaintiff was this suspect.

Still additional factors confirmed Trooper Wyatt's probable cause. Plaintiff emerged—shirtless despite it being December. *Id.* ¶ 21. This supports a reasonable belief that Plaintiff had removed and changed his clothing to avoid being identified as the suspect. Moreover, Plaintiff was sweaty[4] and breathing heavily consistent with someone who had just been in a foot pursuit. *Id.* ¶ 21. Trooper Wyatt asked Plaintiff why he was out of breath, and Plaintiff stated it was because he was doing dishes—an explanation any reasonable officer would find suspicious. *Id.* ¶ 21.

Finally, Trooper Wyatt viewed the suspect from as close as 15 feet, at least partially observing the suspect's skin and face, heard his voice, and identified Plaintiff as the suspect. *Id.* ¶¶ 8–9, 21. While the passengers in the suspect's vehicle stated that Plaintiff was not the suspect, even they acknowledged that Plaintiff was of a similar build to the suspect. *Id.* ¶ 24. The concession by the passengers that the suspect had a similar build as Plaintiff demonstrates the reasonableness of Trooper Wyatt's identification of the suspect. And a reasonable officer would give little to no credence to the refusal of the three passengers to identify Plaintiff as the suspect—after all, each of them was joyriding with the suspect in a stolen vehicle, and the front seat passenger was (like

---

[4] While several Troopers observed Plaintiff to be sweaty, he disputes this in his own testimony. To the extent there is a legitimate dispute over this fact, it is not necessary to the probable cause determination and, therefore, not material.

the suspect) armed with a firearm. SUF ¶¶ 23–25; *see Robinson v. Cook*, 706 F.3d 25, 37 (1st Cir. 2013) ("a reasonable police officer need not credit a suspect's self-serving statements").

These facts, taken together, established probable cause that Plaintiff was the suspect who had fled from Trooper Wyatt. Plaintiff asserts that Trooper Wyatt was ultimately mistaken and apprehended the wrong person. Even assuming that is true, it does not change the fact that Trooper Wyatt had probable cause to believe that Plaintiff committed a serious criminal offense, and it does not amount to a constitutional violation. *Mensh v. Dyer*, 956 F.2d 36, 39 (4th Cir. 1991) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)) ("An arrest based on probable cause does not violate the fourth amendment, even if the wrong person is arrested."); *Thompson v. Prince William Cnty.*, 753 F.2d 363, 364 (4th Cir. 1985) ("Not every mix-up in the issuance of an arrest warrant, even though it leads to the arrest of the wrong person with attendant inconvenience and humiliation, automatically constitutes a constitutional violation for which a remedy may be sought under 42 U.S.C. § 1983.").

## II.    Because Plaintiff cannot establish causation, his malicious prosecution claims must be dismissed.

Plaintiff's confinement at the Richmond Juvenile Detention Center was not a result of his initial detention on December 11, 2023—Plaintiff was released at the scene.  Rather, this detention resulted from a neutral intake officer's finding of probable cause to issue petitions for the alleged crimes and a detention order, based on the observations of Trooper Wyatt. *See* SUF ¶¶ 32–34.

The Virginia statute that specifies the process for filing criminal charges against juveniles requires an "intake officer" to decide whether there is probable cause to bring charges. *L.M. v. Graham*, No. 1:23-cv-01574, 2024 U.S. Dist. LEXIS 74197, at *16–18 (E.D. Va. Apr. 23, 2024). The intake officer may find "probable cause for the issuance of the petition," Va. Code § 16.1-260(B), or "if the intake officer believes that probable cause does not exist … [the intake officer]

may refuse to authorize the filing of a petition." *Id.* § 16.1-260(C). Because the intake officer makes an independent probable cause determination under the statutory scheme, the intake officer is an "intervening superseding cause[] that break[s] the causal chain." *Graham*, 2024 U.S. Dist. LEXIS 74197, at *17 (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (internal quotation marks omitted)).

In this case, an intake officer found probable cause. SUF ¶ 34. The intake officer did so on the basis of Trooper Wyatt's affidavit *and* the information Trooper Wyatt provided verbally to the intake officer. SUF ¶ 32. In light of the intake officer's independent probable cause determination, Plaintiff can only establish causation if he can demonstrate that Trooper Wyatt materially lied to or misled the intake officer, failed to disclose material exculpatory evidence, or unduly pressured the intake officer to issue the petitions. *Evans*, 703 F.3d at 647–48 (citations omitted). Stated differently, "[a]n independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant." *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988).

Where a § 1983 Plaintiff asserts that an officer's affidavit was tainted, the *Franks* analysis applies. *Evans*, 703 F.3d at 649–50 (citation omitted) ("*Franks v. Delaware*, 438 U.S. 154 (1978), guides our analysis as to whether asserted material false statements and omissions in the … supporting affidavits … state a constitutional claim."). Thus, to establish causation on his malicious prosecution claims, Plaintiff "must show (1) that [Trooper Wyatt] made false or misleading statements in the affidavit; (2) that the statements were made deliberately or with reckless disregard for the truth; and (3) that the statements were material to a demonstration of probable cause such that, when they are set aside, the remaining content was insufficient to establish probable cause." *Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025).

"Reckless disregard" can be established by evidence that an officer "acted with a high degree of awareness of a statement's probable falsity, that is, when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025) (cleaned up). "[I]nnocent or even negligent mistakes in an affidavit provide *no basis for a constitutional violation*." *Id.* (emphasis added) (citation omitted).

"When relying on an omission [for the "false or misleading statement" prong], rather than on a false affirmative statement, [Plaintiff's] burden increases yet more." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008); *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990). An affidavit "cannot be expected to include … every piece of information gathered in the course of an investigation. [Thus,] the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information." *Tate*, 524 F.4th at 455 (cleaned up). Because mere intentional omissions do not satisfy *Franks*, "the omission must be designed to mislead or must be made in reckless disregard of whether [it] would mislead." *Id.* (cleaned up).

Discovery has confirmed that Trooper Wyatt did not intentionally or recklessly taint the intake officer's probable cause determination. The evidence adduced in discovery shows that Plaintiff's allegations concerning misrepresentations and omissions[5] in Trooper Wyatt's affidavit are either false, incorrect, or immaterial to the probable cause determination—and fail to establish

---

[5] *See* Compl. ¶¶ 33–37. Trooper Wyatt propounded an interrogatory asking Plaintiff to state in detail all facts in support of his contention that Trooper Wyatt's "affidavit has many material misrepresentations and omissions." *Id.* ¶ 33. Plaintiff's answered by copying and pasting the text of paragraphs 33 to 37 of his Complaint nearly word-for-word.

a genuine dispute of material fact regarding whether Trooper Wyatt intentionally or recklessly included a material false statement or made a material omission in his affidavit.

First, Plaintiff alleges that the "most notabl[e]" misrepresentation is that Trooper Wyatt's affidavit stated that Trooper Wyatt could "conclusively identify" Plaintiff as the suspect. But neither the term "conclusively," nor any variant of it, appears in Trooper Wyatt's affidavit. Trooper Wyatt merely stated that he "identified [Plaintiff] as the same person who was driving the vehicle and who took off on foot." SUF ¶ 33. Trooper Wyatt's description of his positive identification was proper. *See supra* Argument, Section I (identifying facts relied on by Trooper Wyatt to identify the suspect).  "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971).

Second, Plaintiff alleges that Trooper Wyatt's failure to state in his affidavit that the suspect was wearing a ski mask was "telling[]" given that was something the Trooper said over the radio when he first called in the incident, which was still in progress. Trooper Wyatt clarified in his deposition that this was because the ski mask—which may actually have been a durag—was on the suspect's head and not covering his face, and therefore not obscuring his view. Wyatt Dep. 39:10–40:4. While Plaintiff states that the suspect was wearing a mask that covered all but the suspect's eyes and nose, Ex. 2, Logan-Patterson Dep., 30:10–22, this discrepancy in Trooper Wyatt's and Plaintiff's memory does not amount to a material omission under the heightened standard Plaintiff must meet. *Tate*, 524 F.3d at 454 (enhanced burden under *Franks* for proving omissions versus false affirmative statements). At most, it was an innocent or negligent mistake that cannot form the basis for a constitutional violation. *Jackson*, 128 F.4th at 534.. A complete view of Plaintiff's face was unnecessary for the probable cause determination, as a number of other factors established probable cause, including Trooper Wyatt observing the suspect run up to the

21

door of Plaintiff's residence, disappear therein, before appearing shirtless and panting for breath consistent with running.

Third, Plaintiff accuses Trooper Wyatt of an "outright lie" in stating that Plaintiff "jogged back inside the house." Compl. ¶ 35. Yet Trooper Wyatt's dash cam shows Plaintiff expressly said he ran into his house upon seeing the suspect, and that it was a "jog at first." SUF ¶ 27.

Fourth, Plaintiff alleges that Trooper Wyatt omitted from his affidavit that "other officers at the scene disagreed with Wyatt's determination of [Plaintiff]'s guilt and kept telling him to let [Plaintiff] go"; "left out the K-9 units and aviation searching for the suspect long after [Plaintiff] had been forced into Trooper Wyatt's backseat"; and that Trooper Wyatt failed to mention a second gun that was recovered from the stolen Charger. Yet, the other troopers have confirmed that the first two allegations are simply not true.[6] In addition, they have clarified that the second gun recovered from the scene was not brought into evidence because it was determined to have been possessed by one of the Charger's passengers. SUF ¶ 25.

If that weren't enough to reveal the fatal flaws in Plaintiff's allegations, there is more. Plaintiff alleges that Trooper Wyatt's statement that he saw the suspect flee into Plaintiff's home and monitored it afterward was false. Plaintiff claims the Ring camera footage shows Trooper Wyatt was too far away to see Plaintiff's home and that Trooper Wyatt's dash cam shows him returning to his car before encountering Ms. Patterson at the back door.

The Ring footage Plaintiff describes, however, proves nothing. Plaintiff is referencing Trooper Wyatt's ongoing foot pursuit of the suspect down Commerce Road (occurring from 1:15

---

[6] SUF ¶ 29 & n.3 (no other troopers disagreed with Wyatt's determination of guilt or told Wyatt to release Plaintiff); Ex. 12, Layton Decl. ¶ 14 (Trooper Layton describing his coordination with air units after Plaintiff was in custody and shortly thereafter breaking down the perimeter, including securing K9 scar in his vehicle).

to 1:40 in the video), long before Trooper Wyatt ultimately pursued the suspect to the Patterson home and began monitoring it. In other words, the footage Plaintiff relies on does not shed light on Trooper Wyatt's ability to have seen the suspect flee into the home and monitor it.

And Plaintiff's assertion that Trooper Wyatt came back to his vehicle during the time that Trooper Wyatt said he was monitoring the Patterson home—based on his claim that Trooper Wyatt's dash cam shows him returning to his vehicle during this period—is patently false. From the time Trooper Wyatt regained a visual on the suspect at the Charger and observed him remove a bag from the trunk—giving chase again—to the time Wyatt encountered Ms. Patterson at her back door, Trooper Wyatt never appears in his vehicle's dash cam. SUF ¶ 15 & n.2.[7]

Plaintiff's claims of misrepresentations and omissions include only two other allegations, each concerning purported distinctions between Plaintiff and the suspect that were not included in Trooper Wyatt's affidavit.[8]

First, Plaintiff alleges that the Ring camera footage shows the suspect wearing a gray hoodie, yet Trooper Wyatt collected Plaintiff's black hoodie. Compl. ¶ 34; Ex. 21, Pl.'s Second Supp. Responses to Def. Wyatt's Interrogatories at 20. Thus, Plaintiff seems to be alleging that it

---

[7] Plaintiff also casts a 10-minute discrepancy between the time period Trooper Wyatt estimated he was monitoring Plaintiff's residence in his affidavit (15 minutes) versus the time period he estimated in a summary prepared for the Commonwealth's Attorney (5 minutes) as "maliciously … alter[ing] his timeline." Compl. ¶ 41; *compare* Ex. 1, Wyatt Aff., *with* Ex. 5, Wyatt Statement, VSP 000063. This discrepancy is not material, particularly where it is being cited to demonstrate Plaintiff's false assertion that Trooper Wyatt could not have been monitoring the residence the entire time because Trooper Wyatt's dash cam shows he returned to his vehicle.

[8] Plaintiff also asserts that Trooper Wyatt added a "new misrepresentation" by including in a June 18, 2024, Statement to Internal Affairs that the three passengers stated Plaintiff "look[ed] just like the su[bj]ect but [wa]s not him." Compl. ¶ 40; VSP 000097. Even if this was a misrepresentation— and it is not—it is irrelevant, because it was not included in Trooper Wyatt's affidavit. And if construed as an omission from Trooper Wyatt's affidavit, it is nothing more than an imperfect reference to the passenger's statement that Plaintiff was of "similar build" to the suspect. *See* SUF ¶ 23.

was an omission for Trooper Wyatt not to include in his affidavit a supposed difference in the clothing worn by the suspect and the clothing he ultimately collected.

This claim fails in the first instance because it relies on Ring camera footage which Trooper Wyatt did not possess, and so could not consider, before submitting his affidavit. While Trooper Wyatt searched the area for home security cameras, he didn't find any, which is understandable given the darkness of that December evening. Moreover, the factual predicate for Plaintiff's claim concerning discrepancies in clothing is off base: while Plaintiff implies that Trooper Wyatt collected Plaintiff's black hoodie as evidence of what the suspect was wearing, Trooper Wyatt collected the hoodie for another purpose: to attempt to retrieve Plaintiff's DNA. Ex. 10, Wyatt Decl. ¶ 22. This makes sense given that Plaintiff had ample time to change clothes after running into his home and came to the door shirtless. *See* SUF ¶¶ 13–21.

Plaintiff's final claim points to a supposed height discrepancy between himself and the suspect: According to Plaintiff, he stands six-foot-four while "the suspect was shorter to average height." Compl. ¶ 34; Ex. 21, Pl.'s Second Supp. Responses to Def. Wyatt's Interrogatories at 20–21. At his deposition, Plaintiff said the suspect was "[p]robably like your average male height," his best estimate being five-foot-eight, Ex. 2, Logan-Patterson Dep. 31:1–15, and Plaintiff's mother could only offer that the suspect was "[f]ive feet something," because "[h]e was way shorter than my son, and my son is six feet." Ex. 3, Patterson Dep. 39:14–16. Trooper Wyatt, in contrast, testified that the suspect was a "taller gentleman." Ex. 6, Wyatt Dep. 43:19–22. While Plaintiff now disputes Trooper Wyatt's assessment of the suspect's height, all observations at the time were made of a rapidly-fleeing suspect—not, by contrast, of a person standing still and upright—and Trooper Wyatt had more opportunities to observe the suspect, given the length of the chase. Moreover, the passengers on scene acknowledged that the suspect had a "similar build" to

24

that of Plaintiff. Viewed alongside all of the other factors supporting probable cause, had Trooper Wyatt included a description of the suspect's height in his affidavit, such a description still would not have defeated probable cause. The Fourth Circuit has held that discrepancies in height, weight, and eye and hair color are insufficient to defeat probable cause. *Thompson*, 753 F.2d at 365. This is particularly so given that Plaintiff has asserted this was an omission. *Tate*, 524 F.3d at 454 (enhanced burden under *Franks* for proving omissions versus false affirmative statements).

In any event, "[a]ffiants are not required to include every piece of exculpatory information in affidavits." *Chalmers*, 703 F.3d at 651.  In point of fact, Trooper Wyatt's omission of *inculpatory* evidence from his affidavit which would have bolstered probable cause, such as the police canine tracking to the Plaintiff's front door, and Wyatt's observation of the Plaintiff's shortness of breath when he came to the back door, "makes it even less likely that any mistakes were intentional or reflected reckless disregard for the truth." *United States v. Pettis*, No. 15-CR-0233 (PJS/FLN), 2016 U.S. Dist. LEXIS 48683, at *2 (D. Minn. Apr. 11, 2016) (rejecting defendant's request for a *Franks* hearing where officer did not include evidence "that a police dog had tracked a scent from the abandoned vehicle to the squad car in which Pettis was sitting").

None of the "facts" Plaintiff asserts were misrepresented or omitted are material. Even if they were deemed material, there is no evidence that Trooper Wyatt "acted with a high degree of awareness of a statement's probable falsity" in stating in the affidavit that he identified Plaintiff as the suspect. *Jackson* 128 F.4th at 534. Trooper Wyatt at all points expressed his sincere belief that he had identified Plaintiff as the suspect based on the evidence available to him. The Supreme Court has recognized that arrest warrants "are issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." *Illinois v. Gates*, 462 U.S. 213, 235–36 (1983). To the extent Trooper Wyatt

25

erred by failing to include certain facts, such errors were neither reckless nor intentional. Without evidence to demonstrate otherwise, Plaintiff's claims fail.

Because the intake officer made an independent probable cause determination consistent with Virginia's statutory scheme and broke the causal chain required for Plaintiff's malicious prosecution claims, and Plaintiff cannot demonstrate that Trooper Wyatt somehow tainted that determination, Plaintiff's malicious prosecution claims must be dismissed.

### III. Because Plaintiff cannot show that Trooper Wyatt violated "clearly established law," Trooper Wyatt is entitled to qualified immunity.

The doctrine of qualified immunity balances the conflicting interests in providing an avenue for the vindication of constitutional rights against the "substantial social costs" that "damages against government officials can entail …  including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). Consequently, Supreme Court "cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.*

Trooper Wyatt is "entitled to qualified immunity under § 1983 unless (1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was 'clearly established at the time.'" *Wesby*, 583 U.S. at 62–63 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 63 (quoting *Malley v. Briggs*, 475 U. S. 335, 341 (1986)). Courts "should … exercise their sound discretion in deciding which of the two prongs of the qualified

immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

For the reasons stated above, Trooper Wyatt had reasonable suspicion to detain and probable cause to arrest Plaintiff and did not make intentionally or recklessly false material statements or omissions. Because Trooper Wyatt did not violate Plaintiff's federal constitutional rights, Plaintiff cannot satisfy the first prong of the qualified immunity analysis, and this Court should find Trooper Wyatt is entitled to qualified immunity.

To the extent the Court reaches the second prong—or decides in its discretion to address the second prong first—"'[c]learly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (emphasis added) (cleaned up). Critically, the "'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him," which "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix* v. *Luna*, 577 U. S. 7, 13 (2015) (*per curiam*)). Moreover, the standard requires that the "rule must be "settled law," which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (cleaned up).

The Supreme Court has "stressed that the specificity of the rule" establishing the unlawfulness of an officer's conduct "is especially important in the Fourth Amendment context." *Id.* at 64 (cleaned up). Accordingly, a Plaintiff seeking to defeat an officer's claim of qualified immunity must "identify a case where an officer acting under similar circumstances … was held to have violated the Fourth Amendment." *Id.* (cleaned up).

Under the facts at issue in this case, any reasonable official would have believed he had reasonable suspicion and probable cause to detain and seek the filing of charges against Plaintiff.

27

Such an analysis begins by "defining the circumstances with which [Trooper Wyatt] was confronted." *Anderson*, 483 U.S. at 640. As discussed, *supra*, Argument Section I, the totality of the undisputed circumstances Trooper Wyatt confronted included, but were not limited to: (1) the car chase led to Plaintiff's neighborhood; (2) the suspect ran from the vehicle with Trooper Wyatt in close pursuit, at times within 15 feet of the suspect; (3) the suspect ran toward Plaintiff's residence; (4) the suspect and Trooper Wyatt exchanged words during the chase; (5) the suspect ran up to the threshold of the front door of Plaintiff's residence and disappeared therein; (6) no one else entered or left the residence before Plaintiff's mother and Plaintiff appeared; (7) a police canine tracked to Plaintiff's front door; (8) Plaintiff's mother emerged and informed Trooper Wyatt that Plaintiff had recently arrived; (9) Plaintiff appeared shirtless and out of breath (even though it was December); (10) Plaintiff offered a suspicious story inconsistent with being out of breath—that he was washing dishes; (11) both Plaintiff and his mother informed Trooper Wyatt that Plaintiff had run into the house (albeit, allegedly after seeing the police chase someone else); (12) Plaintiff and his mother told troopers Plaintiff ran, but his mother inconsistently stated that he couldn't run due to bad knees; (13) Plaintiff was 17 which is consistent with Trooper Wyatt's experience that passengers of stolen cars enlist a juvenile to drive; (14) when asked about the identity of the driver, the passengers asserted that they got into a car with someone whose real name they did not know nicknamed "Zay", (15) one of the passengers stated Plaintiff was of "similar build" to the suspect, (16) Trooper Wyatt identified Plaintiff from seeing his face during the chase,[9] (17) Trooper Wyatt observed Plaintiff to be similar in build and height to the suspect (as outlined above, discrepancies from others on height and build do not negate probable cause). Even several of these factors taken

---

[9] Although Plaintiff claims he saw the suspect wearing a mask covering part of his face—that does not create a genuine dispute of fact as there is no evidence that it was covering all or part of the suspect's face for the entire chase.

together would support a finding of probable cause in this matter, and together they are overwhelming.

At bottom, not only do the many factors above support probable cause to detain and seek charges against Plaintiff, they also firmly establish that Trooper Wyatt *reasonably believed* he had probable cause, even if mistaken. "We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Id.* at 641; *see also Wesby*, 538 U.S. at 65 (cleaned up) ("Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified immunity because they reasonably but mistakenly conclude[d] that probable cause [wa]s present."). Here, taken together, the above facts strongly support the conclusion that, if Trooper Wyatt lacked probable cause to detain and seek charges against Plaintiff, his mistake was an objectively reasonable one and so did not violate "clearly established" law.

Plaintiff will likely point to various alleged exculpatory factors that he claims should have swayed Trooper Wyatt toward a suspect other than Plaintiff. Those are red herrings and not material to the Court's considerations: "[O]nce an officer has probable cause to arrest a suspect, the officer need not investigate ... claims of innocence prior to making the arrest." *De Michele v. City of N.Y.*, 2012 U.S. Dist. LEXIS 136460, at *29 (S.D.N.Y. Sep. 24, 2012) (cleaned up).

Further, at the time Trooper Wyatt submitted his affidavit to the intake officer, the law likewise did not "clearly establish" that every reasonable officer would have known that affidavit to be unlawful. Affidavits, which sometimes lack precision, "must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have

29

written if given the opportunity nor 'judged as an entry in an essay contest.'" *United States v. Moody*, 931 F.3d 366, 372 (4th Cir. 2019) (quoting *United States v. Harris*, 403 U.S. 573, 579 (1971)). "Mere imprecision does not, by itself, show falsity." *Id.*

While Plaintiff asks this Court to find that Trooper Wyatt should have included every conceivable piece of exculpatory evidence in his affidavit, that is not what the law requires. *Chalmers*, 703 F.3d at 651; *Simmons*, 47 F.3d at 1384 (affiant's omission of facts suggesting defendant may not have been the correct suspect "was not an attempt to mislead the magistrate"); *Colkley*, 899 F.2d at 301 (affiant's omission of six eyewitnesses' failure to identify defendant in photospread did not satisfy *Franks* without requisite intent to mislead). As noted above, the fact that Trooper Wyatt's did not include certain *inculpatory* information in his affidavit further supports his lack of intent to mislead. *Pettis*, 2016 U.S. Dist. LEXIS 48683, at *2. Far from being an affidavit that every officer would know was unlawful, Trooper Wyatt's affidavit represents sufficient, while perhaps imprecise, recitation of the facts demonstrating probable cause. "Given the lack of precision in the statement at issue, we cannot reasonably infer that [the affiant] acted with intent to mislead or with reckless disregard of whether the statements would mislead." *Moody*, 931 F.3d at 372 (citations omitted).

Trooper Wyatt did not violate clearly established law in detaining Plaintiff or in seeking the issuance of charges against him, and Trooper Wyatt is entitled to qualified immunity.

## **CONCLUSION**

Consistent with the reasons stated above, the Court should grant Trooper Wyatt's motion for summary judgment.

Dated: May 9, 2025

Respectfully submitted,

**TRAVIS SCOTT WYATT**

By: */s/ Stanley W. Hammer*

Jason S. Miyares
*Attorney General of Virginia*

Thomas J. Sanford
*Deputy Attorney General*

Jacqueline C. Hedblom
*Trial Section Chief/*
*Senior Assistant Attorney General*

Stanley W. Hammer (VSB No. 82181)*
R. Cooper Vaughan (VSB No. 92580)*
Assistant Attorneys General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 200-4216
Facsimile: (804) 371-2087
shammer@oag.state.va.us
cvaughan@oag.state.va.us
*Counsel of Record for Travis Scott Wyatt*

## <u>CERTIFICATE</u>

I hereby certify that on May 9, 2025, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system.


/s/ Stanley W. Hammer
Stanley W. Hammer
Assistant Attorney General
*Counsel for Defendant Travis Scott Wyatt*