# Exhibit 6

Deposition of Travis Scott Wyatt: Transcript

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    Richmond Division

 4

 5   _____

 6   ONTARIO LOGAN-PATTERSON,

 7                    Plaintiff,

 8   v.                          Case No. 3:24-cv-526

 9   TRAVIS SCOTT WYATT,

10                    Defendant.
     _____

11

12

13
                  DEPOSITION OF TRAVIS SCOTT WYATT
14

15

16

17                    February 18, 2025

18                    Richmond, Virginia

19

20

21

22             HALASZ REPORTING & VIDEO

23          1011 E. Main Street, Suite 100
                 Richmond, Virginia 23219
24       www.HalaszReporting.com (804)708-0025
         Reported by:  Lori McCoin Jones, RPR, CCR
25
```

1        UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF VIRGINIA

3            Richmond Division

4

5    _____

6    ONTARIO LOGAN-PATTERSON,

7               Plaintiff,

8    v.                          Case No. 3:24-cv-526

9    TRAVIS SCOTT WYATT,

10              Defendant.
     _____

11

12

13        DEPOSITION OF TRAVIS SCOTT WYATT

14

15

16

17            February 18, 2025

18            Richmond, Virginia

19

20

21

22         HALASZ REPORTING & VIDEO

23       1011 E. Main Street, Suite 100
              Richmond, Virginia 23219
24      www.HalaszReporting.com (804)708-0025
         Reported by:  Lori McCoin Jones, RPR, CCR

25

2

1          Deposition of TRAVIS SCOTT WYATT, taken by and

2    before Lori McCoin Jones, RPR, CCR, Notary Public in and

3    for the Commonwealth of Virginia, taken Pursuant to Notice

4    to Take Deposition, and the Federal Rules of Civil

5    Procedure; commencing at 9:22 a.m., February 18, 2025, at

6    the Office of the Attorney General, 202 North 9th Street,

7    Richmond, Virginia  23219.

8

9    Appearances:

10

         THE KRUDYS LAW FIRM
11       MARK J. KRUDYS, ESQ.
         attorney, of counsel for the plaintiff
12       919 East Main Street, Suite 2020
         Richmond, Virginia  23219
13       Mkrudys@krudys.com

14

         OFFICE OF THE ATTORNEY GENERAL
15       STANLEY W. HAMMER, ESQ.
         R. COOPER VAUGHAN, ESQ.
16       attorney, of counsel for the defendant
         202 North 9th Street
17       Richmond, Virginia  23219
         Shammer@oag.state.va.us
18       Cvaughan@oag.state.va.us

19

20

21

22

23

24

25

```
 1                        I N D E X

 2    Deponent:              Examination by:              Page:

 3    Travis Scott Wyatt    Mr. Krudys                       5

 4

 5

 6

 7

 8                      E X H I B I T S

 9    Exhibit No.            Description:                 Page:

10    2      Defendant Travis Scott Wyatt's Answer and
             Responses to Plaintiff's First
11           Interrogatories and Requests for Production
             of Documents                                 172
12
      3      VSP 000190 through VSP 000200                 172
13
      5      VSP 000202 through VSP 000203                 172
14
      6      VSP 000204 through VSP 000211                 172
15
      7      VSP 000212                                    172
16
      11     VSP 000012 through VSP 000013                 172
17
      12     VSP 000014 through VSP 000015                 172
18
      13     VSP 000016 through VSP 000017                 172
19
      14     VSP 000018 through VSP 000019                 172
20
      16     VSP 000096 through VSP 000097                 172
21
      18     VSP 000040                                    172
22
      23     VSP 000045                                    172
23
      27     VSP 000062 through VSP 000063                 172
24
      28     VSP 000105, VSP 000111 through VSP 000189     172
25
```

4

1                E X H I B I T S (cont'd)

2    Exhibit No.             Description:              Page:

3    29     VSP 000001                                 172

4    31     Google image                               172

5    32     Google Earth image dated 3/12/2024         172

6    33     Photos labeled A through F and H           172

7    34     OLP000001 through OLP000049                172

8    38     Illustrations of facial and head coverings  172

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1              TRAVIS SCOTT WYATT,
 2          was sworn and deposed as follows:
 3                  EXAMINATION
 4  BY MR. KRUDYS:
 5      Q.    Can you state your full name, please?
 6      A.    Travel Scott Wyatt.
 7      Q.    And how do you spell Wyatt?
 8      A.    W-Y-A-T-T.
 9      Q.    What -- what city or county do you live in?
10      A.    Chesterfield.
11            MR. KRUDYS:  All right.  Outside of the record,
12      can I get his specific address from you?
13            MR. HAMMER:  Sure.
14  BY MR. KRUDYS:
15      Q.    Have you ever had your deposition taken before?
16      A.    No.
17      Q.    But you have testified in court, correct?
18      A.    Yes.
19      Q.    How many times do you think you've testified in
20  court?  Dozens?  Hundreds of times?
21      A.    Yeah, probably.
22      Q.    Another way to do it, rather than total, how
23  frequently do you testify?  One day a week?  One day a
24  month?
25      A.    Regularly we have one court day a month.
```

6

```
 1        Q.    All right.  And is that for a full day or a
 2   portion of the day?
 3        A.    Usually a half day.
 4        Q.    Okay.  So I take you understand fully the
 5   obligations of the oath that you have just taken, correct?
 6        A.    Yes.
 7        Q.    Okay.  You are -- you understand that you are
 8   obligated to speak with absolute candor, correct?
 9        A.    Yes.
10        Q.    Without inquiring into any conversations with
11   your lawyers, what preparation did you undertake for this
12   deposition?
13        A.    I just had a meeting with my lawyers.
14        Q.    Did you look at any documents?
15        A.    Yes.
16        Q.    Do you recall which documents you looked at?
17        A.    Notes, all the documents that was in the binder
18   I was given.
19        Q.    Okay.  And the binder that you looked at was
20   just like this one here?
21        A.    Yes.
22        Q.    The one in front of you, the witness binder?
23        A.    Yes.
24        Q.    Did you see any documents in there that you had
25   not previously seen before?
```

```
 1        A.    No.
 2        Q.    Were there any facts contained in those
 3   documents that you were unaware of until you reviewed
 4   them?
 5        A.    No.
 6        Q.    Have you spoken with any other individuals in
 7   preparation for your deposition today other than your
 8   lawyers?
 9        A.    No.
10        Q.    Who is your current employer?
11        A.    Virginia State Police.
12        Q.    And for how many years have you worked for VSP?
13        A.    A little over four years.
14        Q.    Do you have any other previous law enforcement
15   experience?
16        A.    I just did corrections beforehand.
17        Q.    All right.  Were you employed by the Virginia
18   Department of Corrections?
19        A.    No.
20        Q.    Who were you employed by?
21        A.    Riverside Regional Jail.
22        Q.    I have brought cases against Riverside Regional
23   Jail in the past.  Have you -- are you familiar with me?
24   Have we ever met before?
25        A.    No.
```

1       Q.    Have you ever seen my name before in anything
2  you've done?
3       A.    In anything to do with me?
4       Q.    Yeah.
5       A.    No.
6       Q.    Okay.  In addition to working at Riverside
7  Regional Jail, did you work in any other corrections
8  experiences?
9       A.    No.
10      Q.    Do you have any military experience?
11      A.    No.
12      Q.    How old are you?
13      A.    Thirty-two.
14      Q.    All right.  So did you grow up in this area?
15      A.    I'll from a military family.
16      Q.    Same here.
17      A.    Yeah, I moved around.  I lived here the last
18  15, 20 years or so.
19      Q.    Yeah, I lived all over the place myself, so I'm
20  familiar.
21      A.    Yeah, me too.
22      Q.    Were both of your parents in the military or
23  just one?
24      A.    Just my dad.
25      Q.    Okay.  And where was the last -- is he retired

1    now?

2         A.    Yes.

3         Q.    Were you in high school when he retired?

4         A.    Yes.

5         Q.    Okay.  What grade were you when he retired?

6         A.    I don't know exact grade.

7         Q.    And where were you living at the time when he

8    retired?

9         A.    In Chesterfield.

10        Q.    What was his last duty station, Fort Lee?

11        A.    Fort Lee, yes.

12        Q.    So you went to high school in Chesterfield?

13        A.    Yes.

14        Q.    And do you have any college?

15        A.    No.

16        Q.    Okay.  So after you graduated from high

17   school -- what year did you graduate?

18        A.    2010.

19        Q.    Walk me through the employment that you had

20   upon graduation up through getting with the VSP.

21        A.    After high school, I worked for a heating and

22   air-conditioning company for about six years.

23        Q.    What is the name of that company?

24        A.    It was Weather Crafters.

25        Q.    Who is -- was there a supervisor that you

```
 1   worked with?

 2        A.    I guess the owner of the company, Mark

 3   Bartlett.

 4        Q.    Mark?

 5        A.    Mark, yeah.

 6        Q.    Bartlett.  Okay.

 7              Who is your -- and why did you leave that

 8   employment?

 9        A.    To -- I left that one to go to another heating

10   and air-conditioning company for a short --

11        Q.    Which one?

12        A.    I don't recall that name of that one.

13        Q.    Okay.  How long were you there?

14        A.    Probably just about a year.

15        Q.    But it's a local company, right?

16        A.    Yes.

17        Q.    Is it one of the big ones like Michael & Son?

18        A.    No.

19        Q.    All right.  Where did you work after that

20   second heating and air-conditioning?

21        A.    Then I went to Riverside.

22        Q.    And when did -- what year did you join

23   Riverside?

24        A.    2015.

25        Q.    Who was the head of Riverside at the time?  I'm
```

1    not sure if he or she had the name superintendent.

2        A.    I think it was Superintendent Jeffrey Newton.

3        Q.    Newton?

4        A.    Newton, yeah.

5        Q.    And who do you recall working for, the

6    sergeants and/or lieutenants that you worked with there?

7        A.    It was a Michael Ferguson was a sergeant there.

8    A Lieutenant Mells.

9        Q.    How do you spell that?

10       A.    M-E-L-L-S.

11       Q.    Anybody else that you can recall?

12       A.    Sergeant Bain.

13       Q.    How do you spell that?

14       A.    B-A-I-N.

15       Q.    Anyone else?

16       A.    Sergeant Edmonds.

17       Q.    Is that with an U or an O?

18       A.    I think it's M-O-U-N-D-S.

19       Q.    Did you work in a particular section at

20   Riverside Regional Jail?

21       A.    At some point, yes, but I kind of worked

22   through the whole jail at one point at the time.

23       Q.    And when did you join and when did you leave?

24   Joined in 2015, right?

25       A.    2015.

 1          Q.     And when did you leave?

 2          A.     2021.

 3          Q.     And that's to join Virginia State Police?

 4          A.     Yes.

 5          Q.     I take it you went to an academy when you

 6   joined?

 7          A.     Yes.

 8          Q.     You also probably went to the basic jailers

 9   course while you were at Riverside Regional Jail?

10          A.     Yes.

11          Q.     How long does each one of those two courses

12   last?

13          A.     The basic jailer, I believe, was eight weeks.

14          Q.     Uh-huh.

15          A.     And then the state police academy was around

16   six, seven months long.

17          Q.     Okay.  Have you been -- were you subject to any

18   discipline while you were at Riverside?

19          A.     No.

20          Q.     Okay.  So no demotion of rank, no letters of

21   seeking you to improve in a particular area?

22          A.     Not that I recall, no.

23          Q.     Okay.  Have you suffered any disciplinary

24   events while at VSP?

25          A.     Maybe a verbal counseling.

```
 1        Q.    How many times?

 2        A.    Maybe I would say twice.

 3        Q.    Was it the same person that provided the

 4   counseling or different?

 5        A.    Different.

 6        Q.    Who were the two different people?

 7        A.    Sergeant Phillips and Sergeant Smith.

 8        Q.    Which event was first?  Which counseling was

 9   first?

10        A.    Sergeant Smith.

11        Q.    All right.  And when was that counseling,

12   approximately, as best you can recall?

13        A.    Maybe two years ago.

14        Q.    And what did it concern?

15        A.    It was my -- I believe my microphone getting

16   cut off early during an interaction.

17              Thank you.

18        Q.    Sure.

19              And what caused the microphone to be cut off

20   early during an interaction?

21        A.    I cut it off.

22        Q.    Why did you do that?

23        A.    Because I was talking about personal business

24   with other law enforcement.

25        Q.    When you were saying talking about personal
```

```
 1    business, what exactly does that mean?
 2         A.    I wasn't talking about the incident that
 3    happened, I was talking about personal stuff going on.
 4         Q.    So what kind of personal stuff going on were
 5    you talking about?
 6         A.    I can't recall what exactly we were talking
 7    about.
 8         Q.    So what is the requirement, while an incident
 9    is ongoing, you cannot turn your mic off; is that correct?
10         A.    Yes.
11         Q.    And there was an incident at the time where you
12    wanted to have a conversation apart from the incident and
13    you turned your microphone off; is that right?
14         A.    Yes.
15         Q.    And for how long did you turn it off?
16         A.    I don't recall.
17         Q.    Okay.  Was it more than like a minute?
18         A.    Yes.
19         Q.    Okay.  What was the underlying incident, like
20    an arrest of a person?  What was going on?
21         A.    Yeah, it was arresting after a pursuit.
22         Q.    Okay.  What was the race of the person that you
23    were arresting after the pursuit?
24         A.    Black.
25         Q.    Was it a black male?
```

```
 1      A.    Yes.

 2      Q.    Approximate age?

 3      A.    I -- I don't recall that.

 4      Q.    Under 30?

 5      A.    I would say over 30.

 6      Q.    Okay.  Help me out.  So from time to time, like

 7   in the beginning of this deposition, we will go off the

 8   record from time to time.  You saw the court reporter

 9   raise her hands.

10      A.    Uh-huh.

11      Q.    Is it a common thing with the VSP as you've

12   seen it in your experience to turn off the mic from time

13   to time to have a personal interaction with another

14   trooper?

15      A.    Yes.

16      Q.    Okay.  So help me out, when you're turning off

17   the mic and having a personal interaction with another

18   trooper, are you -- with the Smith event, are you talking

19   about like a football game or are you talking about the

20   suspect and you just don't want it recorded?  What were

21   you talking about?

22      A.    No, it's about nothing to do with the incident.

23      Q.    Okay.

24      A.    It could be about like a football game maybe.

25      Q.    Okay.  And do you recall what this particular
```

 1    circumstance was about?

 2        A.    No.

 3        Q.    Well, if it's a common thing, why did you feel

 4    that you were disciplined if other troopers do that too?

 5        A.    Just because it's a common thing -- because I

 6    had interaction with the suspect afterwards and I just

 7    didn't cut my mic back on.

 8        Q.    Oh, I see.

 9        A.    Yeah.

10        Q.    So you turned it off and, thus, you didn't have

11    that other interaction captured on the audio; is that

12    right?

13        A.    Yes.

14        Q.    Okay.  And we're talking about audio, there is

15    no body cam?

16        A.    No, just audio, right.

17        Q.    Where exactly is the microphone on your

18    uniform?

19        A.    I usually keep it down on my belt.

20        Q.    Okay.  All right.  The incident, second

21    incident was a verbal counseling by Sergeant Phillips.

22    What did that concern?

23        A.    That was another pursuit.

24        Q.    Is the pursuit of -- what was the race of that

25    suspect?

1    A.    That was a black male also.  That was a pursuit

2  that I was helping another trooper on a traffic stop.

3    Q.    And what --

4    A.    And the -- and the suspect took off on the

5  other trooper.

6    Q.    I see.  What -- and had you turned off your

7  microphone on that one?  Was that what the problem was on

8  that one?

9    A.    No.

10    Q.    What happened there?

11    A.    That was just kind of like he just talked to me

12  about maybe I shouldn't have continued that pursuit

13  because of the high traffic volume of that day.

14    Q.    What speed did that pursuit get up to?

15    A.    Over a hundred miles an hour.

16    Q.    And how long did it last?

17    A.    Five, ten minutes.

18    Q.    Is it a circumstance different than this

19  particular case or is it the same case?

20    A.    Are you talking about the two counseling are

21  the same incidents?

22    Q.    No.  No.  The counseling by Phillips concerning

23  the high speed pursuit, was that on a day other than

24  December 11, 2023?

25    A.    Oh, yes.

```
 1        Q.    All right.  When did that occur?

 2        A.    If I remember correctly, it was around that --

 3   it was like a week or so after, around December.

 4        Q.    Okay.  So which one was before?  Was the

 5   Ontario Logan-Patterson pursuit first or was the pursuit

 6   that you received a verbal counseling first?  Which one

 7   occurred first?

 8        A.    I think the Ontario was first, I believe.

 9        Q.    Okay.  In the one, the matter that you got

10   counseled for by Phillips, was there a car crash?

11        A.    Yes, there was.

12        Q.    Okay.  Were there multiple crashes or -- in

13   other words, did the suspect's vehicle crash or did a

14   state trooper vehicle crash or multiple ones?

15        A.    The suspect vehicle crashed into two different

16   cars.

17        Q.    And were these -- I take it those cars had

18   occupants in them?

19        A.    Yes.  Well, the first one was.

20        Q.    And the occupant in the car, did they have

21   anything to do with the car chase?

22        A.    No.

23        Q.    Were they injured?

24        A.    No.

25        Q.    And do you recall the age of the person, the
```

1  occupants of the car?

2      A.    No.

3      Q.    Okay.  Where was the crash at?  What

4  intersection as you can recall?

5      A.    The first crash was on 95.

6      Q.    Okay.  Did the car flip over?

7      A.    No.

8      Q.    Okay.  So are there any other matters in which

9  you have been counseled or disciplined that you can recall

10 other than those two circumstances?

11     A.    No.

12     Q.    All right.  In the -- I'm going to just ask you

13 just a few questions about your community contacts.  I'm

14 not intending to probe, but this is just if we pick a

15 jury, we would like want to know if you are in any clubs

16 as jurors and the like.  So that's why I'm asking these

17 few questions.

18           Are you members of any organization?

19     A.    No.

20     Q.    Any groups?

21     A.    No.

22     Q.    Do you pay dues to any organization?

23     A.    No.

24     Q.    Like other than maybe Fraternal Order of

25 Police?

1    A.    No.

2    Q.    Okay.  Are you a member of any church?

3    A.    Yes, I go to church.

4    Q.    Which church do you go to?

5    A.    The Chapel.

6    Q.    Where is that located?

7    A.    Off of Old Hundred Road in Chester.  It's

8    Chesterfield, actually.

9    Q.    Okay.  Any no other leagues, softball league,

10   bowling league, nothing like that?

11   A.    No.

12   Q.    All right.  From time to time, I'm going --

13   I've already done it.  I mentioned Ontario.  That's going

14   to be my short-term way of talking about Ontario

15   Logan-Patterson.

16        MR. KRUDYS:  For the court reporter, that's

17        Ontario Logan, hyphen, Patterson.

18   BY MR. KRUDYS:

19   Q.    And I may from time to time talk about the

20   incident.  The incident I'm talking about is your December

21   11, 2023, police chase in and/or around Richmond,

22   Virginia, of a driver of a blue or dark-colored Dodge

23   Charger and subsequent search for the driver, as well as

24   the detention, seizure, arrest, questioning, and/or

25   charging of Ontario Logan-Patterson.  That's what I mean

1  by the incident.

2       A.     Okay.

3       Q.     Do you understand that?

4       A.     Yes.

5       Q.     And you do you understand the incident to have

6  occurred on December 11, 2023?  That's the chase part of

7  it.

8       A.     Yes.

9       Q.     Okay.  All right.  Tell me about the chase.

10  Like I want to take it up in segments.  I just want your

11  recall of the chase.  Later on I'm going to ask you about

12  your recall of from the crash on and then I'm finally

13  going to ask you about the investigation.  Tell me what

14  you recall about the chase.

15       A.     So what exactly do you want?  Just what exactly

16  do you want me to tell you about the chase?

17       Q.     So tell me everything you can recall about the

18  chase.  Something like I was patrolling at such-and-such

19  time of the day on December 11, 2023, when a fast moving

20  car passed.  That kind of thing.

21       A.     Okay.

22             MR. HAMMER:  Just a quick objection to the

23        form.  Just can you please clarify if you mean the

24        vehicle chase or the -- you just mean the vehicle

25        chase, correct?

1          MR. KRUDYS:  Yeah.

2  BY MR. KRUDYS:

3      Q.    Or we're going to -- I'm going to stop you when

4  you get done with the car crash.

5      A.    Okay.

6          MR. HAMMER:  Thank you.

7          MR. KRUDYS:  Okay.

8      A.    Okay.  I was on routine patrol.  It was around

9  five clock p.m. on December 11th and I was running a

10 stationary radar on southbound Chippenham at Hopkins Road

11 when a blue Dodge Charger came by my radar going 102 in a

12 posted 60 mile an hour zone.  I caught up to the vehicle.

13     Q.    I'm sorry.  What did you just say?

14     A.    I caught up to the vehicle.

15     Q.    Okay.

16     A.    I tried to initiate a stop at -- on one Route 1

17 just south of Dundas Road.  The vehicle took off.  He

18 immediately made a U-turn, went -- went up northbound

19 Route 1, in and out of traffic, high rate of speed, got on

20 Chippenham, went northbound 95.  Went all the way

21 northbound 95 all the way to Maury Street.  When he went

22 to Maury Street, he went east on Maury Street, then he

23 made a first left on East 3rd Street, and that was back

24 alley roads, and then he took a left on Everett Street,

25 and then we continued through Everett Street all the way

```
 1    until we hit Commerce, then took a left on Commerce and
 2    then that's where the vehicle wrecked.
 3         Q.    On December 11, 2023, were you assigned to a
 4    particular area?
 5         A.    Yes.
 6         Q.    What is the breadth of the area that you were
 7    assigned to?
 8         A.    Chesterfield County.
 9         Q.    The whole county?
10         A.    The whole county, yes.
11         Q.    How many other troopers were assigned to
12    Chesterfield County during the same time that you were?
13         A.    I don't recall the exact number.
14         Q.    Roughly.
15         A.    It's usually four of us, so about four of us at
16    least.
17         Q.    And are you assigned to a particular portion of
18    the county and the others to another portion or how does
19    that work?
20         A.    You're assigned the whole county, but every day
21    you get a -- you sometimes have a road assignment.
22         Q.    Did you have a road assignment that day?
23         A.    Yes, I did.
24         Q.    What was it?
25         A.    I'm not sure which road I was assigned to.
```

```
 1          Q.    And who was your supervisor that day?
 2                Who was your supervisor during the time of the
 3     chase?
 4          A.    If I recall, it was Sergeant Smith.
 5          Q.    Do you recall Sergeant Smith's first name?
 6          A.    Madison.
 7          Q.    Is Sergeant Madison Smith a woman?
 8          A.    No, a male.
 9          Q.    Male.  Okay.
10                Had you worked with Sergeant Madison Smith
11     before?
12          A.    Yes.
13          Q.    Any other supervisors assigned to you that day?
14          A.    No.
15          Q.    Did you have an understanding as to what a
16     supervisor, their role was in connection with a high speed
17     police chase?
18          A.    Yes.
19          Q.    What did you understand their role to be?
20          A.    They are to monitor the pursuit and to
21     determine -- they can terminate or continue the pursuit.
22          Q.    Were you ever told to terminate the pursuit?
23          A.    No.
24          Q.    Okay.  And had you been told, would you have
25     terminated the pursuit?
```

1    A.    Yes.

2    Q.    The pursuit was about eight to nine minutes; is

3  that correct?

4    A.    Roughly, yes.

5    Q.    Had you ever been in a pursuit that long?

6    A.    Yes.

7    Q.    How what's the longest pursuit that you've been

8  in?

9    A.    I don't recall a timeframe.

10    Q.    Okay.

11    A.    I mean I don't know.

12    Q.    This -- you've been in pursuits previously

13  where you're one of many troopers pursuing the car, right?

14    A.    Yes.

15    Q.    But here, you were the primary trooper pursuing

16  the car.  Had you ever been in an eight-to-nine-minute

17  pursuit where you were the primary trooper?

18    A.    Yes.

19    Q.    Okay.  How many others?

20    A.    There was one that I recall.

21    Q.    Did that one end in a car crash like this one?

22    A.    No.

23    Q.    Okay.  So -- just some -- so was December 11,

24  2023, you were involved in the car chase of the Dodge

25  Charger, correct?

1    A.    Yes.

2    Q.    The Dodge Charger passed you going at what you

3    judged to be an excessive speed, correct?

4    A.    Yes.

5    Q.    Almost twice that of the posted speed limit?

6    A.    Yes.

7    Q.    In response, you activated your lights and

8    siren and pursued the Charger?

9    A.    Yes.

10   Q.    The Charger did not slow and pull over,

11   correct?

12   A.    Yes.

13   Q.    In response, you began a high speed pursuit of

14   the Charger?

15   A.    Yes.

16   Q.    You radioed other troopers, including

17   supervisors, that you were in pursuit?

18   A.    Yes.

19   Q.    You provided over the radio a description of

20   the speed of the pursuit, correct?

21   A.    Yes.

22   Q.    The driver of the Charger drove, at times, in

23   excess of 100 miles per hour?

24   A.    Yes.

25   Q.    In excess of 110 at times?

1        A.      Yes.

2        Q.      In excess of 120 at times?

3        A.      Probably, yes.

4        Q.      Do you have a sense as to the top speed that

5    the Charger drove during the pursuit?

6        A.      Top speed was around 115, 120.

7        Q.      Had you ever previously been engaged in a

8    pursuit at that high rate of a speed?

9        A.      Yes.

10        Q.      Had you ever been engaged in a pursuit at that

11    high rate of a speed weaving in and out of traffic?

12        A.      Yes.

13        Q.      How many times?

14        A.      A handful, four or five times.

15        Q.      At times during the pursuit, you drove on the

16    shoulder?

17        A.      Yes.

18        Q.      So I saw the video, I'm sure you did, of the

19    pursuit from your dash cam.  When I'm driving my car and

20    if I see lights behind me, I'm just trained to move to the

21    right.  You were passing cars oftentimes on the right of

22    the vehicle, correct?

23        A.      Yes.

24        Q.      All right.  So if the driver would have done

25    like I do, moved to the right, that could have been -- put

1   them in a jeopardy of an accident, correct?

2       A.    Yes.

3       Q.    During the car chase, you sought to keep up

4   with the Charger, correct?

5       A.    I did what?  What was that again?

6       Q.    You sought to keep up with the Charger?

7       A.    Yes.

8       Q.    And the actions of the driver of the Charger

9   dictated your own driving actions, correct?

10      A.    Yes.

11      Q.    The driver of the Charger ran stop signs,

12  correct?

13      A.    Yes.

14      Q.    You did the same, correct?

15      A.    No, I did -- I went through a stop sign with

16  due regards and checked up before I went through the stop

17  sign.

18      Q.    I'm sorry?

19      A.    I went through the stop sign with due regards.

20      Q.    Okay.  So --

21      A.    And --

22      Q.    So you're saying you ran a stop sign, but you

23  were -- did so with due regard?

24      A.    Yes.

25      Q.    What does that mean?

1     A.    Made sure it was safe to do so.

2     Q.    Okay.  And how did you make sure it was safe to

3  do so?

4     A.    While approaching the stop sign, I can look

5  around and see if anybody else is coming or anything is in

6  the way.

7     Q.    Well, when you were going through stop signs,

8  how fast were you approximately going?

9     A.    I don't know exact speed.  I would slow down at

10  the stop sign just to slow down to check up.

11     Q.    Okay.  Well, when you're making that left

12  around Everett and near Commerce, you're driving on a road

13  that is surrounded by three- or four-story buildings,

14  correct?

15     A.    Yes.

16     Q.    So you can't always look around the corner as

17  you approach the stop sign, can you?

18          MR. HAMMER:  Objection to the form.

19     A.    Yeah, sometimes, but at that time, I could.

20     Q.    Okay.  At the time of the car chase, was the

21  driver of the Charger wanted for anything other than

22  speeding?

23     A.    At the time, the car chase was for reckless

24  driving.

25     Q.    And reckless driving is going 20 miles over the

1    posted speed limit, right?

2         A.    Yes, that's one of them.

3         Q.    All right.  So if a driver -- if the -- if 95

4    is marked at 60 miles an hour, then a person driving 80 is

5    considered to be reckless, correct?

6         A.    Yes.

7         Q.    Okay.  You understood that speeding is against

8    the law because it is a dangerous activity, correct?

9         A.    Yes.

10        Q.    So you have been in multiple accidents chasing

11   speeders is that right?

12             MR. HAMMER:  Objection to the form.

13   BY MR. KRUDYS:

14        Q.    I mean there has been a car crash multiple

15   times when you have been chasing a vehicle, correct?

16        A.    Yes.

17        Q.    And that's two times?

18        A.    Yes.

19        Q.    And in response to the Charger's speeding,

20   eight to nine troopers also responded, correct?

21        A.    Yes.

22        Q.    If there are four troopers assigned to

23   Chesterfield, does that mean that additional cars were

24   dispatched from neighboring counties or from the

25   headquarters building?

1      A.    Yes.

2      Q.    Okay.  Now, you told me that no supervisor ever

3   discontinued the speed chase.  Did any supervisor

4   authorize you to take part in a high speed, nine-minute

5   chase?

6      A.    Yes, it was a supervisor on listening.

7      Q.    Okay.  So your thought is that if Madison Smith

8   knows of such a chase, he has approved it, correct?

9      A.    Yes.

10      Q.    Okay.  Did you have authority yourself to

11   terminate the pursuit?

12      A.    Yes.

13      Q.    And have you ever determined to terminate a

14   pursuit because of the speed and danger to the public?

15      A.    Yes, I believe I have terminated before.

16      Q.    And because of the speed and danger to the

17   public?

18      A.    Yes.

19      Q.    All right.  How many times have you terminated

20   a pursuit because of that?

21      A.    I would say once.

22      Q.    And during that one time, was that before or

23   after the December 11th incident?

24      A.    Before.

25      Q.    All right.  And how fast were you going during

```
 1   that pursuit where you decided to discontinue it?

 2       A.    We were probably just going at 70, 80 miles an

 3   hour.

 4       Q.    All right.  If you decided to discontinue the

 5   pursuit previously when you doing 70 to 80, why did you

 6   decide to continue this one that got up to 120?

 7             MR. HAMMER:  Objection to the form.

 8       A.    At the time, it was not a dangerous situation

 9   to me yet.

10       Q.    Okay.  Has any officer, any supervisor reviewed

11   your dash cam video in terms of the appropriateness of the

12   pursuit?

13       A.    Yes.

14       Q.    And who is that?

15       A.    I believe Madison Smith and then the first

16   sergeant, Brown.

17       Q.    And what is First Sergeant Brown's first name?

18       A.    Joseph.

19       Q.    Did they provide any type of observations for

20   you, either stating that you did a good job or you could

21   have done something better, some criticism?  What were the

22   comments you got back from Madison Smith and Joe Brown?

23       A.    I got no comments back from them.

24       Q.    Okay.  Did they review the video with you or

25   just do it separately?
```

1      A.    They do it separately.

2      Q.    Okay.  Now during the car chase, you had

3  radioed the license plate of the Charger, correct?

4      A.    Yes.

5      Q.    All right.  And did -- during the car chase,

6  did the Charger go through any tolls or otherwise pass any

7  cameras to your knowledge?

8      A.    No.

9      Q.    During the car chase itself, did you see the

10  driver's face?

11      A.    No.

12      Q.    Not at all?

13      A.    Not during the car chase, no.

14      Q.    Okay.  So during the car chase, you were unable

15  to determine the gender of the driver, correct?

16      A.    Yes.

17      Q.    You were unable to determine the race of the

18  driver, correct?

19      A.    Yes.

20      Q.    Okay.  The chase ended in a crash, correct?

21      A.    Yes.

22      Q.    The crash was at the corner of Commerce and

23  Maury; is that right?

24      A.    Yes.

25      Q.    And specifically the Charger rammed into the

```
1    back of an SUV, correct?
2         A.    Yes.
3         Q.    When that occurred, did you check on the health
4    of the driver rammed by the Charger?
5         A.    No.
6         Q.    And why not?
7         A.    At that time, I pursued the suspect on foot.
8         Q.    All right.  But why did you not check on the
9    health of the driver that was just rammed by the Charger
10   that you were chasing?
11              MR. HAMMER:  Objection to the form.
12        A.    Because I was chasing the criminal and the
13   suspect in the Dodge Charger pursuit and another -- I had
14   other units coming.
15        Q.    Okay.  But why did you prioritize chasing the
16   suspect over the safety of the person who was rear-ended
17   by the Charger that you were chasing?
18              MR. HAMMER:  Objection to the form.
19        A.    Because I -- I just was chasing a criminal.  I
20   didn't know what the situation was with the criminal, so I
21   was just chasing him at the time, and I knew we had other
22   troopers coming that would check on the suspect -- the
23   other vehicle crashed.
24        Q.    Did you do any type of glance into the car of
25   the -- of the car that was rammed?  Like did you look in
```

1  to see if anybody was all right or whether or not they

2  were bleeding, anything like that?

3      A.    No.

4      Q.    Okay.  At the time of the crash, did you know

5  that there were three other persons in the Charger?

6      A.    No.

7      Q.    And you didn't check on the health or safety of

8  anybody in the Charger at the time of the crash, correct?

9      A.    Yes.

10      Q.    You did not?

11      A.    I did not.

12      Q.    Remember I told you I was going to ask for

13  three different detailed walk-throughs?  Could you now

14  tell me about -- let's go from the moment the crash

15  occurred up until you take Ontario into custody.  Can you

16  walk me through that, please?

17          MR. KRUDYS:  Before we do that, everybody good

18      with bathroom and all?  Are you good?

19          (Discussion off the record.)

20  BY MR. KRUDYS:

21      Q.    Okay.  Let's continue.

22      A.    The suspect got out of the Charger.  I got out

23  of my vehicle behind the Charger.  I was parked behind the

24  Charger.  I chased the suspect up Commerce.  We went

25  around some apartments or townhomes, went in front of the

```
1    townhomes, then we came between two sets of townhomes.
2    But before we came between the two sets of townhomes, when
3    we were running, I lost sight of him.  So I was walking,
4    actually walking between the townhomes.  And when I cam
5    back down, that's when the suspect came out from behind
6    the dumpster.  It was a dumpster and port-a-john right
7    there.  He came out --
8        Q.    A dumpster and what?
9        A.    A dumpster and port-a-john right beside each
10   other.  So he came out.
11       Q.    Oh, okay.
12             At what intersection was the dumpster and
13   port-a-john?
14       A.    That was like in the parking lot behind the
15   townhomes.
16       Q.    Okay.  All right.
17       A.    So he comes out of there, and that's when I see
18   him, and we're both walking.  And then he takes off again.
19   And then I end up just walking back to my car and I lost
20   sight of him right now.  And I walk to my car.  And that's
21   when the same suspect is in the trunk getting a bag out of
22   the trunk.  And I see him and another foot pursuit
23   happened down Commerce, around a fenced area right there.
24   You come around the fenced area and we both stop on each
25   side of the fence.  And so he's around -- he comes behind
```

1    the dumpster.  I see an object get thrown under the

2    dumpster from the bag.  And we both stop on each side of

3    the fence.  We take a glance right there.  And I walk

4    around the fence and the dumpster and he takes off between

5    the two townhomes again and then runs into the apartment.

6         Q.    How long did the -- how long was it from when

7    he alights, when he jumps from the car until he goes, as

8    you say, into the townhome?  How much time passes?

9         A.    I would say about around four or five minutes.

10        Q.    During that period of time, did you see any

11   other troopers or any other law enforcement on scene?

12        A.    No.

13        Q.    How many times did you lose sight of the

14   suspect during that four or five minutes?

15        A.    Two, two times.

16        Q.    And for how long?  The first time when you lost

17   sight of him, how long was that?

18        A.    Just within a few seconds.

19        Q.    All right.  And then the second time you lost

20   sight of him, how long was that?

21        A.    I'd say 15 to 20 seconds.

22        Q.    What is the closest you ever got to the suspect

23   during the chase?

24        A.    Within 15 feet.

25        Q.    We have this long table here.  Were you farther

1    than from one end of the table to the other?

2              MR. HAMMER:  Objection to the form.

3       A.    No, that was -- that was about as close as we

4    got.

5       Q.    All right.  How many times did you get that

6    close to the suspect?  More than once?

7       A.    Yes.

8       Q.    Okay.  How many times were you that close to

9    the suspect?

10      A.    There were a few times when we were actually

11   running, I was about that close.  And then when he was

12   walking away, a few times we got that close.

13      Q.    So let's put a number on it.  So you're saying

14   that you're within -- did you play football?

15      A.    No.

16      Q.    Okay.  Well, you know, like a first down, was

17   it approximately the distance of a first down?

18      A.    I don't know the exact distance.

19      Q.    Okay.  All right.  When -- you ran after the

20   driver, but there were times when you were walking; is

21   that right?

22      A.    Yes.

23      Q.    Did you ever notice that the driver seemed to

24   have any type of injury in their gait?

25      A.    I did not notice that.

```
1        Q.    Okay.  You didn't catch him.  Is that because
2   he was faster than you?
3              MR. HAMMER:  Objection to form.
4        A.    At times, yes.
5        Q.    Okay.  Did you ever gain distance on him?
6        A.    No.
7        Q.    Conversely, did he ever put distance between
8   the two of you?
9        A.    Yes.
10       Q.    Okay.  What was the closest you ever got to the
11  driver?
12             Well, let me do it this way.  When he alights
13  from the -- jumps from the car, he has a ski mask on,
14  correct?
15       A.    He doesn't have a ski mask on his face.  No, he
16  does not.
17       Q.    Didn't you, over the radio, say ski mask on?
18       A.    Yes, I did.
19       Q.    Why would you say ski mask on if he didn't have
20  a ski mask on?
21             MR. HAMMER:  Objection to form.
22       A.    Because at the time, I seen something on his
23  head and I didn't know if it was a ski mask, a durag, or
24  what it was on his head.
25       Q.    You didn't know if it was a ski mask or what?
```

```
1        A.    A durag.  I just seen something on his head.

2        Q.    What's a durag?

3        A.    A cloth thing that covers up your head that

4   people wear.

5        Q.    Okay.  What color was the ski mask?

6        A.    I don't know if it was a ski mask or not.

7        Q.    What color was this?

8        A.    It looked like it was black, what was on his

9   head.

10       Q.    You didn't say hat or ski cap, you said ski

11  mask?

12       A.    Yes.

13       Q.    Okay.  And you didn't just say ski mask, you

14  said ski mask on, correct?

15       A.    I don't recall if I said exactly like that.

16       Q.    Okay.  All right.  So you don't recall if you

17  said ski mask on or just said ski mask?

18       A.    Yes, I don't.

19       Q.    All right.  There is a bunch of exhibits that

20  you have in front of you.  Why don't you go to number 38.

21             MR. KRUDYS:  This a new one.  We'll get it to

22       you.

23             MR. HAMMER:  Is there one I can look at right

24       now?

25             MR. KRUDYS:  You can look at it with him.
```

```
 1              MR. HAMMER:  Okay.
 2    BY MR. KRUDYS:
 3        Q.    So Exhibit 38 shows a variety of different
 4    facial masks, ski masks, and the like.  Which one did you
 5    was -- is most like the one that you saw him wearing, the
 6    suspect wearing?
 7              MR. HAMMER:  Objection to the form.
 8        A.    He didn't actually have a ski mask on his face,
 9    so.
10        Q.    But you -- but you -- you say over the radio
11    contemporaneously ski mask on, but now you're telling me
12    that he did not have a ski mask on?
13        A.    Yes.
14              MR. HAMMER:  Objection to the form.
15        A.    I don't know if he had a ski mask on or a
16    durag.  I just know it was a black cap on his head or a
17    back cloth or something on his head.
18        Q.    All right.  Well, were you able to see his
19    features?
20        A.    Yes, I did see his face.
21        Q.    Okay.  The -- how would you describe his
22    eyebrows?
23              From the chase, were you able to see his
24    eyebrows?
25        A.    No, I wasn't really focused on his eyebrows.
```

1     Q.   Oh.  Were you able to see the size of his nose?

2     A.   No.

3     Q.   The size of his ears?

4     A.   No.

5     Q.   The nature of his face, whether or not it was

6  square or oval, rectangular?

7     A.   No.

8     Q.   Okay.  The ski mask, did you -- you said it

9  wasn't covering his face, but was it -- there is a

10  picture, for instance, of a gray ski cap that doesn't

11  cover the face.  Do you see that?

12     A.   Yes.

13     Q.   Was it a ski cap that wasn't pulled down or was

14  it like this facial mask that -- where the facial mask

15  wasn't pulled all the way down; do you recall?

16     A.   No, I don't recall.

17     Q.   Okay.

18     A.   It was nothing covering his face.

19     Q.   Nothing covering his face.

20         Was the ski mask ever discarded by the driver?

21     A.   I never found the ski mask or the mask.

22     Q.   Okay.  Well, did he ever take it off his head?

23     A.   During the foot pursuit?

24     Q.   Yeah.

25     A.   No.

```
 1        Q.    So you were never able to determine the length
 2   of the person's hair because they had a cover over their
 3   head the entire time; is that right?
 4        A.    Yes.
 5        Q.    Okay.  So you never -- you engaged in this foot
 6   pursuit, but neither you or any of the officers ever found
 7   a ski mask on scene, correct?
 8        A.    Correct.
 9        Q.    And you don't know where, if anywhere, the ski
10   mask was abandoned, correct?
11              MR. HAMMER:  Objection to the form.
12        A.    No, I do not.
13        Q.    You never found a ski mask in a dumpster or
14   under the dumpster, correct?
15        A.    Correct.
16        Q.    Had you ever seen the driver of the Dodge
17   Charger before?
18        A.    No.
19        Q.    Were you able to get a sense of the height of
20   the driver during the foot pursuit?
21        A.    Yes.  It was -- it was -- I don't know the
22   exact height, but a taller gentleman.
23        Q.    Did you provide that type of description over
24   the radio, a tall gentleman?
25        A.    No.
```

44

```
1        Q.    Okay.  According to you, during the foot chase,
2   the driver of the Charger spoke with you; is that right?
3        A.    Yes.
4        Q.    All right.  What exactly did he say to you?
5        A.    When -- there was one instance where he said
6   something to the effect of I'm not going to jail.
7        Q.    When he -- how far away from you was he when he
8   uttered those words?
9        A.    Approximately 15, 20 feet.
10       Q.    Okay.  Was he facing you or --
11       A.    Yes.
12       Q.    -- facing away from you?
13       A.    He was facing me.
14       Q.    So when you sat and interviewed Ontario in your
15  state police car, you never told him that he sounded like
16  the suspect, did you?
17            MR. HAMMER:  Objection to form.
18       A.    I don't think I did.  No.
19       Q.    Did you ever identify Ontario as the driver of
20  the Charger based in part on his voice?
21            MR. HAMMER:  Objection to the form.
22       A.    No.
23       Q.    The description of the driver of the Charger
24  was black male, Army pants, ski mask on, white shirt,
25  correct?
```

```
 1        A.    Yes.

 2        Q.    All right.  No description as to tall, short,

 3   correct?

 4        A.    Correct.

 5        Q.    No description as to stocky or skinny, correct?

 6        A.    Correct.

 7        Q.    Having been in law enforcement for so many

 8   years, I take it that on December 11, '23, you knew of the

 9   doctrine of hot pursuit?

10        A.    Yes.

11        Q.    Okay.  You understood that the principle allows

12   the police to pursue a fleeing suspect into private

13   property, correct?

14        A.    Yes.

15        Q.    Like a home without a warrant, correct?

16              MR. HAMMER:  Objection to the form.

17        A.    Correct.

18        Q.    It essentially means that when you're doing a

19   chase and there's -- and you're immediately following a

20   suspect, you can go right into a home after a suspect,

21   correct?

22              MR. HAMMER:  Objection to the form.

23   BY MR. KRUDYS:

24        Q.    That's your understanding?

25        A.    Correct.
```

1      Q.    You say that the suspect entered a home,

2   correct?

3      A.    Correct.

4      Q.    But you didn't follow him into the home, did

5   you?

6      A.    No.

7      Q.    How much of a gap was there from when he

8   entered the home and -- well, how far away were you when

9   you saw him enter the home?

10     A.    I'd say about 30, 40 feet.

11     Q.    So why didn't you follow him right in the house

12  after you were saying you saw him enter the home?

13     A.    Just for safety reasons.

14     Q.    Well, did you go up to the door and bang on the

15  door?

16     A.    No.

17     Q.    Did you go up to the door and seek to open the

18  door and just follow him in?

19     A.    No.

20     Q.    If you're speaking of safety reasons, did you

21  have your gun unholstered at that point that he enters the

22  home?

23     A.    No.

24     Q.    So why were you concerned -- why do you mention

25  safety if you didn't have your gun unholstered?

```
 1              MR. HAMMER:  Objection to the form.
 2       A.    Just -- just -- I didn't want to enter a house
 3   I didn't know by myself.
 4       Q.    But it's -- you're not like right on his toes,
 5   right on his back when he entered the home, correct?
 6   There's 30 to 40 feet between the two of you when he does
 7   that, correct?
 8       A.    Yes.
 9       Q.    And you're saying you never did run up to the
10   door and knock on it, correct?
11       A.    Correct.
12       Q.    You never ran up to the door and saw if it was
13   open?
14       A.    No.
15       Q.    When you say that you saw the suspect enter the
16   home, did he need keys to open the home?
17       A.    I'm not -- I didn't see that.
18       Q.    Well, do you know one way or another whether or
19   not he used keys to open the home?
20       A.    I don't know one way or another.
21       Q.    And you don't know whether or not he used keys
22   because you were too far away to see that; is that right?
23              MR. HAMMER:  Objection to the form.
24   BY MR. KRUDYS:
25       Q.    I'm trying to figure out why you don't know one
```

```
 1    way or the other.

 2         A.    Yeah, I -- I couldn't see that.

 3         Q.    Okay.  Did any -- did you actually see -- so

 4    this is the threshold of the door, this right here where

 5    you open the threshold.  Did you actually see him go

 6    through the threshold of the door?

 7         A.    No.

 8         Q.    What actually did you see, then, when he's

 9    entering the door if you don't see him go through the

10    threshold?

11         A.    I seen him come back into the entranceway and

12    there is only one door in that entranceway.

13         Q.    Okay.  All right.  All right.  Explain as best

14    you can from him -- this is the third part.  You've now

15    taken him into custody.  And walk me through taking him

16    into custody until releasing him that evening, what you

17    recall of that.

18         A.    So after he came out the house and I identified

19    him, he -- and it was a brief exchange between us.  Well,

20    first, the mom comes out and a brief exchange between me

21    and the mom.  Then he comes out, and that's when I

22    identify him.  And shortly after, he was just -- he

23    stepped on his back porch and he was detained.  And then

24    he was walked to the car.  Exchanges were done between

25    that time period.
```

49

```
1         Q.    I didn't hear what you were saying.
2         A.    Some exchanges were done between the time
3   period I walked him to the car and I placed him in my
4   front seat of my car.
5         Q.    Did you put him in handcuffs at any point?
6         A.    Yes.
7         Q.    When?
8         A.    When he came out on the back porch.
9         Q.    Were the handcuffs in front of him or behind
10  him?
11        A.    Behind him.
12        Q.    And you talked about exchanges on the way to
13  the car.  What happened when you placed him in the car?
14        A.    He sat in my front seat.  And then from there,
15  it was just a few -- you know, some exchanges between us
16  right there between everybody, and he was later released
17  to his mother.
18        Q.    Who made the decision to release him to his
19  mother?
20        A.    I did.
21        Q.    Why?
22        A.    Because he was a juvenile.
23        Q.    So is your -- is your -- did -- did any of the
24  other troopers have a role in determining whether or not
25  to release him?
```

```
 1        A.    No.

 2        Q.    Okay.  All right.  Had you never arrested a

 3   juvenile before?

 4        A.    No.

 5        Q.    Okay.  This is the first juvenile you've ever

 6   arrested?

 7        A.    Yes.

 8              MR. HAMMER:  Objection to form.

 9        Q.    Was any law enforcement organization other than

10   VSP involved in the car chase to your knowledge?

11        A.    Anyone other than VSP?

12        Q.    Yes.

13        A.    No.

14        Q.    How about in the search for the driver on

15   scene?

16        A.    No.

17        Q.    Were there any helicopters overhead?

18        A.    Yes.

19        Q.    And who were the -- were those VSP helicopters?

20        A.    Yes.

21        Q.    How many were there?

22        A.    Just one.

23        Q.    Did the helicopters remain over the area after

24   you put Ontario into your police cruiser?

25        A.    No.
```

```
1        Q.    How long did the helicopters remain on scene?

2        A.    They were only there a few minutes.

3        Q.    Where was -- you said that the suspect went

4    into a townhome.  Did the helicopters arrive before or

5    after that?

6        A.    I don't recall.

7        Q.    Do you know the names of any of the helicopter

8    pilots?

9        A.    No.

10       Q.    Was -- an investigation revealed that the -- is

11   it a blue or black Dodge Charger that was -- we're talking

12   about?

13       A.    A dark blue.

14       Q.    A dark blue.  Okay.

15             And an investigation revealed that it was

16   stolen, correct?

17       A.    Yes.

18       Q.    When on December 11 was it determined by --

19   that the Charger had been stolen; do you know?

20       A.    During right there on the incident.

21       Q.    Okay.  So during the car chase, it was not

22   determined at that time, correct?

23       A.    No.

24       Q.    The chase was initiated because of -- of

25   reckless driving, correct?
```

1       A.      Yes.

2       Q.      Who reported the vehicle as being stolen; do

3   you know?

4       A.      Stafford County.

5       Q.      Do you know when it was reported as stolen?

6       A.      No.

7       Q.      I'll tell you, it's September 30th on 2023.

8               Did you take -- here, let's look at Exhibit

9   Number 28, page 111.  So there's little numbers at the

10  bottom, and if you go to VSP and it's 000111.  If you look

11  toward the bottom, Trooper, it says date stolen, 8 -- I'm

12  sorry, 9/30/2023.

13      A.      9.

14      Q.      Is that -- are you learning that now, or in the

15  context of the investigation, did you learn that it was

16  stolen on 9/30?

17      A.      That was during the context of the

18  investigation.

19              That was during that time of the investigation

20  I learned that.

21      Q.      So while you're doing -- this is before you

22  filled out your affidavit, you had learned that the

23  vehicle was stolen on September 30, '23?

24      A.      Yes.  I learned it was stolen the day of the

25  incident.

1          I learned it was stolen the day of the

2    incident.

3          Q.    Okay.  On the day of the incident, you learned

4    that the vehicle had been stolen, but it was originally

5    stolen from -- in Fredericksburg on 9/30/23 is what this

6    document shows.

7          Do you see that?

8          A.    Yes, I see that.

9          Q.    When did you learn that the vehicle was

10   originally stolen on 9/30/23?

11         A.    When I -- so if I put that on the side means I

12   called the person who reported it stolen, I talked to

13   them, the owner of the dealership, and that's the day that

14   they told me they reported it stolen.

15         Q.    Okay.  And did they -- was there any type of

16   camera that captured the person stealing the car?

17         It's from a car lot that it was stolen from.

18   Did you know that?

19         A.    Yes.

20         Q.    All right.  So did you ask is there any footage

21   of the people stealing the car?

22         A.    Yes.

23         Q.    And what did they say?

24         A.    They said all they could see was a truck with

25   occupants -- I believe they said black male occupants got

1  out of the truck and take two Chargers.

2      Q.    And did you ask for a description of the two

3  black males?

4      A.    I believe the conversation was said that it was

5  pretty much that it was no -- they couldn't get a good

6  description of it because the cameras weren't good.

7      Q.    All right.  Was there any type of description

8  of the tag on the truck?

9      A.    No.

10      Q.    All right.  Did -- what was Ontario doing on

11  September 30, 2023, when the vehicle was stolen in

12  Fredericksburg?

13          MR. HAMMER:  Objection to the form.

14  BY MR. KRUDYS:

15      Q.    Do you know?

16      A.    I don't know what he was doing.

17      Q.    Do you know how, if at all, he could have

18  gotten up to Fredericksburg to steal the vehicle on

19  September 30, 2023?

20          MR. HAMMER:  Objection to the form.

21      A.    No, I do not know.

22      Q.    Was there any indication that Ontario ever

23  possessed a blue Dodge Charger in the days and months

24  preceding December 11, 2023?

25      A.    Ask that again.

```
 1        Q.    Was there ever any indication that Ontario ever

 2   possessed a blue Dodge Charger in the days and months

 3   preceding December 11, 2023?

 4             MR. HAMMER:  Objection to the form.

 5        A.    No.  No.  Beforehand, no, I don't know.

 6        Q.    All right.  So let me give you some examples,

 7   did any neighbor ever state that that car was parked in

 8   the neighborhood in the weeks or months prior to December

 9   11, 2023?

10             MR. HAMMER:  Objection to form.

11        A.    No.

12        Q.    Did you ever ask any of these neighbors if they

13   had ever seen the car before?

14             MR. HAMMER:  Objection to form.

15        A.    No.

16        Q.    You understood that Richmond Police oftentimes

17   electronically records license plates of cars, correct?

18        A.    Correct.

19        Q.    Did you check to see if there was any record of

20   the Dodge Charger ever being in Ontario's neighborhood

21   prior to the crash on December 11th at Maury Street and

22   Commerce?

23        A.    No.

24        Q.    Was there ever an effort to obtain evidence of

25   who actually stole the car?
```

```
 1              MR. HAMMER:  Objection to the form.
 2      A.    Just me calling the dealership.
 3      Q.    Okay.  And that was, what, a five-minute
 4  conversation?
 5      A.    Yeah.
 6      Q.    Okay.  The passengers said that they met the
 7  driver at a car show, correct?
 8      A.    Something to that effect, yes.
 9      Q.    Which car show?
10              MR. HAMMER:  Objection to form.
11      A.    They said it was a car club.
12      Q.    Okay.  Which car club?
13      A.    I'm not sure.
14      Q.    And where physically did they meet him that
15  day?
16              MR. HAMMER:  Objection to the form.
17              You can answer.
18      A.    I just recall it's -- it was a car club.
19      Q.    What does that mean?  Like I looked -- I did a
20  search of a car club and there is a gathering, for
21  instance, at Regency Mall on Saturdays mornings.  Is that
22  the car club you're referring?
23      A.    I don't know what car club they were at.
24      Q.    Why didn't you ask that question?
25      A.    That's just really not -- wasn't relevant at
```

```
 1    the time to me.
 2         Q.    Okay.  Well, these people in the car were with
 3    the driver of the car for over nine minutes, correct,
 4    seated right next to him, correct?
 5              I apologize.  I'm sorry.  I thought I turned
 6    this off.
 7              All right.  So these individuals that were in
 8    the car with the driver are saying that they were -- they
 9    met him prior to going in the car with him, correct?
10         A.    Yes.
11         Q.    Did you interview any of those individuals?
12         A.    Yes.
13         Q.    Okay.  And who did you interview?
14         A.    All -- all three of them.
15         Q.    Okay.  And so tell me about your interviews
16    with the three of them.  First off, what's the name of the
17    three people?
18         A.    I don't have the names for all of them.
19         Q.    Okay.  Where did this interview of the three
20    people take place?
21         A.    Right there on the side of the road on scene.
22         Q.    Okay.  Were they placed in handcuffs like
23    Ontario?
24         A.    No.
25         Q.    Why not?
```

1      A.    Because they were just passengers of the
2  vehicle.
3      Q.    Okay.  And so tell me about was there -- did
4  you ever ask them if there was any type of -- about their
5  relationship with the driver of the vehicle?
6      A.    No.
7      Q.    Has anyone ever been charged with stealing the
8  car?
9      A.    Has anybody been asked -- ask that again.
10      Q.    Yeah.
11            Has anyone, other than Ontario, ever been
12  charged with stealing the car?
13            MR. HAMMER:  Objection to the form.
14      A.    No.
15      Q.    I'm sorry?
16      A.    No.  No.
17      Q.    Ontario was charged with receiving stolen
18  property, right?
19      A.    Yes.
20      Q.    Was anybody else charged with that?
21      A.    No.
22      Q.    So after you got the car, after you released
23  Ontario after he was detained for weeks, nobody else has
24  been charged with this crime, correct?
25      A.    Correct.

59

 1      Q.    When Ontario turned himself into the police,

 2   subsequently he was fingerprinted, correct?

 3      A.    I'm not sure what happened then.

 4      Q.    Well, did you ever -- the fingerprints that

 5   were provided by his mom, did they ever show any type of

 6   prior criminal charges?

 7      A.    I do not have that with me.  I just have the

 8   fingerprint -- it was a fingerprint like paper.

 9      Q.    Right.  And didn't you turn that in and see if

10   there had been any previous criminal activity by Ontario?

11      A.    No.

12      Q.    So sitting here today, did you know that

13   Ontario had never been convicted of any crime, charged by

14   any crime until you -- you did so?

15            MR. HAMMER:  Objection to the form.

16      A.    Not -- at that time, no, I did not.

17      Q.    Why is that you inquire in other cases as to

18   whether or not a person has any prior criminal history?

19   Why do you do that?

20            You're trying to see if they have the

21   propensity of doing it again; isn't that why you do it?

22            MR. HAMMER:  Objection to the form.

23      A.    Sometimes.

24      Q.    Is there any other reason why you would do

25   that?

```
 1        A.    Not me, no.  I don't do that too often.
 2        Q.    All right.  With regard to Ontario, did the
 3   records reveal that Ontario had ever purchased a weapon?
 4        A.    Not to my knowledge.
 5        Q.    Did you check to see if Ontario had any records
 6   of weapon purchases by him?
 7        A.    No.
 8        Q.    Did you check to see -- you maintain databases
 9   that are available to you of gang activity, correct?
10        A.    I don't have that, no.
11        Q.    Well, don't -- don't -- haven't you, in the
12   past, run a person's name to see if they're affiliated
13   with any gang?
14        A.    Sometimes you run the name in data -- in VCIN
15   and it comes back, but that's all.  That's all I have.
16        Q.    Did you name -- when you said -- you're talking
17   about VCIN; is that what you mean?  VCIN?
18        A.    VCIN.
19        Q.    V-C-E-N?
20        A.    V-C-I-N.
21        Q.    What does that stand for?
22        A.    Virginia Criminal Institution Network,
23   something like that.
24        Q.    All right.  And did you run Ontario's
25   particulars, his identifiers through there?
```

```
 1        A.    Yes.

 2        Q.    And what did it come back?

 3        A.    It just comes back to who he is and his

 4   address.

 5        Q.    Right.  And no other criminal activity, gang

 6   activity of any type, right?

 7        A.    That does not come back on that.  That's on his

 8   criminal history and we don't run the criminal history on

 9   our computers.

10        Q.    Okay.  Did anybody ever run his criminal

11   history?

12        A.    Not to my -- unless it was CA or something like

13   that, but me, no.

14        Q.    Are you saying you do or do not have the

15   ability to run a criminal history of Ontario?

16        A.    We can run -- we can call -- our dispatch can

17   do that.

18        Q.    Did you ever do that with Ontario?

19        A.    No.

20        Q.    Why not?

21        A.    Because I didn't need to.

22        Q.    Why didn't you need to?

23        A.    There was just no reason for me to do that.

24   That's just not what we have to do.

25        Q.    Well, did you ever learn that your arrest and
```

```
 1    detention of Ontario was the first time in his 17 years

 2    that that had ever occurred?

 3               MR. HAMMER:  Objection to the form.

 4        A.    At the time of the incident, no.

 5        Q.    But his mom was telling you he had no criminal

 6    history, right?

 7        A.    I don't recall if she said that or not.

 8        Q.    Did he tell you?  Did Ontario tell you he had

 9    no criminal history?

10        A.    I don't recall that.

11        Q.    Was there ever a determination as to what

12    your -- you charged Ontario with receiving stolen property

13    and going on a joyride on December 11.  Did you ever come

14    up with a motivation for why he would do that, this good

15    student that had never been -- had a criminal history?

16               MR. HAMMER:  Objection to the form.

17        A.    No, I don't know why he would do that.

18        Q.    Did he have any violations at the detention

19    center that you were aware of?

20        A.    I'm not aware of that.

21        Q.    Any violations of his home confinement that

22    you're aware of?

23               MR. HAMMER:  Objection to the form.

24        A.    I'm not aware of that.

25        Q.    You did obtain Ontario's Social Security
```

1    number, correct?

2         A.    Yes.

3         Q.    And he told you that he did not have a driver's

4    license correct?

5         A.    Yes.

6         Q.    So this person that you were -- that you

7    eventually arrested was 17 and had no driver's license,

8    correct?

9         A.    Correct.

10        Q.    Now, the person you were chasing was going up

11   to 120 miles an hour, weaving out in and out of traffic.

12   That was an experienced driver in your view, correct?

13             MR. HAMMER:  Objection to the form.

14        A.    I'm not sure what kind of driver he was.

15        Q.    Well, this -- you drove 120 miles an hour for 8

16   to 9 minutes in and out of traffic going twice the speed

17   limit when you were chasing this vehicle, correct?

18        A.    Correct.

19        Q.    All right.  This is not a new driver, this is

20   an experienced driver is what you were thinking when you

21   were doing this, correct?

22             MR. HAMMER:  Objection to form.

23        A.    No.

24        Q.    What do you mean no?

25        A.    I was not -- new drivers -- new drivers do that

64

```
 1   too.  I mean that's not.
 2        Q.    Okay.  So had -- is there any evidence that you
 3   were able to find that Ontario had ever driven a car
 4   before in his life?
 5        A.    No.
 6        Q.    Did you ever interview any of neighbors to see
 7   had you ever seen Ontario driving?
 8        A.    No.
 9        Q.    Ontario's mom was present on the scene,
10   correct?
11        A.    Yes.
12        Q.    And she said he was a 17-year-old, correct?
13        A.    Yes.
14        Q.    Did he give -- did she give you permission to
15   interview her son, a minor, outside of her presence?
16        A.    No.
17        Q.    But you did, nonetheless, correct?
18        A.    Yes.
19        Q.    Why?
20        A.    For investigative detention.  He was placed in
21   investigative detention.
22        Q.    But you understood that when you place somebody
23   that is a minor in investigative detention and their
24   parent is right there, you're supposed to have the parent
25   present during the interview, right?
```

```
 1              MR. HAMMER:  Objection to the form.
 2   BY MR. KRUDYS:
 3        Q.    You knew that, right?
 4              MR. HAMMER:  Objection to the form.
 5        A.    Yes.  I'm aware of it now, yes.
 6        Q.    Were you not aware of it then?
 7        A.    I wasn't sure at time.
 8        Q.    Well, if you weren't sure at the time, did you
 9   call a supervisor to say, hey, can I independently
10   interview him without his mom present?
11        A.    No, I did not.
12        Q.    Why not?
13        A.    I just didn't think of that.
14              MR. KRUDYS:  Okay.  It's good time to take a
15        five-minute bathroom break.
16              (Recess, 10:48 a.m. to 10:58 a.m.)
17   BY MR. KRUDYS:
18        Q.    Did any of the -- did any of the documents
19   indicate the -- the investigative documents indicate the
20   names of the three persons identified in the car, that
21   being the Charger, in the back seat and front seat?  Were
22   there any documents that indicate what their names are?
23        A.    Yes.
24        Q.    Okay.  Where are those documents?
25        A.    They should be in the CAD incidents.
```

66

```
 1        Q.    Okay.  And did you do any type of follow-up
 2   investigation with those individuals?
 3        A.    No.
 4        Q.    Did any other state trooper, to your knowledge,
 5   follow up with them?
 6        A.    No.
 7        Q.    Would -- did you inquire to find out if there
 8   was any type of familial connection between any of three,
 9   like any of them related by blood?
10        A.    No.
11        Q.    Did you find out whether or not they lived
12   close to each other?
13        A.    No.
14        Q.    Did you find out if they went to the same
15   school?
16        A.    No.
17        Q.    Did you find out if they're Facebook, Instagram
18   friends?
19        A.    No.
20        Q.    Why didn't you do any of those things?  You --
21   these are people that were in the car with the driver.
22        A.    I did not feel a need to do that.
23        Q.    All right.  Did any of those three in the car
24   identify Ontario as the driver?
25        A.    No.
```

```
 1        Q.    Did any of them state that Ontario was not the
 2  driver?
 3        A.    Yes.
 4        Q.    And who was that?  Which one said he was not
 5  the driver or were there multiple ones?
 6        A.    Well, I remember -- I remember the guy in the
 7  Gap shirt.
 8        Q.    And do you know his name?
 9        A.    No, I do not.
10        Q.    So he's saying that Ontario was not the
11  driver --
12        A.    Yes.
13        Q.    -- is that right?  Okay.
14              Did you ever ask to examine their phones, GPS
15  data to find out where they all were when earlier in the
16  day when they got together with the driver?
17        A.    No.
18        Q.    Why didn't you do that?
19        A.    I just did not need to do that.
20        Q.    Didn't need to do that?
21        A.    No.  I just didn't feel like I needed to do
22  that.
23        Q.    Okay.  And did anyone ever ask to see that data
24  from any of these three individuals?
25              MR. HAMMER:  Objection to form.
```

```
1          A.    No.

2          Q.    And so you don't know what, if any, connection

3    there was between these three individuals and the driver

4    of the vehicle, correct?

5                MR. HAMMER:  Objection to form.

6          A.    Correct.

7          Q.    Do you know if there was any connection between

8    those three individuals and 17-year-old Ontario?

9          A.    No.

10         Q.    They were all appreciably older than Ontario,

11   weren't they?

12               MR. HAMMER:  Objection to the form.

13         A.    Yes.

14         Q.    So what was your theory as to why these older

15   people are hanging out with a 17-year-old kid?

16         A.    That's a common -- that's a common thing that

17   goes on out there with stolen cars.

18         Q.    That people in their -- what were they, in

19   their 20s or 30s?

20         A.    I recall about -- in their 20s.

21         Q.    But what's the connection?  Why are they

22   happening to hang out with a 17-year-old kid that's in

23   high school?

24         A.    I don't know why they did, but I know it's a

25   common -- it's a common thing for the driver to be a
```

```
 1    juvenile and the adults not to be driving the car.
 2         Q.    And what's the basis for that?
 3         A.    The juvenile gets less punishment in the court
 4    systems.
 5         Q.    Okay.  So this is, as you saw it, a plan
 6    between -- to have a younger driver in the vehicle; is
 7    that right?
 8              MR. HAMMER:  Objection to the form.
 9         A.    That's just a common thing that I notice out
10    there, yes.
11         Q.    Okay.  But did you -- was there any connection
12    that you were able to link between the three in the car
13    and Ontario, any connection whatsoever?
14         A.    No, I don't know how they were related or their
15    connection.
16         Q.    You don't know if they went to the same grade,
17    correct?
18         A.    No.
19         Q.    Or if they went to same school, correct?
20         A.    No.
21         Q.    If they went to the same church, correct?
22         A.    No.
23         Q.    You knew of no connection whatsoever between
24    Ontario and any of the three people in the car, correct?
25              MR. HAMMER:  Objection to the form.
```

1     A.    Correct.

2     Q.    The three in the car identified a guy by the

3     name of Zay, Z-A-Y, as the driver, correct?

4          MR. HAMMER:  Objection to the form.

5     A.    Correct.

6     Q.    And where did they encounter Zay that day, did

7     you ask?

8     A.    All I know is at a car club.

9     Q.    And you saw never sought any type of video as

10    to the place where they all met at this car club?

11         MR. HAMMER:  Objection to the form.

12    A.    No.

13    Q.    And you never asked to examine the phones of

14    the three individuals in the car, correct?

15    A.    No.

16    Q.    Now -- and when the person is -- when there is

17    one person saying, hey, this is not the guy, in other

18    words, Ontario is not the guy, you understood that making

19    false statements to a trooper in the context of an

20    official investigation is illegal, correct?

21    A.    Say that again for me.

22    Q.    You understood in December of 2023 that if you

23    ask a question in connection with an initial investigation

24    and the person lies to you that they could be charged with

25    a criminal crime, correct?

 1       A.    Yes.

 2       Q.    And one of the persons was saying that this guy

 3   they identified as Zay was not Ontario, correct?

 4       A.    Correct.

 5       Q.    What tests and/or analyses did you conduct in

 6   connection with the incident?  Like, for instance, let's

 7   start with fingerprints.  Did you dust for fingerprints?

 8       A.    No.

 9       Q.    Did anybody else?

10       A.    No.

11       Q.    Okay.  So you didn't look for fingerprints on

12   the car?

13       A.    No.

14       Q.    But you know that the driver of the car would

15   have had his hand on the wheel, right?

16       A.    Right.

17       Q.    And you know that the driver of the car would

18   have had his hands on the door opening and closing the

19   door, correct?

20       A.    Yeah.

21       Q.    And the driver would have had his fingerprints

22   on the back of the vehicle when he accessed the back of

23   the vehicle, correct?

24            MR. HAMMER:  Objection to the form.

25       A.    Yes.

```
 1        Q.    But you didn't dust for any of those prints,
 2   correct?
 3        A.    No.
 4        Q.    Wasn't Ontario specifically asking the -- you
 5   to dust for prints?
 6             MR. HAMMER:  Objection to form.
 7        A.    I recall him stating something to I can take
 8   his DNA or his fingerprints and stuff like that, yes.
 9        Q.    Okay.  So he's basically saying take my
10   fingerprints because it will prove my innocence.  That's
11   what you understood him to be saying, correct?
12        A.    Yes.
13        Q.    But you didn't take fingerprints of the car,
14   correct?
15        A.    Correct.
16        Q.    And were you like in a rush to finish up the
17   investigation?
18             I'm trying to figure out why that was not done.
19             MR. HAMMER:  Objection to the form.
20        A.    No, I wasn't in a rush.
21        Q.    I heard something about troopers having to get
22   over to a governor's event.  Was that something that was
23   going on that evening?
24        A.    I don't know.  That's about a whole other --
25   another unit.
```

1      Q.    Okay.  So did you not know how to dust for

2   prints?

3      A.    No, I do.

4      Q.    You do.

5            And the person when they walked into the house,

6   presumably they touch some type of knob or door handle to

7   get inside, correct?

8      A.    Most likely they had to.

9      Q.    Okay.  So did you dust for prints on that?

10     A.    No.

11     Q.    Well, aren't fingerprints generally a helpful

12   thing in connection with a criminal investigation?

13           MR. HAMMER:  Objection to the form.

14     A.    It can be sometimes.

15     Q.    And you knew how to do that, correct?

16     A.    Yes.

17     Q.    So you had a card of Ontario's prints provided

18   by his mom, correct?

19     A.    Yes.

20     Q.    So if, in fact, Ontario was the driver of the

21   vehicle, you would have expected his prints to match the

22   prints that would have been on the steering wheel, on the

23   door, on the trunk, correct?

24     A.    Yes.

25     Q.    But that was never undertaken by you, correct?

```
 1        A.    No.

 2        Q.    Did you ever obtain any video surveillance of

 3   the area?

 4        A.    No.

 5        Q.    Why not?

 6        A.    I did not see no video surveillance.

 7        Q.    Well, I mean, did you look around for -- like,

 8   for instance, any Ring camera video?

 9        A.    Yes.

10        Q.    It was right on one of the -- the doors of the

11   townhouses.  How did you not see that?

12              MR. HAMMER:  Objection to the form.

13        A.    I missed that one somehow.  I didn't see that

14   one.

15        Q.    And none of the other troopers saw it either;

16   is that right?

17        A.    Yes.

18        Q.    Okay.

19        A.    Not to my knowledge.

20        Q.    You seized the gun from the dumpster, correct?

21        A.    Under the dumpster yes.

22        Q.    Under the dumpster.

23              All right.  You say you saw it thrown under the

24   dumpster, correct?

25        A.    Yes.
```

1    Q.    But the documents indicate that you first were

2    searching inside the dumpster; isn't that right?

3    A.    Yes.  I did look in the dumpster too also, yes.

4    Q.    After you looked inside the dumpster, then you

5    looked under; isn't that right?

6    A.    Yes.

7    Q.    Well, actually, there was another trooper that

8    actually found the gun under the dumpster, not you,

9    correct?

10    A.    Correct.

11    Q.    So as I understand it, your testimony is you

12    saw -- did you see a gun be thrown under the dumpster?

13    A.    I saw an object.

14    Q.    An object?

15    A.    Yes.

16    Q.    But when you went to the dumpster, you had a

17    vehicle that you pulled up, somebody stood up on the

18    bumper, and they looked in the dumpster, correct?

19    A.    Correct.

20    Q.    And they did that before checking under the

21    dumpster, right?

22    A.    Yes.

23    Q.    And the person that checked under the dumpster

24    was another trooper, correct?

25    A.    Correct.

1    Q.    All right.  Did you know that you put in your

2  report that you -- well, why is it that you would check

3  inside the dumpster if you are -- if your testimony is you

4  saw an object thrown under the dumpster?

5    A.    Looking inside the dumpster was just looking

6  for anything else that was maybe thrown in there, maybe

7  clothing or anything like that.

8    Q.    Now the -- there was a gun that was obtained

9  from under the dumpster, right?

10    A.    Yes.

11    Q.    There was a gun that was with one of the three

12  passengers, right?

13    A.    Yes.

14    Q.    Which one of the three passengers had the gun?

15    A.    I'm not sure of that.

16    Q.    For what purpose did they have a gun?

17        MR. HAMMER:  Objection to form.

18    A.    I'm not sure of that.

19    Q.    Did you ask them?

20    A.    No, another trooper had that guy.

21    Q.    Okay.  And you were never able to connect

22  Ontario to any of those two guns, right?

23        MR. HAMMER:  Objection to form.

24  BY MR. KRUDYS:

25    Q.    Correct?

1    A.    Yes.  When I seen him throw it, the object

2  under there and there was a gun right there.

3    Q.    I see.  So were his fingerprints on the gun?

4    A.    I submitted it to the lab for fingerprint

5  analysis.

6    Q.    And what happened?

7    A.    It was to not be of value for comparison.

8    Q.    All right.  Well, there were other places you

9  could have taken prints from, like I said, the car, the

10 trunk of the car, the door of the car, the inside of the

11 car, but you never did those, right?

12   A.    Correct.

13   Q.    So did you do any other investigations other --

14 you didn't -- we talked about fingerprints.  We talked

15 about video surveillance, the guns.  Any other

16 investigations that you did?

17   A.    No.

18   Q.    All right.  Did anyone other than you actually

19 see the driver of the Charger?

20         MR. HAMMER:  Objection to form.

21   A.    Not that I'm aware.

22   Q.    All right.  Where -- when did you first see the

23 Ring camera video that shows the suspect running in front

24 of the Ring camera?  When did you first see that?

25   A.    At a CA's office in Richmond.

1    Q.    All right.  And shortly after seeing that at

2  the CA's office, the charges were dropped against Ontario?

3    A.    After that, they were non prossed [sic] to my

4  knowledge.

5    Q.    How much time passed from when the -- you found

6  this or when you got this -- received this video 'til the

7  charges were non prossed?  How much time went by?

8    A.    I don't recall how much time it was between

9  there.

10    Q.    Are we talking weeks?  Months?  Do you know?

11    A.    I would say weeks.

12    Q.    What is that video -- how -- why was that video

13  relevant or what does the video show that was relevant to

14  this investigation?

15          MR. HAMMER:  Objection to form.

16    A.    I don't know.  I don't know what -- what was

17  relevant to it.

18    Q.    Did you -- have you ever seen the video

19  yourself?

20    A.    Yes.

21    Q.    All right.  What does the video show, the Ring

22  camera video that was obtained in this matter by -- from a

23  neighbor by non-law enforcement?  What does this video

24  show?

25    A.    It shows a suspect, it shows myself, and two

```
 1   other individuals.
 2        Q.    Two other African-American individuals,
 3   correct?
 4              MR. HAMMER:  Objection to the form.
 5        A.    I can't tell who they are from that video.
 6        Q.    Oh, you can't?
 7        A.    No.
 8        Q.    Okay.  And did you go door to door and ask if
 9   anybody had video in units surrounding the unit that you
10   took Ontario from?
11        A.    I went to one unit that had a video in her
12   window.
13        Q.    You went to one unit that had a video?
14        A.    Yes.
15        Q.    Did you obtain that video?
16        A.    No.
17        Q.    Why not?
18        A.    Because she said it did not record so it had
19   nothing on her video.
20        Q.    So you thought that this video, any Ring camera
21   video could be relevant to the circumstance, correct?
22        A.    Yes.
23        Q.    Because it would show the event, correct?
24        A.    Yes, possibly.
25        Q.    And but you -- but you never got the Ring
```

1    camera video that was submitted by the family to the

2    Commonwealth's Attorney's office, correct?

3        A.    Correct.

4        Q.    All right.  In the footage from the Ring

5    camera, at the same time, you can see the suspect, you,

6    and two other individuals in the video at the same time,

7    right?

8        A.    Yes.

9        Q.    And you understood that Ontario and his mom

10   said that these two African-American individuals that are

11   in the video after the crash occurs are them, correct?

12            MR. HAMMER:  Objection to form.

13       A.    Yes.

14       Q.    Did you have any reason to doubt that?

15       A.    Yeah, I can't positively identify them.

16       Q.    All right.  But when you talked to Ontario, he

17   said right before the suspect ran down the street, him and

18   his mom went into their home, correct?

19       A.    Yes.

20       Q.    Okay.  So -- and that's what you basically see,

21   you see two African-American people in the camera footage

22   and then moving to the left of where their home is

23   located, correct?

24            MR. HAMMER:  Objection to form.

25       A.    I don't see them moving to the house, no.

1    Q.    No.  But you see them move to the left pf the
2    screen toward their home, correct?
3    A.    I see them move out of the screen, yes.
4    Q.    Okay.  In the direction of where their home is,
5    correct?
6    A.    I don't know who that was or where the home is.
7    Q.    Did you ever see Ontario and Ms. Patterson
8    enter their home when you were chasing the suspect?
9    A.    No.
10   Q.    Did you ever see two individuals enter a home
11   in close proximity to when you were chasing the suspect?
12   A.    I seen a suspect enter the home from the foot
13   pursuit.
14   Q.    All right.  So -- and you saw the suspect enter
15   the home from the front of the door, correct?
16   A.    Yes.
17   Q.    All right.  But the back of the door is the
18   part that faces the alley, correct?
19   A.    Correct.
20   Q.    Did you ever see two individuals go into the
21   back of the -- of a unit roughly at the same time that the
22   suspect ran by the apartment?
23   A.    No.
24   Q.    So you never saw Ontario and Ms. Patterson at
25   all, correct?

```
 1              MR. HAMMER:  Objection to form.
 2      A.   Correct.
 3      Q.   So you were singularly focused on what this
 4  individual you were chasing; is that right?
 5      A.   Yes.
 6      Q.   And how tall is this individual that you were
 7  chasing, were you able to determine that?
 8      A.   No, I don't know exact height.
 9      Q.   Okay.  Ontario and his mom both said that they
10  went into the back door of their house, correct?
11      A.   I don't recall them saying back door.
12      Q.   Well, the door that was located by the alley,
13  that's where they told you they went in, correct?
14      A.   I don't recall that.
15      Q.   Did you ask about that?
16      A.   I don't recall what door they went into, no.
17      Q.   All right.  But did you ask Ontario?  Didn't
18  Ontario tell you that he entered the back door with his
19  mother?
20      A.   I don't recall what door he said he entered.
21      Q.   Okay.  But he said that he entered his house
22  with his mom at the same time, right?
23      A.   No.
24      Q.   Okay.  Did any trooper besides yourself ever
25  claim to see the face of the driver of the Charger?
```

```
 1              MR. HAMMER:  Objection to form.
 2        A.    No.
 3        Q.    Did troopers ever encourage you to or not to or
 4   to arrest Ontario?
 5        A.    No.
 6        Q.    And nobody identified Ontario as the driver of
 7   the blue Dodge Charger other than yourself, correct?
 8              MR. HAMMER:  Objection to form.
 9        A.    Correct.
10        Q.    And did you ever provide a description of the
11   driver of the vehicle other than the one that we spoke of
12   previously, black male, Army pants, ski mask on, white
13   shirt?
14        A.    Yes -- what was your question?
15        Q.    Did anybody -- did you ever provide a
16   description of the person you were chasing other than that
17   description?
18        A.    No.
19        Q.    What evidence, if any, did -- linked Ontario to
20   the crime he was charged with by you?
21        A.    I recognized him while I was chasing him.
22        Q.    So it's solely recognition, you saw his face
23   and you arrested the person with that face, right?
24        A.    Yes.
25        Q.    That's it, the totality of it, correct?
```

84

1      A.    Yes.

2      Q.    Okay.  And what evidence, if any, linked

3  Ontario to the gun found in the dumpster?

4      A.    I saw him grab something out of the bag, an

5  object come under the dumpster, and that's when the gun

6  was found under the dumpster.

7      Q.    Okay.  After a nine-minute car chase, the

8  driver of the Charger crashed into another car at a

9  stoplight, correct?

10     A.    Yes.

11     Q.    The chase went all throughout the city,

12  correct?  Not the total city, but it went all the way from

13  Chester County -- Chesterfield, on interstates, on back

14  roads, through stop signs, through lights, through

15  multiple streets, correct?

16     A.    Correct.

17     Q.    And was there any evidence that the car crash

18  that terminated the chase was intentional by the driver?

19          MR. HAMMER:  Objection to form.

20     A.    Yeah, I'm not sure.

21     Q.    Well, what -- was there anything that -- did

22  you get the impression that this driver purposefully drove

23  into the back of the car?

24          MR. HAMMER:  Objection to form.

25  BY MR. KRUDYS:

1      Q.    Or that they were trying to avoid it and that
2    their speed was just excessive and they crashed and they
3    ran from there?
4      A.    I'm not sure what his intentions were.
5      Q.    Well, did you -- weren't you operating under
6    the assumption that the -- it was an unintentional
7    accident?
8            MR. HAMMER:  Object to form.
9      A.    No.  I can't determine if it was intentional or
10   unintentional.
11     Q.    What was the benefit you saw for the car driver
12   that you were chasing to get into the car crash?  How was
13   he benefited by that?
14           MR. HAMMER:  Objection to form.
15   BY MR. KRUDYS:
16     Q.    There was no benefit, was there, that you were
17   able to perceive?
18     A.    I can't answer on none of that.
19     Q.    Okay.  So was it just a wild coincidence that
20   the car chase ended right next to Ontario's home?
21           MR. HAMMER:  Objection to form.
22     A.    It can be a coincidence.
23     Q.    All right.  But is that your theory, that it
24   was a wild coincidence that it just -- that the car crash
25   happened right in front of his home?

```
 1          A.    I don't know if it was.  I mean, that's a
 2    possibility.  It could be a coincidence, yes.
 3          Q.    So Ontario and his mom were saying that they
 4    lived there and they saw the car crash from their home,
 5    correct?
 6          A.    Yes.
 7          Q.    So you -- at any time was Ontario affirmatively
 8    identified by you as the driver of the Charger?
 9          A.    Can you ask that again?
10          Q.    At any time was Ontario affirmatively
11    identified by you as the driver of the Charger?
12          A.    Yes.  I recognized him, yes.
13          Q.    When did you affirmatively identify him, say
14    you are the guy, you're the person I'm chasing?  When did
15    that occur?
16          A.    Are you asking when I told him that or when I
17    identified him as?
18          Q.    However you want to do it.  When did you
19    identify him as the driver of the vehicle?
20          A.    During the foot chase.
21          Q.    All right.  And then at any other time?
22          A.    No.  It was just during the foot chase and then
23    when he came to the back door.
24          Q.    All right.  And during the foot chase, how many
25    times was Ontario facing you or was the person, the
```

1    suspect facing you?

2        A.    Two times.

3        Q.    For how long the first time, how many seconds?

4        A.    It was within about two or three seconds.

5        Q.    All right.  And then the second time, how many

6    seconds?

7        A.    Probably about the same, two or three seconds.

8        Q.    Did you ever perform any type of analysis of

9    the height of the driver of the vehicle?

10       A.    No.

11       Q.    All right.  Well, you know, there is video,

12   dash camera video where he gets out of the vehicle, goes

13   in front of the SUV.  Did you know that the -- that height

14   of the SUV, you can affirmatively determine how high it

15   is?

16             MR. HAMMER:  Objection to form.

17   BY MR. KRUDYS:

18       Q.    Did you know that?

19       A.    No.  I can't determine how high that is on my

20   camera.

21       Q.    What is that?

22       A.    I can't confirm how high that is.

23       Q.    It's the make and model of the car that was

24   involved in the crash that was hit from the back, you can

25   affirmatively determine how high that vehicle is, right,

1  or did you not know that?

2      A.    No, I'm not aware of that.  I couldn't -- I

3  couldn't confirm that on camera right now.

4      Q.    But you can look up the vehicle and find out

5  how high -- what was the make and model of the vehicle

6  that was hit?

7      A.    I don't recall exactly.

8      Q.    Okay.  But it's an SUV, right?

9      A.    Yes.

10     Q.    Did you know that every vehicle, you can find

11  out, make and model, how tall it is?

12     A.    Okay.  That makes sense.

13     Q.    Okay.  But you didn't know that before this

14  deposition?

15     A.    No, I didn't think about that.

16     Q.    Okay.  And the person is running right in front

17  of that vehicle, correct?

18     A.    Yes.

19     Q.    All right.  And so you can do a comparison

20  between the height of the person and the vehicle, correct?

21          MR. HAMMER:  Objection to the form.

22     A.    I don't believe you can do that on the camera,

23  no.

24     Q.    But you didn't undertake that.

25          And then when you're running down the street,

```
 1    you actually come in the video, correct?

 2         A.    Yes.

 3         Q.    So you can judge your height compared to the

 4    suspect you were chasing, correct?

 5               MR. HAMMER:  Objection to form.

 6    BY MR. KRUDYS:

 7         Q.    You could have done that, right?

 8               MR. HAMMER:  Objection to form.

 9         A.    No, I don't think I can do that on camera.

10         Q.    Why couldn't you do that?

11         A.    I think it's just many parts take place on

12    that.  He might have been bending over, anything like

13    that.  I don't...

14         Q.    Okay.  How tall are you?

15         A.    About five, eleven.

16         Q.    And how much do you weigh at the time?

17         A.    Probably about 220.

18         Q.    And then -- okay.  What was the weight and

19    height of the description that the people in the car gave

20    of Zay, if any?

21         A.    They told me -- I just recall that they told me

22    like he was an exact match of what Ontario was.

23         Q.    And they --

24         A.    Something to those words, it was --

25         Q.    They used the word that it was an exact match?
```

1        A.    Maybe not those exact words, that's

2  paraphrasing a little bit.

3        Q.    But I thought they said that this is not the

4  guy, right?

5        A.    Right.

6        Q.    Okay.  Now so what -- what description -- did

7  you ask him how tall he was, the driver of the car?

8        A.    No.

9        Q.    Did you ask him how much he weighed?

10        A.    No.

11        Q.    Did you ask him his age?

12        A.    Did I ask Ontario's age?

13        Q.    No, the three people in the vehicle, did you

14  ask them how old the driver or the suspect was?

15        A.    I don't recall if I did or not.

16        Q.    Okay.  So you never asked for any type of

17  description from the three passengers that were in the car

18  with Zay for eight to nine minutes --

19             MR. HAMMER:  Objection.

20  BY MR. KRUDYS:

21        Q.    -- as to how tall he was, how thin he was,

22  right?  No description whatsoever, correct?

23             MR. HAMMER:  Objection to form.

24        A.    Yes, because they just told me that he looked

25  exactly like him.

```
 1        Q.    But they were saying that it was not him,
 2   correct?
 3        A.    Yes.
 4        Q.    And the firearm that was -- there was one
 5   firearm that came back as came back to Jada Hall, correct?
 6        A.    Yes.
 7        Q.    Which firearm was that?
 8        A.    The one that was under the trash can.
 9        Q.    All right.  And she stated -- did you ever talk
10   to her personally?
11        A.    On the phone, I did.
12        Q.    Okay.  All right.  She stated that she had a
13   few firearms but some were missing; is that right?
14        A.    Yes.
15        Q.    So when were they taken, did you ask her that?
16        A.    I don't recall if I asked that or not.
17        Q.    All right.  Did you ask to try to determine
18   whether or not there is any connection between Ontario and
19   Jada Hall?
20        A.    I did not put his name, no.  I was just trying
21   to ask if she knows who had it or anything of that.
22        Q.    Well, your theory was that Ontario had the gun
23   that was put under the dumpster, correct?
24        A.    Correct.
25        Q.    So did you try to make any type of connection
```

```
 1    between him and Jada Hall who the gun was registered to?
 2         A.    No, because she wasn't telling me nothing like
 3    that.  She wasn't telling me nothing.
 4         Q.    Wasn't telling you nothing?  You had --
 5         A.    Yeah, she wouldn't tell me about who the gun
 6    was, where it was, who had it.
 7         Q.    Did you ask her?
 8         A.    Yes.
 9         Q.    How long was this conversation with Jada Hall?
10         A.    It was just a few minutes.
11         Q.    All right.  Did you ask her in that
12    conversation when -- when the gun was stolen?
13               MR. HAMMER:  Object to form.
14         A.    I believe I did.
15         Q.    What did she say?
16         A.    I believe she talked about she moved and it
17    just -- that she really didn't know.
18         Q.    So was the gun, in fact, stolen or --
19         A.    No.
20         Q.    Or just misplaced by her?
21         A.    To my knowledge, just misplaced.
22         Q.    All right.  So it was never reported stolen by
23    her?
24               MR. HAMMER:  Objection to form.
25         A.    No.
```

1      Q.    And you never linked the -- Ontario to Jada
2   Smith, did you?
3            MR. HAMMER:  Objection to form.
4   BY MR. KRUDYS:
5      Q.    Jada Hall.  I'm sorry.  Jada Hall.
6      A.    No.
7      Q.    Ontario was not arrested on the scene, correct?
8      A.    Correct.
9      Q.    And the reason he was not arrested on scene
10  was?
11     A.    I was unsure what the juvenile process.
12     Q.    Well, don't you have supervisors to talk to?
13     A.    Yes.
14     Q.    Did you ask any supervisor how do I arrest a
15  juvenile?
16     A.    I don't recall if I asked a supervisor.
17     Q.    Did you find any incriminating evidence?
18           There is two types of evidence, as you know,
19  incriminating and exculpatory evidence.  Did you find any
20  incriminating evidence between the evening of December 11,
21  2023, and when you arrested -- or when -- and when you
22  asked Ontario to turn himself in?
23           MR. HAMMER:  Objection to form.
24     A.    No.
25     Q.    There was no new evidence against him, correct?

```
 1        A.    No.

 2        Q.    The sole and only evidence that you're able to

 3   identify in the matter is that you made a positive ID of

 4   him, correct?

 5              MR. HAMMER:  Objection to form.

 6   BY MR. KRUDYS:

 7        Q.    That's it, right?

 8        A.    Yes.

 9        Q.    Okay.  Are you aware that -- in part of your

10   training, are you told that -- did you learn anything

11   about the -- the accuracy of split-second identifications

12   of individuals?

13        A.    I don't recall.

14        Q.    Okay.  So you'd never seen Ontario prior to

15   you -- to the events of December 11, 2023, correct?

16        A.    Correct.

17        Q.    And then you saw a person over the context of

18   about three to -- about six seconds two different times,

19   three seconds and three seconds again, that's the totality

20   of your description of him, correct?

21              MR. HAMMER:  Objection to form.

22   BY MR. KRUDYS:

23        Q.    Right?

24        A.    Yes.

25        Q.    And it was from 15 feet away at that time,
```

1    correct?

2        A.    Yes, about.

3        Q.    All right.  And you were running.  And then the

4    time you were walking was because you were tired of

5    running, correct?

6        A.    Or I lost sight of him.

7        Q.    Okay.  And that happened twice, correct?

8        A.    Yes.

9        Q.    All right.  Did you -- did you or any other

10   trooper seek to obtain a search warrant related to the

11   investigation?

12       A.    No.

13       Q.    Why not?

14       A.    I just did not need to.

15       Q.    Okay.  Why did you not need to?

16       A.    I just don't think I needed to --

17       Q.    Okay.

18       A.    -- get a search warrant.

19       Q.    Okay.  Lakita Patterson has asserted that when

20   she opened her back door, you were pointing a -- your

21   issued firearm at her.  Are you aware of that?

22       A.    Yes, I'm aware she said that, yes.

23       Q.    Were you doing that?

24       A.    No.

25       Q.    Did you have your gun unholstered at the time?

```
 1         A.    No.

 2         Q.    Why did you not have your gun unholstered at

 3   the time?

 4         A.    I just didn't feel the need to.  I didn't feel

 5   like there was no threat.

 6         Q.    Okay.  But you didn't enter the home because

 7   you thought that was a threat; is that right?

 8               MR. HAMMER:  Objection to form.

 9   BY MR. KRUDYS:

10         Q.    Isn't that right?

11         A.    Yes.

12         Q.    Okay.  Were any other troopers on the scene

13   that -- when you encountered Lakita Patterson?

14         A.    Yes.

15         Q.    Did they have their weapons unholstered at the

16   time?

17               MR. HAMMER:  Objection to form.

18         A.    Not that I recall, no.

19         Q.    Did you ever like take a written formal

20   statement from the three people in the car?

21         A.    No.

22         Q.    Why not?

23         A.    I just asked them for the statements.  I didn't

24   need to write them down.

25         Q.    Why specifically was Ontario released on the
```

1    evening, just because he was a juvenile?  That's the sole

2    reason?

3         A.    Yes.

4         Q.    Okay.  Were any of the troopers encouraging you

5    to release him?

6         A.    No.

7         Q.    You created an affidavit to originally -- let

8    me show you.  If we go to Exhibit Number 34 and if you go

9    to a few pages in, page 4, there is -- it's hard to kind

10   of see, but there's an 004 at the bottom.  It's a Juvenile

11   Violation Affidavit Report.

12        A.    Yes.

13        Q.    And it says Summary of Violation/Probable

14   Cause/Affidavit, see attached, correct?

15        A.    Yes.

16        Q.    All right.  All right.  And then you -- this is

17   that affidavit that you put together; is that right?

18        A.    Yes.

19        Q.    I mean this is the -- this is -- I sorry.  This

20   is the information in support of that original arrest,

21   correct?

22        A.    Correct.

23        Q.    All right.  Is this -- was it accurate in all

24   respects?

25        A.    Yes, to the best of my knowledge, yes.

98

```
 1        Q.    All right.  And then if you go over to page 17.
 2   Do you know what this is?
 3        A.    Yes, my -- my report.
 4        Q.    Okay.  And did you type this up?
 5        A.    Yes.
 6        Q.    Okay.  Did any supervisors approve any of these
 7   documents?
 8        A.    I don't believe these ones, no.
 9        Q.    Was any supervisor aware of the submission of
10   the documents?
11             MR. HAMMER:  Objection to form.
12        A.    Possibly.
13        Q.    And who is possibly?  Who would you include as
14   possibly?
15        A.    They approve our LEAMS reports.  They approve
16   our LEAMS reports that we have.  So, I mean, I don't --
17        Q.    Okay.  Yeah.  But how about these two documents
18   that I've showed you, did they specifically look at these
19   to your knowledge?
20        A.    They might not look at that.  I'm not sure if
21   they look at these or not.
22        Q.    You're not sure.
23             So four days after arresting -- four days after
24   you took Ontario into custody and put him in the back of
25   your vehicle with handcuffs on, you then called his mom;
```

99

```
 1   is that right?

 2        A.    Yes.

 3              MR. HAMMER:  Objection to form.

 4   BY MR. KRUDYS:

 5        Q.    And what were you doing in those four days

 6   between the 11th and when you called his mom?  Were you

 7   working?

 8        A.    Some of the days.  Some of the days, I was off.

 9        Q.    Okay.  Was there anybody else working on that

10   investigation during that period of time other than you?

11        A.    No.

12        Q.    Okay.  If you go to Exhibit Number 2.

13              All right.  So these are your sworn responses

14   to certain questions posed to you, correct?

15        A.    Yes.

16        Q.    All right.  If you go over to -- we're going to

17   mainly be at Exhibit 2, but I want to flip over and show

18   you another document that might be helpful in discussing

19   this.  All right.

20              If you go over to Exhibit Number 31.  All

21   right.  Exhibit Number 31 shows Commerce Street, Maury

22   Street.  That orange or reddish thing is where a dumpster

23   was.  The star is where Ontario's house is, the back and

24   front.  And then do you generally recognize the scene?

25        A.    Yes.
```

```
 1        Q.    All right.  Okay.  Utilizing --
 2              (Discussion off the record.)
 3   BY MR. KRUDYS:
 4        Q.    Can you, utilizing the red Sharpie, show us
 5   where you ran in connection with the chase?
 6              I'm going to walk over, just kind of look at a
 7   certain distance so I can see what you're doing.
 8        A.    From here, I started up right here, come up, up
 9   Maury Street, come across the sidewalk, and we come down
10   here, and then we cut back this way, and then I believe I
11   cut through right here between these two apartments right
12   here.
13        Q.    All right.
14        A.    And that's when I come -- I believe I started
15   walking back down for the second was down here again when
16   gets back in the car.
17        Q.    So do you know what direction this is when
18   you're going on Maury Street initially?
19        A.    No, I don't.
20        Q.    All right.  Well, Commerce Street, does that
21   run east/west or north/south?
22        A.    I'm not sure.
23        Q.    All right.  So well -- but if I could -- I
24   could put an arrow where you originally ran, you were
25   going in the direction of 9th Street originally, correct?
```

1      A.    Yes.

2      Q.    And then you made a right at 9th Street, right?

3      A.    Yep.

4      Q.    And I'll put another arrow showing the

5  direction that you were going.

6            And then when you got toward -- you didn't go

7  all the way to Everett, you're saying that you turned in

8  front of the dumpster; is that correct?

9      A.    Yes.

10     Q.    All right.  I'll put another arrow in that

11 direction.

12           And then you made a right when you got to the

13 alley and cut between the apartments in this 312 and 310?

14     A.    Yes.

15     Q.    Is that right?

16     A.    Yes.

17     Q.    All right.  I'll put another arrow.

18           Then you doubled back and were going in the

19 opposite direction of where you were running, correct?

20     A.    Correct.

21     Q.    Made a left on Maury Street and went back to

22 the car, correct?

23     A.    Correct.

24     Q.    So where is it where you first saw Mr. -- you

25 said you were chasing him.  When did you first get -- you

```
 1   said you were 15 feet away from him for up to 3 seconds.
 2   Where did that occur?
 3        A.    Around this area right here.
 4        Q.    Put an X where that occurred, please.
 5              MR. HAMMER:  Are you seeking the X where the
 6        suspect was or where Trooper Wyatt was?
 7   BY MR. KRUDYS:
 8        Q.    Well, put a circle -- actually, put an X where
 9   you were when you first encountered him and you say you
10   were 15 feet away.
11        A.    Right there.
12        Q.    You put X.
13              Now, where was he at the time that you saw him?
14        A.    Around somewhere right here.
15        Q.    So you put a circle?
16        A.    Yes.
17        Q.    Okay.  Now where is the next time where you saw
18   him for three seconds?  Where was that at?  Where were you
19   standing?
20        A.    The second one, I was around right here and he
21   was right there.
22        Q.    All right.  So you put another -- let's do it
23   this time.  Next to your first X, I'm going to put a 1 and
24   next to your first zero, I'm going to put a 1.  And next
25   to your next X, I'm going to put a 2, and next to your
```

1    next zero, I'm going to put a 2.  Okay?

2         A.    Okay.

3         Q.    So when -- where was this conversation that you

4    say occurred?

5         A.    Between the 1 and the 1.

6         Q.    Between the 1 and the 1?

7         A.    Yes.

8         Q.    Okay.  Well, when he's talking with you, isn't

9    he like running away from you?

10        A.    At that time, he was -- I believe he was just

11   like walking, fast jog, but still looking at me.

12        Q.    But he would have been looking back at you,

13   walking away from you; is that right?

14        A.    Yes.  Yes.

15        Q.    So you're saying you see his face looking back

16   at you?

17        A.    Yes, his face was turned towards me.

18        Q.    All right.  And then what was he doing the

19   other time you saw his face?

20        A.    That time when I was stopped right here and he

21   was stopped just looking at me.

22        Q.    Okay.  So but there -- there's at least one

23   fence between you and him; isn't that right?

24        A.    Yes.  It's two fences.

25        Q.    Two fences?

104

```
 1        A.    Yeah.
 2        Q.    Okay.  And isn't that much more than 15 feet
 3   between the two of you at that time?
 4        A.    15 feet was the first interaction.
 5        Q.    All right.  So what was the next interaction?
 6        A.    This was the second time I seen him and this
 7   was -- I mean that was a little bit more than 15 feet.
 8        Q.    How much would you estimate it was?
 9        A.    25, 30 feet.
10        Q.    Okay.  So the first time you see him, he's
11   walking away from you looking back, and the next time when
12   you see him, he's looking at you from 25 to 30 feet away
13   for 2 to 3 seconds, correct?
14        A.    Correct.
15        Q.    Okay.  And that's the totality of your good
16   looking at him, correct?
17        A.    Yes.
18        Q.    Okay.  This dumpster that is in the picture at
19   Exhibit Number 31, is that the same dumpster where you
20   found a weapon under?
21        A.    Yes.
22        Q.    All right.  And where was the weapon found in
23   the dumpster?  Utilizing my blue magic marker, put a
24   little X where the weapon was found.
25              No, not the red.  Use the blue one to show
```

105

```
 1   where the weapon was found -- or put a W.
 2              MR. HAMMER:  That may not do very well on that
 3        paper.
 4   BY MR. KRUDYS:
 5        Q.    Put a W.
 6        A.    Right there.
 7        Q.    Okay.  And circle the W.
 8              Well, in your foot pursuit, you never have him
 9   actually at that end of the dumpster, correct?  You have
10   him on the other end of the dumpster, correct?
11        A.    No.  He was over there also.
12        Q.    Okay.  So when you were doing your description
13   of the events, could it have been that he ran all the way
14   down to Everett and made the right on Everett as opposed
15   to cutting between the two?
16        A.    I don't recall, no.
17        Q.    You're not sure one way or the other?
18        A.    Yeah.
19        Q.    Okay.  But you know the weapon was found over
20   here, so the foot -- you're thinking he had to run past
21   that end, correct?
22        A.    No, that was dropped during the second foot
23   pursuit.  So when I got to the car, we -- we -- the second
24   foot pursuit happened right here and that's when he came
25   around this side.
```

```
 1        Q.    All right.  So let's do -- let's do your dark
 2   blue one, that blue magic marker.  Show us the foot
 3   pursuit where you went after he goes to the car.
 4             All right.  Okay.  Now can you put arrows to
 5   show the direction of that?
 6             MR. HAMMER:  And, Mark, I just want to clarify
 7        for the record.  I don't believe Trooper Wyatt has
 8        testified as to any movements other than those of
 9        himself during his foot pursuit, right?  We were kind
10        of muddying the waters there seconds ago.  All these
11        lines, my understanding, is testimony this is where
12        he went, correct?
13             MR. KRUDYS:  Well, it's also where the suspect
14        was, right?
15             MR. HAMMER:  It may or may not have been the
16        suspect.
17             MR. KRUDYS:  I think the record states what it
18        states.
19   BY MR. KRUDYS:
20        Q.    Where are the places that you lost sight of
21   him?
22             All right.  Put dash lines with the red marker
23   like railroad tracks to show where you lost sight of him.
24        A.    Right around here.
25             And then somewhere in this area.
```

```
 1        Q.    Where else?

 2        A.    And then I walked back, yeah.

 3        Q.    Well --

 4              MR. HAMMER:  Just for the record, I don't think

 5        it's clear what direction Trooper Wyatt was traveling

 6        and the suspect was traveling with these -- where

 7        these lines are being placed.

 8              MR. KRUDYS:  I think it's --

 9   BY MR. KRUDYS:

10        Q.    Show -- you put various dashes where you lost

11   sight of him, correct?

12        A.    Yeah.

13        Q.    But the entire time that you were walking back

14   on Maury Street, you didn't know where he was, correct?

15        A.    Yeah.

16        Q.    So let's put dashes there too.

17              So when -- you lose sight of him in the

18   alleyway, is that correct, on that first time through,

19   right?

20        A.    Yeah.  Well, I'm coming up this way.

21        Q.    Okay.  So when you're originally going up 9th

22   Street, you lost sight of him, correct?

23        A.    Yes.

24        Q.    And all these dash lines --

25        A.    And when he cut through down here.
```

1      Q.    Oh.

2      A.    He cut through right here.

3      Q.    Okay.  So you actually lost sight of him when

4   he's -- when he was going toward the --

5      A.    Yes, when he was going this way.  I came

6   around.

7      Q.    Put some lines there too to show.

8            So wherever you have these railroad crossings

9   or these lines across that go perpendicular to the route,

10   that's where you have lost sight of him, correct?

11            MR. HAMMER:  Objection to form.

12      A.    Yes.

13      Q.    Okay.  So you lost sight of him on Maury at one

14   time.  You lost sight of him on East 9th.  You lost sight

15   of him when he was approaching the -- the parking lot from

16   East 9th; isn't that right?

17      A.    Yes.

18      Q.    And you also lost sight of him when he went

19   between the apartments, correct?

20      A.    During this time, I didn't know where he ran

21   from here.

22      Q.    All right.

23      A.    I don't know where he went.

24      Q.    So when you're running up Maury Street, are

25   you -- the first time, you --

1       A.    I have sight of him, yes.

2       Q.    Sight of him.

3             When you -- when did you first lose site of

4   him?

5       A.    Coming around this townhome here.

6       Q.    All right.  So when you're making a right on

7   East 9th toward the dumpster, you lose sight of him,

8   correct?

9       A.    Yes.

10      Q.    And when do you see him next?

11      A.    When I come back down here in this area when he

12  comes out from behind the dumpster.

13      Q.    Okay.  And then you then lose sight of him

14  again when he goes between the apartments, correct?

15      A.    That's where I -- I believe I went, right

16  there.  I don't know where he went from there.

17      Q.    Yeah.

18            You don't know where he was at the time?

19      A.    Yes.

20      Q.    And then the whole time walking back Maury

21  Street, you had no idea where he was, correct?

22      A.    Correct.

23      Q.    And then how far away were you from the car

24  when you recognized him at the car?

25      A.    I was probably about 15, 20 feet.

1       Q.    Okay.  And then but you didn't catch up with

2   him again.  He -- he took off and you lost sight of him

3   again?

4       A.    Yeah.  I just -- right here, and then he came

5   around and turned, and that's when I stopped right there.

6       Q.    So you're -- you're saying that he ran down

7   Commerce Street and you only went half the way and you

8   stopped, correct?

9       A.    Yes.

10      Q.    Okay.  And then from there, you were looking at

11  a distance at him, correct?

12      A.    Yes.

13      Q.    And so when he -- when you think he put

14  something under the dumpster, you're actually all the way

15  over on Commerce Street looking over there, correct?

16      A.    Yes.

17      Q.    All right.  And then when he enters the -- you

18  say he enters an apartment.  Did he enter the back of

19  what -- what's marked as the back of the apartment or the

20  front of the apartment?

21      A.    The front.

22      Q.    All right.  Where exactly were you standing

23  when he entered the front of the apartment that you would

24  say you were too far away to follow him right into the

25  apartment?

```
1        A.    Somewhere right here.

2        Q.    All right.  Put a -- using the blue magic

3   marker, make a big X exactly where you were standing.

4        A.    I don't know exactly, but this is the

5   approximate location right here.

6        Q.    Okay.  You're approximately -- you made --

7   there is X mark that is next to the dumpster.  That is

8   approximately where you are when you say he entered the

9   front of the home, correct?

10       A.    Correct.

11       Q.    Okay.  All right.  At one point, you encounter

12  a woman as she exited the back door of the apartment,

13  correct?

14       A.    Yes.

15       Q.    The woman was identified as plaintiff's mother,

16  Lakita Patterson, correct?

17       A.    Yes.

18       Q.    And were any other troopers on scene at this

19  point?

20       A.    Yes.

21       Q.    Who?

22       A.    Chance Morris and Seth Layton.  They were at

23  the door with me.  I don't know --

24       Q.    They were what?

25       A.    They were at the door when -- when I
```

112

```
1   approached, so.
2        Q.   Okay.  And you're not sure if any other
3   troopers had their weapons unloaded at this -- I mean
4   unholstered at this time?
5        A.   I don't believe they did, no.
6        Q.   Are you saying affirmatively they did not?
7        A.   To the best of my knowledge, no, I don't
8   believe they did, no.
9        Q.   Okay.  All right.  Did you ever unholster you
10  weapon at any time that evening?
11       A.   No.
12       Q.   Why not?
13       A.   Just the circumstances didn't call for that.
14       Q.   Okay.  What do you mean by that?
15       A.   I'm not going to unholster my weapon when I'm
16  running, chasing someone like that, and then it was just
17  not a time I felt like I needed to unholster it.
18       Q.   Why did you not go to the front door of the
19  apartment ever?
20            MR. HAMMER:  Objection to form.
21       A.   Because I just watched the doors.  I didn't
22  need to go to the front door because they came out of the
23  back door.
24       Q.   Okay.  The front door of Lakita Patterson's
25  apartment faces 9th Street, right?
```

1      A.    Yes.

2      Q.    It doesn't face Everett Street, it faces 9th

3   Street, correct?

4      A.    Yes.

5      Q.    When you took Ontario into your car, did you

6   know at the time what a custodial interrogation was?

7            MR. HAMMER:  Objection to form.

8      A.    Yes.

9      Q.    Yeah.

10           And you knew that when you have a suspect in

11   custody and asking him questions, that's a custodial

12   investigation, correct?

13           MR. HAMMER:  Objection to form.

14   BY MR. KRUDYS:

15      Q.    You understood that at the time?

16      A.    Yes.

17      Q.    That would that would require providing Miranda

18   rights to a person, right?

19           MR. HAMMER:  Objection to form.

20      A.    No.

21      Q.    Were you -- as part of your training, are you

22   trained that when you are conducting a custodial

23   interrogation that you're supposed to provide the person

24   their Miranda rights?

25      A.    No.

114

1      Q.    You're not?

2      A.    At that time, he was under investigative

3   detention.  So that's what, he was actually under

4   investigative detention at the time, so it was just

5   questioning.

6      Q.    You know that Miranda rights, the determination

7   as to when to read Miranda is when there is a custodial

8   interrogation, correct?

9           MR. HAMMER:  Objection to form.

10  BY MR. KRUDYS:

11     Q.    Right?  That's what you're trained, correct?

12     A.    Not unless they're placed under arrest.  He was

13  not placed under arrest at the time.

14     Q.    That's not the test.  Are you telling me

15  sitting here today that you don't know that the Miranda

16  test the based upon custodial interrogation, has nothing

17  to do with the word arrest?

18          MR. HAMMER:  Objection to form.

19  BY MR. KRUDYS:

20     Q.    Did -- are you learning something for the first

21  time today?

22     A.    No.

23     Q.    All right.  You knew that then?

24     A.    Yes.

25     Q.    So when you have him in your car, you have him

115

```
1    handcuffed in your car, correct?

2         A.    Yes.

3         Q.    He can't leave, right?

4         A.    Right.  Yes.

5         Q.    And it's under those circumstances that you ask

6    questions of him, correct?

7         A.    Yes.

8         Q.    You understood that you're supposed to give

9    Miranda warnings in that context, correct?

10             MR. HAMMER:  Objection to form.

11        A.    No.  At that time, he was under investigative

12   detention.  He was not under arrest.

13        Q.    It doesn't matter if it's an arrest.  You knew

14   if -- you just told me that you understand that Miranda

15   has to be provided in a custodial interrogation, correct?

16             MR.  HAMMER:  Objection to form.

17        A.    If they're under arrest, yes.

18        Q.    Okay.  So sitting here today, you're going to

19   inform the court that you don't have to read Miranda

20   until -- unless the person is under arrest; is that right?

21             MR. HAMMER:  Objection to form and argumentive.

22   BY MR. KRUDYS:

23        Q.    That is your understanding, it's not custody,

24   it's arrest; is that correct?

25             MR. HAMMER:  Objection to form and argumentive.
```

```
 1        A.    Yes, he was -- yes, if they're under arrest.
 2   He was not under arrest at that time.
 3        Q.    Okay.  So at this point sitting here today, you
 4   have been a Virginia state trooper for how many years?
 5        A.    Four.
 6        Q.    And you have been operating under those all
 7   four years believing you don't have to give Miranda until
 8   the person is under arrest; is that right?
 9             MR. HAMMER:  Objection to form and argumentive.
10        A.    Yes.
11        Q.    And that's how you've been doing it for the
12   last four years, correct?
13             MR. HAMMER:  Same objection.
14        A.    I do it different ways depending on the
15   circumstances.
16        Q.    What does that mean?
17        A.    I mean under this circumstance, he was not
18   under arrest at the time.  He was under investigative
19   detention.
20        Q.    Right.  But you're telling me in the four years
21   preceding this event, you would not Mirandize a person
22   unless they were under arrest.  That's what you told me,
23   right?
24             MR. HAMMER:  Objection to form.
25        A.    No, not every time, no.
```

117

```
 1        Q.    Okay.  So there were other times when you gave
 2   them their Miranda when they were in custody; is that
 3   right?
 4        A.    Yes, that's a possibility, yes.
 5        Q.    Okay.  So how does it determine, based upon how
 6   you wake up in the morning and feel?
 7              MR. HAMMER:  Objection to form.
 8        A.    Not, just circumstances.
 9        Q.    All right.  So was it your understanding that
10   this circumstance demanded that you provide Ontario with
11   his Miranda rights?
12        A.    No.
13        Q.    Why not?
14        A.    Because he was -- I mean, like I said, he was
15   under investigative detention.  He was not placed under
16   arrest.
17        Q.    But you've told me in the past that on other
18   times, you have Mirandized persons when they're not under
19   arrest, correct?
20              MR. HAMMER:  Objection to form.
21        A.    Yes.
22        Q.    Okay.  Do you -- do they have any type of
23   training that they tell you as a state trooper when you're
24   supposed to Mirandize a person?
25              We're going to get that training.  And, tell
```

```
 1   me, do you recall the training saying when they're under
 2   arrest or when they are in custody?
 3        A.    Yes, we have had that training.
 4        Q.    All right.  And what does it say?  Does it say
 5   arrest or custody?
 6        A.    I don't recall at the top of my head what it
 7   exactly says without it in front of me.
 8        Q.    How many times have you had persons in custody
 9   that were not under arrest?
10             MR. HAMMER:  Objection to form.
11        A.    A handful of times.
12        Q.    And this is one of them?
13        A.    Yes.
14             MR. HAMMER:  Objection to form.
15   BY MR. KRUDYS:
16        Q.    Did Ontario ever ask you that evening if you
17   were going to read him his rights?
18        A.    I don't believe he asked me that, no.
19        Q.    On your interrogatory questions number 2 -- go
20   to Exhibit Number 2 we were at.
21             So all right.  If you go to page 3.
22             At the top, you say you inform him that you're
23   going to detain him.
24             What does that mean, detain him, that he can't
25   leave?
```

```
 1        A.    Yes.
 2        Q.    And that you placed handcuffs on him at that
 3   time, correct?
 4        A.    Yes.
 5        Q.    Then you escorted him to your vehicle and
 6   placed him in the vehicle, correct?
 7        A.    Yes.
 8        Q.    Not permitted to leave your vehicle, correct?
 9        A.    Correct.
10        Q.    And you told him you match the description,
11   that description of the suspect, correct?
12        A.    Yes.
13        Q.    What did you mean by the word match?
14        A.    That he was a suspect.
15        Q.    All right.  Well, what did you mean by the word
16   match, you match the description?  What -- what exactly
17   did he match in the description?
18        A.    The person I recognized when I was chasing.
19        Q.    Well, you didn't say you are the person that I
20   was chasing.  You say you match the description, correct?
21        A.    Yes.
22        Q.    All right.  So if that's your language, let's
23   use your language, how did he match the description?
24        A.    He was the person I was chasing.
25        Q.    That's all that you say, sir.
```

120

```
1          A.    That's the person I was chasing.

2          Q.    You don't say you are the person that I'm

3   chasing, correct?

4          A.    Correct.

5          Q.    But if you go to 30 -- if you go page number --

6   Exhibit Number 35 and go to page 5.

7                MR. HAMMER:  There is no page 5 on Exhibit 35.

8                MR. KRUDYS:  Oh, 34.  Sorry.  34, page 5.

9                MR. HAMMER:  OLP-5, is that what you're --

10               MR. KRUDYS:  Yeah, OLP005.

11               MR. HAMMER:  Okay.

12   BY MR. KRUDYS:

13         Q.    You see in about the third paragraph down, I

14   identified him as the same person who was driving the

15   vehicle and who took off on foot.

16               Do you see that?

17         A.    Yes.

18         Q.    That's your sworn statement, correct?

19         A.    Yes.

20         Q.    All right.  When you have him in the car, you

21   don't say you are the guy.  You say you match the

22   description, the description, correct?  That's what you

23   say?

24         A.    Yes.

25         Q.    Correct?
```

121

```
 1        A.    That's one of the things I say, yes.
 2        Q.    All right.  Then further down, you ask him,
 3   Ontario, who is that guy in the Gap shirt right there,
 4   correct?
 5              I'm sorry.  We're back on page -- Exhibit 2.  I
 6   apologize.  Exhibit 2, sir.
 7              MR. HAMMER:  Page 3 of Exhibit 2?
 8              MR. KRUDYS:  Yeah.
 9              MR. HAMMER:  And further down, that's when you
10        say that.
11              THE DEPONENT:  Oh, okay.
12        A.    Yep.
13        Q.    And on that same page, when you say you match
14   the description, you don't say I saw you, you say you
15   match the description, correct?
16              MR. HAMMER:  I think we've been over this.
17   BY MR. KRUDYS:
18        Q.    Correct?  You don't use the words I saw you?
19        A.    Yes.  In one of the sentences, yes, I said
20   that.
21        Q.    Okay.  In the -- on page -- we'll go through
22   this.
23        A.    Okay.
24        Q.    But on page 3, it doesn't say I saw you.  It
25   says you match the description, correct?
```

122

```
 1        A.    Correct.

 2        Q.    And the person that you were chasing was a

 3   black guy, correct?

 4        A.    Yes.

 5        Q.    And -- and Ontario is a black guy, correct?

 6        A.    Yes.

 7        Q.    All right.  And you provided nothing in a

 8   description of the person other than he was a black

 9   person, correct?

10             MR. HAMMER:  Objection to the form.

11   BY MR. KRUDYS:

12        Q.    Over the radio, the only description you

13   provide of the person is that he's a black guy, correct?

14             MR. HAMMER:  Objection to form.

15        A.    Over the radio, yes.

16        Q.    Okay.  You ask Ontario about the guy in the Gap

17   shirt and he says I have no clue, never seen him a day in

18   my life, correct?

19        A.    Correct.

20        Q.    And that conformed with what the other persons

21   were saying, correct?

22        A.    Correct.

23        Q.    That they -- that that was not the guy,

24   correct?

25             MR. HAMMER:  Objection to form.
```

1      A.    That's what they said, yes.

2      Q.    Okay.  On page 4, when you ask Ontario about

3   the circumstances, he told you that him and his mom were

4   outside the apartment, correct, and then they went inside,

5   correct?

6      A.    Where are you looking at on here?

7      Q.    I'm just asking a question.

8      A.    Oh, is that what they said?  Yes, he told me.

9      Q.    Okay.  Further down, it's -- he asked you about

10   the other persons and saying -- this is on page 4 of your

11   interrogatories -- that it wasn't me, it wasn't me, you

12   can ask them.

13          And then what is your statement after he asks

14   you to ask the people in the vehicle?  What did you say to

15   him?

16          MR. HAMMER:  I'm sorry.  Where is it wasn't me.

17      It wasn't me?

18          MR. KRUDYS:  Okay.

19          MR. HAMMER:  Where on the page?

20          MR. KRUDYS:  No.  Look, it's on page 4.  It

21      says me -- no, plaintiff, it wasn't me, though.

22          MR. HAMMER:  Okay.

23   BY MR. KRUDYS:

24      Q.    It wasn't -- I wasn't the one who got out the

25   car.  You can ask them.

124

```
 1              What was your reply to that?
 2     A.    Right there below it, they're not -- they're
 3   not going to snitch on their boy.
 4     Q.    What did you mean by that?
 5     A.    They're not going to snitch on their friends,
 6   their buddies.
 7     Q.    Okay.  And why did you know that they were
 8   friends?
 9     A.    Because they were in the car.
10     Q.    All right.  But they're -- but they're
11   saying -- but they're saying that the person that is not
12   in the vehicle -- that -- that Ontario is not the person
13   that was the driver, correct?
14     A.    Correct.
15     Q.    All right.  Now, well, why did you reach the
16   conclusion that they're not going to snitch on their
17   friends?  Did you know anything about the three people in
18   the car?
19              MR. HAMMER:  Objection to form.
20     A.    Because they already -- before that, they
21   already told me that that wasn't him and all they knew was
22   Zay and that's just not common.
23     Q.    And that didn't fit with your narrative that,
24   in fact, Ontario was the driver, correct?
25              MR. HAMMER:  Objection to form.
```

125

1      A.    Yes.

2      Q.    Okay.  So you then say I know how this game

3  works right here.  Why did you think it was a game at that

4  point?

5      A.    The game is I just know how this process works.

6      Q.    But you've never encountered any of these four

7  people ever before, correct?

8      A.    No.

9      Q.    So why is there a game that was going on,

10  Trooper?

11      A.    Because that's just a common thing to do.

12      Q.    It's a common thing for what -- to do what?

13      A.    Like for a stolen car pursuit with a juvenile

14  and just for them not to tell on no one.

15      Q.    And then you say they're not going to snitch on

16  their, you know, homeboys and stuff.  What did you mean by

17  homeboys and stuff?

18      A.    They're not going to snitch on their buddies,

19  friends.

20      Q.    Well, do you use the expression homeboys?

21      A.    Yes.

22      Q.    Okay.  So you refer to other troopers as your

23  homeboys?

24      A.    Sometimes, yes.

25      Q.    Only the white ones or the African-American

126

```
 1   ones?
 2        A.    It don't matter what the race is, it's just...
 3        Q.    So you use the term homeboys with white
 4   troopers?
 5        A.    Yes.
 6        Q.    Which white trooper have you -- do you refer to
 7   as your homeboy?
 8              Which one is it because we're going to take his
 9   deposition?
10              Who is it?  Tell me who this person is that you
11   refer to as your homeboy.
12        A.    I don't know exact ones, but I know I've said
13   it before.  I mean it's just a common thing.
14        Q.    Well, here's your chance under oath.  Tell
15   me -- you just told me you refer to white officers,
16   troopers as homeboys.  Give me the name of the person that
17   you're calling your homeboys and I want to depose them and
18   ask that question.
19              Give us a name, Trooper.
20              MR. HAMMER:  Objection.
21   BY MR. KRUDYS:
22        Q.    Who is it?
23        A.    I don't have a name.
24              MR. HAMMER:  Argumentative.
25   BY MR. KRUDYS:
```

1      Q.    You don't have a name?

2      A.    No.

3      Q.    So when I ask you under oath to identify

4  this -- you say you use the word homeboy to refer to white

5  troopers and then I ask you for a name and you cannot name

6  anyone, right?

7            MR. HAMMER:  Objection to form.

8      A.    It might be a friend or anybody like that.

9  It's not just troopers.

10     Q.    All right.  Well, who is the friend that you

11  say is your homeboy, you -- you call them your homeboy?

12  Who is that?

13           MR. HAMMER:  Objection to form.

14     A.    I don't -- I mean it's just --

15     Q.    You can't identify anybody, can you?

16     A.    No.  No.

17     Q.    No.

18           If we go to the next page, at the top of page

19  5, you use the statement at me, in the middle of the top

20  paragraph, if you ran back in the apartment, that was you,

21  correct?  That's your statement?

22     A.    Where are we at right now?

23     Q.    Okay.  Me, because I mean look --

24     A.    Okay.

25     Q.    That part.  You make the statement if you ran

1    back to the apartment, that was you, correct?

2        A.    Yes.

3        Q.    So you're -- you're saying that -- you're

4    identifying him as the person if you ran back into the

5    apartment, that would be him, correct?

6        A.    Correct.

7        Q.    All right.  When you say at the bottom of page

8    5, you talk about too many obvious clues, what are you

9    referring to as the too many obvious clues that linked

10   Ontario to the -- to the chase?  You say I mean it's --

11   it's kind of -- it's kind of -- there is too many obvious

12   clues.  What are you -- what are the obvious clues that

13   link Ontario to the circumstance?

14       A.    When I recognize him while I was chasing him,

15   when he ran into the apartment, all of those, and when he

16   comes out of the apartment sweating and breathing hard.

17       Q.    All right.  So I want to -- it's -- so remember

18   before when I asked you the totality of the arrest and I

19   said it's based upon the fact that you recognized him and

20   that was the only thing?  Remember that --

21       A.    Yes.

22       Q.    -- testimony under oath?

23       A.    Yes.

24       Q.    Okay.  And you said yes?

25       A.    Yes.

```
 1        Q.    Okay.  So there's more things now, correct?
 2        A.    Yes.  I mean all that --
 3        Q.    Okay.  As the deposition has --
 4              THE COURT REPORTER:  I'm sorry.  Could we all
 5        just speak one at a time, please?
 6  BY MR. KRUDYS:
 7        Q.    Yeah.  As the deposition has gone on, you're
 8  now saying under oath something different from what you
 9  said earlier in the deposition, correct?
10        A.    No.  That's some of it too, yes.
11        Q.    Okay.
12        A.    It all comes together.
13        Q.    Earlier in the deposition, I said the totality
14  of what linked him to the crime was that you recognized
15  him.  You said yes.  That's it, right?
16        A.    Right, I said that, yes.
17        Q.    Okay.  Did you think we are just like -- did
18  you think we were actually in a deposition under oath at
19  the time?
20        A.    Yes.
21        Q.    Okay.  And Ontario asked you are there videos
22  or body cams or fingerprints that you can look to to try
23  to show that he is not the guy, correct?
24              MR. HAMMER:  Objection to form.
25        A.    Correct.
```

1    Q.    And then when you say I watched you run into

2    that house, he replies you didn't watch me, you watched me

3    and my mom, you had to.  That was his statement back to

4    you, correct?

5    A.    Yes.

6    Q.    And then further down, he says you can't do no

7    fingerprint tests or nothing.  That was his statement

8    asking you, correct?

9             MR. HAMMER:  Where are we?

10    A.    Correct.

11             MR. KRUDYS:  On the middle of page 6.

12    BY MR. KRUDYS:

13    Q.    You can't do no fingerprint tests or anything

14    or nothing.  That was him pleading with you to do some

15    other type of testing, correct?

16    A.    Correct.

17    Q.    At the bottom of page 7, at the very last line,

18    Ms. Lakita Patterson refers to Ontario as her 17-year-old

19    son, correct?

20    A.    Yes.

21    Q.    You had no reason to believe that he was not

22    17, correct?

23    A.    Correct.

24    Q.    She told you on the scene, at the top of page

25    8, that her son does not drive, correct?

1     A.    Yes.

2     Q.    You were unable to identify any evidence that

3  he could not drive, correct?

4     A.    Correct.

5     Q.    Or that he could drive, correct?  You had no

6  neighbors saying, oh, I've seen him drive before?  You had

7  no driver's license, nothing like that, correct?

8          MR. HAMMER:  Objection to form.

9     A.    Yeah, correct.

10    Q.    And, again, he tells -- she tells you again, at

11 the middle of page 8 in your interrogatories, he's only

12 17, correct?

13    A.    Correct.

14    Q.    And you wanted -- you wanted to take a DNA swab

15 of Ontario; is that correct?

16    A.    Yes.

17    Q.    All right.  And his -- his mother told you not

18 to, correct?

19    A.    Correct.

20    Q.    But you nonetheless did any way, correct?

21    A.    No.

22          MR. HAMMER:  Objection to form.

23 BY MR. KRUDYS:

24    Q.    Did you put a swab into his mouth?

25    A.    No.

```
 1          Q.    Did you attempt to do that?

 2          A.    I started to, yes.

 3          Q.    You started to.  And why would you start to do

 4    that if you knew that his mom told you not to do that?

 5          A.    That was before his mom said not to do that.

 6    That was before she told me not to.

 7          Q.    Wasn't this at the very end of the encounter?

 8          A.    Yes.

 9          Q.    Okay.  The part on page 10 is about filing a

10    juvenile petition, but that's not -- that doesn't prevent

11    you from arresting Ontario if you believed, in fact, he

12    was the suspect, correct?  They are two different things,

13    correct?

14          A.    Yes.

15          Q.    Okay.  Let's see what time we have.

16                MR. HAMMER:  Fifteen after twelve.

17                MR. KRUDYS:  I suggest we just keep going.

18                MR. HAMMER:  As in you think you can finish up

19          before a lunch break?

20                MR. KRUDYS:  Yeah, that's my plan.

21                MR. HAMMER:  Could we just take, pretty soon, a

22          five-minute break?

23                MR. KRUDYS:  We can take it now.

24                (Recess, 12:17 p.m. to 12:23 p.m.)

25    BY MR. KRUDYS:
```

133

 1      Q.    Going to Exhibit 33, so there were a number of
 2   times when you were just -- when you were chasing the
 3   suspect where you just began walking instead of running,
 4   right?
 5      A.    Right.
 6      Q.    And that's because you either lost sight of him
 7   or you ran out of wind, right?
 8      A.    Yes.
 9      Q.    Okay.  And there were at least two times when
10   you were just walking, correct?
11      A.    Yes.
12      Q.    So one of the times you're walking is when
13   you're on the other side of an -- of the fence that
14   borders Commerce, correct?
15      A.    Yes.
16      Q.    So this is a picture -- the first one, it's
17   marked A, this is a view from -- this is a view from --
18   when you were -- said you were on Commerce and you looked
19   back across the fence and you saw Mr. -- who -- you saw
20   the suspect and identified it as Ontario, this is a view
21   from where Ontario would have been and you would have been
22   on the other side of the fence; is that right?
23      A.    Yes.
24      Q.    Okay.  And this is where you said you saw him
25   for about two to three seconds looking at you?

```
 1        A.    Yes.

 2        Q.    And then he moved to the right; is that right?

 3              So is that right, he moved to the right?

 4        A.    To the right of this picture you're talking

 5   about?

 6        Q.    Yeah.  Yeah.

 7        A.    I don't know exactly where this is, but, I

 8   mean, he was near the dumpster.  So this looks like a

 9   little ways away from the dumpster.

10        Q.    Well, but it captures a circumstance of

11   where -- you would have been like where that black SUV is

12   in the picture, correct?

13              MR. HAMMER:  Objection to form.

14   BY MR. KRUDYS:

15        Q.    That black SUV --

16        A.    I was probably a little bit more up the road.

17        Q.    All right.  But that's how far away you were

18   when you looked over, correct?

19              MR. HAMMER:  Objection to form.

20        A.    I was against the fence almost.  I was pretty

21   much on the fence.

22        Q.    Could that have been in actuality more like 30

23   yards than 30 feet?

24              MR. HAMMER:  Objection to form.

25        A.    I -- I can't tell you exact.  I didn't measure
```

```
 1    or nothing.  I can't tell you exact how far it is.  It's

 2    just my estimation.

 3         Q.    All right.  Then next photo, Exhibit B.

 4               MR. HAMMER:  Just for the record, he doesn't

 5         have any like A, B, C, D.  It's fine.

 6    BY MR. KRUDYS:

 7         Q.    All right.  Write B at the bottom then.

 8               So what does this show?

 9               MR. HAMMER:  Object to the form.

10         A.    I believe this shows an apartment on the left

11    side.

12         Q.    And this is where you say you were standing by

13    the dumpster that you last saw Mr. -- the suspect go into

14    the front of the apartment; is that right?

15         A.    Yes.

16         Q.    You can't see --

17         A.    Around this area.

18         Q.    You can't see the front of the door from here,

19    can you?

20         A.    No.  I was enough to the point where I could

21    see the entranceway.

22         Q.    You've already showed us where the X was and

23    the X was by the dumpster, correct?

24               MR. HAMMER:  Objection to the form.

25         A.    Near the dumpster.
```

136

```
 1        Q.    All right.  Can you see from this photo the
 2   front of the door of the apartment?
 3        A.    No.
 4        Q.    And to get to the front of the door of the
 5   apartment, anybody would have to run around the hedges,
 6   around the railing, correct?
 7              Correct?
 8        A.    Yes.
 9        Q.    And the door -- in the next photo, door C --
10   photo C, the door is actual opening on the right side,
11   correct?
12              It's not on the left of door, correct?  The
13   knob is on the right, correct?
14        A.    Yes.  In the picture, yes.
15        Q.    And the door opens in, not out, correct?
16        A.    Correct.
17        Q.    So isn't the dumpster, if you look at the next
18   photo, Exhibit D, isn't the dumpster in this photo to the
19   right of this photo?  Isn't that where the dumpster was
20   placed?
21        A.    It's almost behind it.
22        Q.    Okay.  So does this approximately show where
23   you were standing when you say -- you said he entered the
24   front of the apartment?
25        A.    Approximately.
```

```
 1        Q.    Okay.  That's Exhibit D.
 2              THE COURT REPORTER:  All right.  Put a D on
 3        that.  You're doing great.
 4   BY MR. KRUDYS:
 5        Q.    And then if you look at E, the E shows that the
 6   entrance to the doorway is recessed inside the -- inside
 7   the building, correct?
 8        A.    Yes.
 9        Q.    Okay.  So not only is the door not facing --
10   let me see that.  Not only does the door not face 9th
11   Street, it faces Everett Street, right?
12              If you want to, you can look at Exhibit 31
13   again.  31.
14        A.    Oh, no, this door faced 9th Street.  Yes.
15        Q.    Okay.  Yeah.
16              So and you have that brick wall that would be
17   between that is to the left of the doorway, correct?
18        A.    Correct.
19        Q.    Now when you encountered Ontario -- the next
20   photo is F, put an F there.
21              When you -- when you encountered Ontario, it
22   was at this back door; is that right?
23        A.    Yes.
24        Q.    All right.  And his mother and then on Ontario
25   came out of the door that's on the left; is that right?
```

138

```
 1       A.    Yes.

 2       Q.    If you look at -- go to and mark as Exhibit H

 3   the photo of the car, the individual and the SUV; do you

 4   see that?

 5             MR. HAMMER:  This is a screen grab from the

 6       video dash cam, correct?

 7             MR. KRUDYS:  Yes.

 8             MR. HAMMER:  Just to clarify, it's not a photo.

 9   BY MR. KRUDYS:

10       Q.    And so who is that individual in the right-hand

11   side?

12       A.    The suspect.

13       Q.    Okay.  And so did he have the mask on then?

14       A.    I cannot see in this photo.

15       Q.    Does he have the hat on?

16       A.    I can't tell with this photo.

17       Q.    Okay.  Where -- at the point, you're way up the

18   street, correct?  And you've lost sight of him, correct?

19       A.    Yes.

20       Q.    And you're walking at this point, correct?

21       A.    Yes.

22       Q.    Okay.  And then when you -- when you start

23   approaching the car, you see that the suspect is actually

24   at the car and you radioed that in, correct?

25       A.    Correct.
```

139

```
 1        Q.    But then when the suspect runs away, you run
 2   for about a half block and then just begin to walk,
 3   correct?
 4        A.    Yes.
 5        Q.    If you look at -- go to Exhibit Number 34, page
 6   18.  About the third -- the paragraph that begins after
 7   the crash, the subject later identified as Ontario Logan
 8   Patterson -- that was identified by you; is that right?
 9        A.    Yes.
10        Q.    All right.  If you go back to the front of the
11   notebook, so we've already talked about Exhibit 2.
12             MR. KRUDYS:  I'm going to move into evidence
13        Exhibit 2.
14   BY MR. KRUDYS:
15        Q.    Let's talk about Exhibit 3.  This is a -- have
16   you ever seen this document before?  It's an -- it's an
17   investigation of the complaint made by Lakita Patterson
18   about you.
19        A.    Yes.
20        Q.    Okay.  You were told at the time that
21   Logan-Patterson -- Ontario had recently had knee surgery;
22   is that right?
23             MR. HAMMER:  Objection to the form.
24        A.    Yes.
25        Q.    That's what you were told at the scene,
```

```
 1   correct?

 2       A.    Yes.

 3       Q.    Did you ever ask to speak with any of his

 4   doctors or obtain any medical records concerning his

 5   surgery and his inability to run?

 6             MR. HAMMER:  Objection to the form.

 7       A.    No.

 8       Q.    In the paragraph 1, 2, 3 -- well, actually, the

 9   second one down, the occupants told Wyatt he had the wrong

10   person in custody.

11             That's correct, right?  The occupants told you

12   that Ontario was not the guy, correct?

13       A.    Correct.

14       Q.    Then his mother says that he can't run due to

15   his knee surgery.

16             That's a correct statement, correct?

17             MR. HAMMER:  Objection to form.

18       A.    I'm not sure if she said that to the camera or

19   she said that exactly to me or not.

20       Q.    Okay.  The last paragraph there is a

21   conversation where there is another individual by the name

22   of Morris -- and I get that there are two deputies named

23   Morris, but one says according to her, well, I need this

24   for my case and this is my case.  Morris then said I

25   understand that, but this is something that bothers her
```

```
 1    and the parent of the young man is saying you cannot take
 2    his DNA.
 3              Is that an accurate statement of what was said?
 4         A.   I don't recall that being said.
 5         Q.   If you go to the top of page 3 which is marked
 6    as Bates number 192, she complains that the occupants of
 7    the stolen vehicle were not detained and were allowed to
 8    walk away from the scene.
 9              That's true, correct?
10         A.   Correct.
11         Q.   Did you make the statement to her that that is
12    what you people do?
13         A.   No, I do not recall saying that.
14         Q.   You're saying that you did not say it or you
15    don't recall?
16         A.   I don't recall saying that.
17         Q.   All right.  If you go to page 193, page 4, it
18    talks about a light-colored hoody at 8:56.  See at 8:56,
19    the suspect was wearing a light-colored hoody, possibly
20    blue, and dark pants?
21         A.   Yes.
22         Q.   But you retained -- you retrieved a black hoody
23    from the scene, correct?
24         A.   Correct.
25         Q.   And over the radio at 10:47, it correctly says
```

142

```
 1   you said over the radio ski mask on, correct?
 2            MR. HAMMER:  Objection to form.
 3   BY MR. KRUDYS:
 4        Q.    That's what the radio announcement was?
 5        A.    Yes.
 6        Q.    And when you say -- you didn't say hat on.  You
 7   said ski mask on, correct?
 8        A.    Correct.
 9        Q.    Did you ever play back the video, the camera
10   video of -- that was captured when Ontario sat in your
11   car?  Did you ever listen to it as part of your
12   investigation?
13        A.    Okay.  Yes.
14              Have I listened to that video of him in the
15   car?
16        Q.    Right.
17        A.    Okay.  Yes.
18        Q.    And he -- when he is placed in the car by
19   himself, he's says he racially profiled the F-U-C-K out of
20   me, right?
21        A.    Yes.
22        Q.    And then at 1:31, he complains you can't do no
23   fingerprint tests or anything or nothing.  That's what he
24   said to you?
25        A.    Where are we at right now?
```

143

1       Q.    1:31.

2       A.    1:31, okay.

3       Q.    On page 194.

4       A.    Okay.  Yes.

5       Q.    So he's -- basically he's pleading with you to

6  do some type of testing to show he's innocent, correct?

7       A.    Correct.

8       Q.    At 26:34 on page 195, it talks about the --

9  remember how you said the occupants said that

10  Mr. Patterson was an exact match for the driver but not

11  the same?

12      A.    Yes.

13      Q.    Do you remember that testimony?

14            And here it says looked the same but was not

15  the driver, correct?

16      A.    Yes.

17      Q.    It's not -- they didn't say an exact -- they

18  didn't say he was an exact match, did he -- did they?

19            MR. HAMMER:  Objection to the form.

20      A.    Something to those words, yes.

21      Q.    What?

22      A.    Something to those words, yes.

23      Q.    Well, there is a big difference between he's an

24  exact match and he looked the same, isn't there?

25            MR. HAMMER:  Objection to form.

144

```
 1   BY MR. KRUDYS:
 2        Q.    Or do you see them as the same?
 3        A.    I see them as the same thing.
 4        Q.    You do?  Exact match and look the same is the
 5   same thing to you, right?
 6        A.    Yes.
 7        Q.    All right.  But you -- when you look at this
 8   report of what the video actually shows, is it your
 9   understanding that the passengers said that he looked the
10   same or that he was an exact match?
11        A.    I see that as they said that he looked almost
12   exactly like that suspect, kind of those words.
13        Q.    Did they use the words exactly like or did they
14   say he looked the same?
15        A.    I recall being the -- from what I recall, I
16   believe it was exact, he looked exactly like that suspect,
17   yes.
18        Q.    Well, you were there when you're saying that
19   they used the word exactly like him?
20        A.    Yes.
21        Q.    And you -- you do know that there is a dash cam
22   video that captures that conversation, correct?
23        A.    Yes.
24        Q.    Okay.  All right.
25        A.    But there is also -- I know -- go ahead.
```

145

1        Q.    There is also what?

2              MR. HAMMER:  You can finish your answer.

3    BY MR. KRUDYS:

4        Q.    There's also what?

5              MR. HAMMER:  Go ahead.

6        A.    There's also some video that shows -- that does

7    not show nothing that -- when I'm walking away talking to

8    him individually.

9        Q.    I'm not catching what you're saying.

10       A.    In some of the -- so the whole incident was not

11   captured on camera.  There is some incidents that are not

12   captured on camera.

13       Q.    Okay.

14       A.    That shows us talking on camera.

15       Q.    Sir, are you testifying that you heard them say

16   he was an exact match --

17       A.    Yes.

18       Q.    -- but not the same?

19       A.    Something to that effect, yes.

20       Q.    Which one is it?

21       A.    Something to the effect that he looked exactly

22   the same.

23       Q.    Well, if he looked exactly the same, what age

24   did they say he was?

25              They didn't, right?

```
 1        A.    No, they didn't.

 2        Q.    You never asked them?

 3        A.    No.

 4        Q.    You never asked them about whether or not the

 5   person driving the car had short, full, or closely cut

 6   hair, right?

 7        A.    No.

 8        Q.    You never asked them about their face -- his

 9   face, whether it was, for instance, square, oval, or

10   round, correct?

11        A.    Correct.

12        Q.    You never asked what his eyes were like, large,

13   small, almond, protruding, deep set, nothing like that,

14   right?

15        A.    Right.

16        Q.    You didn't ask about the nose, whether it was a

17   large nose, small nose, bulbous nose, pointed nose,

18   nothing about that, correct?

19        A.    Correct.

20        Q.    And you didn't ask about his lips, whether or

21   not they were full, thin, plump, nothing along those

22   lines, correct?

23        A.    Correct.

24        Q.    And you didn't ask about his chin, whether or

25   not it was square or sharp, pointy, correct?
```

147

```
1        A.     Correct.
2        Q.     You're laughing -- your counsel is laughing,
3   but my guy, my client spent weeks in jail because of your
4   identification.
5              MR. HAMMER:  For the record I'm not laughing --
6              MR. KRUDYS:  Yes, you were.
7              MR. HAMMER:  -- because of the circumstance.
8         I'm laughing because it sounds like you're describing
9         a sketch artist and the work that they do.  That's
10        why I was chuckling.
11  BY MR. KRUDYS:
12        Q.     Well, did you provide any type of description
13  of any type other than he's a black guy?  Any --
14              MR. HAMMER:  Objection to form.
15        A.     What are you asking again?  Ask that again.
16        Q.     Did you ever provide any type of facial
17  description of the suspect you were chasing other than
18  black male?
19              MR. HAMMER:  Objection to form again.
20        A.     No, I did not.  I just recognize what I know.
21  It's hard to explain how someone exactly looks.
22        Q.     So if you go over to Exhibit 5, this refers to
23  a citizen complaint where Ms. Lakita Patterson -- this is
24  at the bottom in the summary, right in the middle -- says
25  she was greeted with a gun in her face by Trooper Wyatt.
```

148

1              Do you see that?

2         A.    Yes.

3         Q.    That's been her description of events all the

4    time, correct?

5              MR. HAMMER:  Objection to form.

6    BY MR. KRUDYS:

7         Q.    As far as you know.

8         A.    Oh.  Are you saying is that what she's saying I

9    did?

10        Q.    You understand that she -- she has asserted

11   that from the beginning, correct?

12        A.    Okay.  Yes.

13        Q.    Okay.  All right.  If you look at Exhibit

14   Number 6, if you go over to -- let me ask you this,

15   Trooper.  Why is it you say there is a conversation with

16   Mr. -- with the suspect where he says he's not going to

17   jail.  Why is that not captured on your audio?

18        A.    So just a distance away from the car can be a

19   factor, just...

20        Q.    When you set -- when you -- when he says he's

21   not going to jail, according to your testimony, do you say

22   anything in reply?

23        A.    No.

24        Q.    This printout that is on, for instance, page

25   206, this is a summary of some of the radio calls but it's

1    not the exact wording, correct?

2        A.    Yes.

3        Q.    You mean correct?

4        A.    Correct.  Yes.

5        Q.    And then at the top of page 207, you identify

6    the apartments as the apartments at the Christmas lights;

7    is that right?

8              MR. HAMMER:  Objection to form.

9        A.    Yes.

10       Q.    And were there Christmas lights on

11   Ms. Patterson's apartment?

12       A.    I believe it was, yes.

13       Q.    Okay.  And then picture number 7 is a photo of

14   you at the scene?

15       A.    Yes.

16       Q.    If you go over to Exhibit Number 11, at Exhibit

17   Number 11, this is a report by Trooper Robert Morris

18   concerning this circumstance.

19       A.    Okay.

20       Q.    And then about halfway down in the first

21   paragraph, if you see where my finger is, sir, over the

22   radio, he's saying over the radio I could hear him state

23   that he was near the apartment with the Christmas lights

24   over the door, correct?

25       A.    Yes.

150

```
 1        Q.    All right.  Where were the Christmas lights
 2   over Ms. Patterson's apartment, where exactly were they
 3   situated?
 4        A.    I don't exactly remember.  I just remember over
 5   there in that area, there was Christmas lights, and that's
 6   how I guided them to where I was.
 7        Q.    Okay.  Now it's where -- now you're saying it's
 8   in the -- the apartment was in the area where the
 9   Christmas lights, not the actual apartment with the
10   Christmas lights?
11        A.    No.  I believe it was at the Christmas lights
12   at the actual townhome or the apartment.
13        Q.    Okay.  Well, are you --
14        A.    I don't know exactly where they were at the
15   time.
16        Q.    Okay.  So what is it under oath?  Did
17   Ms. Patterson's apartment have Christmas lights on it or
18   not?
19        A.    I recall it did, yes.
20        Q.    And where were they?
21              You said you were standing outside the
22   apartment looking in the window and somebody was looking
23   out the window.  Where are the Christmas lights in
24   relation to that?
25        A.    I don't recall where they exactly were.
```

```
 1        Q.    Okay.

 2        A.    I just know --

 3        Q.    Weren't the Christmas lights, in fact, at a

 4   different apartment farther down or do you not know?

 5        A.    I don't recall.

 6        Q.    Okay.  All right.  Did you ever use the word

 7   describing -- did you use the word thug on the evening of

 8   the 11th?

 9        A.    No.

10        Q.    All right.  Well, if you look over on page 13

11   of Exhibit 11, during the course of events, I do recall --

12   somewhat recall words like thug or those people being

13   used.

14              Do you know who -- who said that?

15        A.    No.

16        Q.    And then if you go to Exhibit Number 12 -- 12

17   is the other way -- this is Chance Morris talking about

18   his conversation with Lakita Patterson and it's about

19   halfway down.  She says nobody ran in my house.  The only

20   person that's -- person in here is my son.

21              That is what she told you, correct?

22        A.    Yes.

23        Q.    If you look at paragraph -- Exhibit Number 13,

24   about halfway down on Exhibit 13, is it says per my

25   training and experience, I unholstered my gun and kept it
```

152

```
 1   pointing down as I saw K9 Trooper Layton stage there as
 2   well.
 3            So remember when I asked you before as to
 4   whether or not troopers had their guns unholstered or not.
 5   So this indicates that Officer Mikel Hana -- is that a
 6   woman or a man?
 7        A.    A man.
 8        Q.    That he had his gun unholstered at the time,
 9   correct?
10        A.    That's what he says.
11        Q.    Okay.  So where was he -- do you recall seeing
12   Hana there?
13        A.    Yes.
14        Q.    Okay.  Was -- was Ontario in custody at the
15   time that Hana was there or not?
16            MR. HAMMER:  Objection to form.
17        A.    I don't recall when he got there, the exact
18   time he got there.  I don't recall him being at the door.
19        Q.    So if you go to Exhibit Number 14.
20            You just said before that the sweater was
21   lighter color, the sweatshirt that the suspect was wearing
22   was lighter color, correct?
23        A.    Yes.
24        Q.    All right.  About halfway down from -- this is
25   from Seth Layton.  Trooper said the driver removed a
```

153

```
1    sweatshirt, plain black were observed from the back, and

2    mentioned that he ducked down.

3              Did the sweatshirt have any writing on the back

4    of it that you have -- the suspect that you were chasing?

5        A.    There was something on the back of it.  I don't

6    know exactly what it was.

7        Q.    All right.

8        A.    I remember something.

9        Q.    But this has Layton saying that you described

10   the sweatshirt as plain black, right?

11       A.    Okay.  That's what he said.

12             MR. HAMMER:  Objection to form.

13   BY MR. KRUDYS:

14       Q.    Okay.  And you took into custody a black

15   sweatshirt, not a lighter-colored sweatshirt with writing

16   on the back, correct?

17       A.    Correct.

18       Q.    So the sweatshirt you took into possession

19   didn't match the sweatshirt of the person you were

20   chasing, correct?

21             MR. HAMMER:  Objection to form.

22       A.    Correct.

23       Q.    And then, in fact, this is your writing on

24   Exhibit Number 16 where you say -- you talk about --

25   halfway down, middle of the photograph -- located at the
```

```
 1    end of Everett Street with his gray jacket in his hand.

 2              So you described sweatshirt as now a gray

 3    jacket, correct?

 4         A.    Yes.

 5         Q.    So it's not black, it's gray, correct?

 6         A.    Yes.

 7         Q.    Yeah.

 8              You stated here you saw an object thrown under

 9    the dumpster, but you, in fact, search inside the dumpster

10    at first, correct?

11         A.    Yes.

12         Q.    And on page 16 or tab 16, the second page, 97,

13    Ontario came to the door wearing long white thermal pants;

14    is that right?

15         A.    Yes.

16         Q.    Not black pants?

17         A.    No.

18         Q.    The suspect you were chasing had black pants,

19    correct?

20         A.    I just remember them being dark pants, yes.

21         Q.    What?

22         A.    I just remember them being dark pants.

23         Q.    Okay.

24         A.    Dark pants.

25         Q.    But he came to the door with light pants,
```

155

```
 1    correct?
 2         A.    Yes.
 3         Q.    Exhibit 18 is the firearm that was found in the
 4    vehicle -- I'm sorry, in the dumpster that came back to
 5    Jada Nicole Hall, correct?
 6         A.    Correct.
 7         Q.    And you had one conversation with her of, what,
 8    less than five minutes?
 9         A.    Yeah, I would say.
10         Q.    That's the totality of your investigation
11    concerning the gun?
12         A.    Yes.
13               MR. HAMMER:  Objection to form.
14    BY MR. KRUDYS:
15         Q.    What is Exhibit Number 27?  This seems to be
16    something that you prepared.
17         A.    Yeah, report, the report for the pursuit.
18         Q.    And to whom did you turn this report in to?
19         A.    The Commonwealth Attorney.
20         Q.    And when did you turn it in to the Commonwealth
21    Attorney?
22         A.    I don't have an exact date.
23         Q.    We referred to this before, the LEAMS.  I think
24    it maybe it was with the other witness.  If you look at
25    Exhibit 28, this has LEAMS in caps written at the top
```

1    right.

2        A.    Yes.

3        Q.    Do you -- what does that refer to?

4        A.    I believe that's Law Enforcement Agency

5    Management System.

6        Q.    And what exactly is that?

7        A.    Just where our investigations and reports go

8    to.

9        Q.    The fingerprints on the gun and the magazine

10   came back as not of value for comparison, correct?

11       A.    Correct.

12       Q.    Was that before or after you called

13   Ms. Patterson and told her son to turn himself in?

14       A.    Did I get the results before or after, is that

15   what you're asking?

16       Q.    Yeah.

17       A.    I got the results after.

18       Q.    So you had him turn himself in and go into

19   custody before you had even gotten the latent prints back?

20       A.    Yes.

21       Q.    How much time passed from when you had Ontario

22   turn himself in until the prints came back?

23       A.    What exhibit is that at?

24       Q.    It's Exhibit Number 28 and it's on page 146.

25   If you want to, I could just give you my page and whatever

```
 1    date.

 2              Is there a date on there?

 3        A.    Yeah.  No.  I don't know the exact date when we

 4    got this and I don't know what time I had it, when we got

 5    this.  I just see where I --

 6        Q.    But how much time generally passed from when

 7    he -- he's -- you had him turn himself in until that

 8    report came back?  Is it days?  Weeks?

 9        A.    It's usually weeks.

10        Q.    Why didn't you wait for the fingerprints to

11    come back?

12        A.    That's just not what we have to do.

13        Q.    So when you -- according to you, when Ontario

14    comes to the back door, you immediately recognize him as

15    the suspect you're chasing, right?

16        A.    Correct.

17        Q.    But you don't arrest him at that time, correct?

18        A.    Yes.

19        Q.    And if he's the guy, why didn't you just arrest

20    him and take him into custody?

21        A.    Like I said earlier, just a juvenile process.

22        Q.    But when he comes to the door, you don't even

23    know that he's a juvenile at that time, correct?

24        A.    Correct.

25        Q.    So if you're so sure that it's him, why didn't
```

158

```
 1    you just take him into custody and drive him downtown?
 2    You weren't sure, were you?
 3          A.    I was sure.  I just did not know about the
 4    juvenile process.
 5          Q.    You what?
 6          A.    I didn't know about the juvenile process.
 7          Q.    All right.  So which officers did you ask about
 8    the juvenile process?
 9          A.    I just asked a few officers.  I don't --
10          Q.    What are their names?
11          A.    I don't know off the top of my head.
12          Q.    We know who is there.  So just bear with me.
13          A.    I don't know if it was someone at the scene or
14    someone away from the scene.  It was just --
15          Q.    Well --
16                MR. HAMMER:  If you're looking for the list of
17          other troopers --
18                MR. KRUDYS:  I've got it.
19                MR. HAMMER:  Speed it along.
20          A.    Yeah.  I don't recall asking anyone on scene
21    that question.
22          Q.    You don't?
23          A.    No, I do not.
24          Q.    Well, why not?
25          A.    That just -- I didn't think about that at the
```

159

```
 1    time.
 2         Q.    But you're telling us the reason you're not
 3    taking him into custody is because you don't know about
 4    the juvenile process, right?
 5         A.    Right.
 6         Q.    There's eight or nine troopers there, right?
 7         A.    Correct.
 8         Q.    The supervisor is present too, correct?
 9         A.    No, my supervisor did not come down there, no.
10         Q.    Present by radio, correct?  You can call them
11    up on the radio, correct?
12         A.    Yes.
13         Q.    So if the only thing preventing you is not
14    understanding the juvenile process, why didn't you just
15    ask the troopers that were present how do I arrest a
16    juvenile?
17         A.    That is just not what I thought about at the
18    time.
19         Q.    But you're telling me that's the sole
20    impediment for not arresting him is not knowing that
21    process.  You've got eight troopers right there with you.
22    Why didn't you ask one of them, hey, how do I arrest a
23    juvenile?
24              MR. HAMMER:  I think this is asked and
25         answered.  He's already answered your question.
```

1    BY MR. KRUDYS:

2        Q.    Why didn't you ask them?

3        A.    I just wasn't sure and I just didn't think

4    about that at the time.  We're not required to do that.

5    We weren't required at that time.  So it's just not what I

6    thought about.

7        Q.    But you're telling me the only thing that's

8    preventing you from arresting him, you're so sure

9    according to your testimony here today, is that you don't

10   know how to arrest a juvenile, right?

11       A.    Yes.

12       Q.    Okay.  So, you've got eight or nine troopers

13   right there and your supervisor over the radio.  Why

14   didn't you ask any of them how do I arrest a juvenile?

15           MR. HAMMER:  Objection, argumentive, asked and

16       answered.  We've gone over this two or three times.

17       A.    Same.  I mean I didn't think about that at the

18   time.  It just did not come to my mind at the time.  We're

19   not required to do that.

20       Q.    But the -- the thing that's -- the big question

21   in your mind is how do I arrest a juvenile.  Who -- when

22   you eventually did arrest him, have him turn himself in,

23   who gave you that information?  Who is the one that

24   provided that to you?

25           MR. HAMMER:  Objection to form.

```
 1        A.    I don't know the exact name.  It was just
 2  coworkers or anything like that.
 3        Q.    Describe them.  White or black?  Asian?
 4        A.    White, black, it might have been two of them or
 5  something, so, but it's just --
 6        Q.    Well, the person that you talked to to learn
 7  how to arrest a juvenile according to your testimony, was
 8  it a man or a woman?
 9        A.    Most likely it was a man.
10        Q.    Most likely it was a man.  So was it -- what
11  was the race, white, Asian, black, Hispanic?  Which one?
12        A.    Most people I work with are white or black, so
13  it's going to be a white or black male.
14        Q.    So you can't identify at all this person you
15  allegedly asked direction of how to arrest a juvenile,
16  correct?
17        A.    No.
18        Q.    You didn't actually see the suspect go into the
19  front of the apartment, did you?  You just saw him pass
20  the front of the apartment, correct?
21              MR. HAMMER:  Objection.  We've already gone
22        over this.
23  BY MR. KRUDYS:
24        Q.    You -- you didn't actually see him go into the
25  apartment, correct?
```

1          MR. HAMMER:  Objection.

2     A.    I seen him go into the entrance.

3     Q.    No.  You couldn't have because the angle cuts

4     it off.

5          MR. HAMMER:  Objection, asked and answered.

6     BY MR. KRUDYS:

7     Q.    You merely saw him run by, correct?

8     A.    No.

9     Q.    So your testimony under oath and you're going

10    to tell the court in this case is that standing near the

11    dumpster, you were, nonetheless, able to see a person go

12    into the apartment; is that right?

13         MR. HAMMER:  Objection.

14    BY MR. KRUDYS:

15    Q.    Go past the threshold of the door, correct?

16         MR. HAMMER:  Objection, argumentive --

17    A.    I can't see him go in the door, no.

18         MR. HAMMER:  Wait a second.

19         Objection, argumentive, asked and answered.

20    BY MR. KRUDYS:

21    Q.    Standing by the dumpster, which is where you

22    said you were at the time, is it your testimony that you

23    saw him go into the door from that circumstance -- from

24    where you were standing?

25         MR. HAMMER:  Same objection.

```
 1        A.    I seen him go in the entranceway.  Where I was

 2   standing, I could see the entranceway of the apartments.

 3        Q.    So you didn't actually see him go into the

 4   apartment?

 5        A.    I could see him go in the entranceway.  That's

 6   the only door --

 7        Q.    Listen to my question.  You did not actually

 8   see him go in the apartment, correct?

 9              MR. HAMMER:  Objection, form.

10        A.    I could see him go into the entranceway that --

11        Q.    What is the --

12        A.    -- leads to the door.

13        Q.    Okay.

14        A.    There's only one doorway.

15        Q.    Let's identity the entranceway.  Let's go over

16   to Exhibit 33 and go to Exhibit E.  If you didn't see him

17   go into the door and you say you saw him go into the

18   entranceway, where is the entranceway?

19        A.    This way right here, this entranceway to the

20   door.

21        Q.    All right.  Put a -- put a big circle around it

22   with your -- with the magic marker.

23              So your testimony now is that you never

24   actually saw him open the door, you saw him at -- go to

25   the entranceway, correct?
```

```
 1              MR. HAMMER:  Objection to form.

 2       A.    Correct.

 3       Q.    All right.  And is that what you put in your

 4  affidavit, that you saw him go in the entranceway and not

 5  the door?

 6              MR. HAMMER:  Objection to form.

 7       A.    I had to see exactly my affidavit to affirm

 8  that.

 9       Q.    All right.  If you look at Exhibit 33B.  All

10  right.  So are you just merely saying that you saw him on

11  the other side of the hedges?

12       A.    No.  From where I was standing, I believe I

13  said this, but this is not the exact area right here.

14  Somewhere around here where I was standing, I could see

15  the entranceway to that door.

16       Q.    All right.  But there -- there -- between the

17  door and the end of the wall is a -- look at Exhibit

18  Number E, 33E.  There is a brick wall that I don't know

19  the exact distance but it's at least five feet from the

20  corner of the building until you get to the door, correct?

21              MR. HAMMER:  Objection to form.

22       A.    I don't know how many feet that is, but okay.

23       Q.    Okay.  And so if you go to Exhibit Number 34 on

24  page 18, do you see the paragraph that says after the

25  crash?
```

1      A.    Yes.

2      Q.    Go to the last sentence of that paragraph.

3    When he approached the apartment, he ran through the front

4    door of the apartment building.

5            That's what you stated under oath in the

6    document, correct?

7      A.    Correct.

8      Q.    And then on your -- on page 5 of Exhibit 34,

9    you state in that document that he entered a single unit

10   apartment, correct?

11     A.    Correct.

12     Q.    Meaning you -- he entered the doorway of the

13   apartment, correct?

14     A.    Correct.

15     Q.    But you never actually saw him enter the

16   doorway of the apartment, correct?

17     A.    No, I seen --

18           MR. HAMMER:  Objection to form.

19   BY MR. KRUDYS:

20     Q.    So both documents utilized in connection with

21   the case are false, correct?

22           MR. HAMMER:  Objection to form.

23     A.    No.

24     Q.    You're saying in these document that he ran in

25   the door of the apartment, correct?

```
 1        A.    Correct.
 2        Q.    But now your testimony under oath is that you
 3   just merely saw him on the entranceway, right?
 4              MR. HAMMER:  Objection to form.
 5        A.    Yeah.  I seen him in the entranceway that led
 6   to that door and he did not exit that door.
 7        Q.    He what?
 8        A.    There's only one door you can enter in the
 9   entranceway.
10        Q.    I see.
11              MR. KRUDYS:  I -- just to make sure that we --
12        so for the reporter, the exhibits that we've shown
13        today are 2, 3, 5, 6, 7, 11, 12, 13, 14, 16.
14   BY MR. KRUDYS:
15        Q.    Oh, if you go to -- sir, if you go to page
16   Exhibit 23, please.
17              This is a description of the property that was
18   taken into possession.  It was black hoody that was
19   obtained.  And this is not a gray hoody, correct?
20        A.    Correct.
21        Q.    Okay.  All right.  We also identified Exhibit
22   27.
23              If you look at on Exhibit 27 at the top of page
24   63.
25        A.    You said 27?
```

1        Q.    Yes, sir, page 63.

2              At the very top of it, your statement in your

3    official report is he ran through the front door of the

4    apartment building, correct?

5              MR. HAMMER:  Objection to form.

6        A.    Yes.

7        Q.    We looked at Exhibit 28.  That's the LEAMS

8    report, just briefly.

9              Exhibit Number 29, this -- this is also created

10   by you, correct?

11       A.    Yes.

12       Q.    And in the second paragraph down, it talks

13   about losing sight of him, correct, for a second time?

14       A.    Yes.

15       Q.    No, I'm sorry.  It says until I lost sight of

16   him, correct?

17       A.    Yes.

18       Q.    If, in fact, you identified Ontario Patterson,

19   Ontario Logan-Patterson affirmatively as the suspect that

20   you were chasing, why were charges dropped against him?

21       A.    The Commonwealth said she cannot prove -- prove

22   beyond a reasonable doubt to the satisfaction of the

23   sitting judge.

24       Q.    So at the trial in this matter, are you going

25   to affirmatively state that the person that you were

168

```
 1    chasing was Ontario Logan-Patterson?
 2             MR. HAMMER:  Objection to form.
 3        A.    Yes.
 4        Q.    And are you also going to tell the jury that
 5    you saw the suspect run into the apartment or not run into
 6    the apartment?
 7             MR. HAMMER:  Objection to form.
 8        A.    I seen him go into the entranceway --
 9        Q.    Okay.  Which is different --
10        A.    -- that led to the door.
11        Q.    Which is different than what you put in
12    official reports, correct?
13             MR. HAMMER:  Objection to form.
14        A.    No, I don't believe so.
15        Q.    You -- when I asked -- all those documents say
16    that he went in the front door.  You've seen that, right?
17        A.    Yes.
18        Q.    But your testimony is not that he went in the
19    front door, it's merely that he got to the entranceway of
20    the apartment, correct?
21             THE COURT:  Objection to form.
22        A.    And there was a door right there and he never
23    exited the door again.
24        Q.    And if you -- if he were to merely continue
25    down the street, you would not have seen him, correct?
```

```
1          A.    I'm not sure.

2          Q.    You're not sure?

3          A.    No.

4                MR. KRUDYS:  No further questions.

5                MR. HAMMER:  All right.  Yeah, just a couple of

6          minutes to see if we've got any redirect.

7                MR. KRUDYS:  Okay.

8                (Recess, 1:08 p.m. to 1:13 p.m.)

9    BY MR. KRUDYS:

10         Q.    If you go to Exhibit 32.

11               32 is a closer up photo of the scene.

12               So if you look at 31, we -- we put the dumpster

13   in there in the picture with the -- with the red.

14         A.    Yes.

15         Q.    And is that where you recall the dumpster

16   being?

17         A.    Yes.

18         Q.    All right.  So if you go to Exhibit Number 32,

19   can you utilize the orange magic marker to draw in where

20   you understood the dumpster to be?

21               Okay.  And then where were you approximately

22   standing when Mr. -- when you saw the suspect go into the

23   apartment or when you saw him, you said, go in the door,

24   where were you -- where was your testimony?

25               You can put this as an X, red pen.
```

170

```
 1          A.     Somewhere in this area.
 2          Q.     Oh.  So you're not by the dumpster now, you're
 3    right in front of the apartment?
 4          A.     Somewhere near the area, approximate.
 5          Q.     Okay.  So --
 6                 MR. HAMMER:  It's the neighboring apartment.
 7    BY MR. KRUDYS:
 8          Q.     You put --
 9          A.     Well, I mean, it could be -- I -- I mean I
10    can't tell you exactly where I tucked my head in.
11          Q.     You cannot tell me exactly where?
12          A.     No.
13          Q.     Well, what's -- how large of an area is it that
14    you recall standing when you saw him go, you're now
15    saying, on the -- on the entranceway of the property?
16                 MR. HAMMER:  Objection to the form.
17    BY MR. KRUDYS:
18          Q.     How large is it?
19                 Can you specify it with any degree of
20    specificity at all?
21          A.     Like where my -- approximate where my --
22          Q.     Where.
23          A.     -- is at?
24                 I mean.
25          Q.     You put a circle around the area that you might
```

```
 1   have been standing in when you saw him on the entranceway,
 2   correct?
 3        A.    Yes.
 4        Q.    All right.  And so you've used a red pen.
 5   Could you go back and use something a little darker?
 6              Let's use this one.  Use this blue magic marker
 7   and circle that -- that area you just marked with the red.
 8              So even though you put an X now, and you
 9   previously identified this, if we go back to Exhibit
10   Number 30 -- if I may, let's go back to 31.
11              Okay.  You previously marked this X over here
12   with the blue where you were standing, correct?
13        A.    Correct.
14        Q.    Now you put the X not next to the dumpster, but
15   you've moved it to the right of where it was before,
16   correct?
17              MR. HAMMER:  Objection to form.
18   BY MR. KRUDYS:
19        Q.    It's not directly next to the dumpster,
20   correct?  You put the X now farther to the right, correct?
21        A.    It was in that area.  I can't --
22        Q.    And then --
23        A.    I can't exactly tell you where.
24        Q.    And then you put -- because you can't exactly
25   tell me where --
```

1        A.    Yes.

2        Q.    -- you've now marked a blue circle that extends

3    from Everett Street through the back alley to the edge of

4    where that white car is parked, correct?

5        A.    Correct.

6             MR. HAMMER:  Objection to the form again.

7             MR. KRUDYS:  All right.  Thank you.  No further

8        questions.

9             MR. HAMMER:  All right.  We don't have any

10       redirect.  We are all done.

11             MR. KRUDYS:  All right.  Thank you.

12             MR. HAMMER:  Read and sign.

13

14             And further, this deponent saith not.

15

16             (The deposition was concluded at 1:17 p.m.)

17

18             (Exhibits 2, 3, 5, 6, 7, 11, 12, 13, 14, 16,
               18, 23, 27, 28, 29, 31, 32, 33A-F and H, 34,
19             and 38 marked.)

20

21

22

23

24

25

```
 1   REQUESTED CHANGES TO THE DEPOSITION OF
     TRAVIS SCOTT WYATT
 2   Reported By:  Lori McCoin Jones, RPR, CCR
     Page/Line       Change to/from:              Reason
 3

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16                _____

17                Travis Scott Wyatt

18

19   Commonwealth of Virginia, to wit:

20   Subscribed to before me this _____

21   Day of _____ 2025.

22   _____
                  Notary Public
23
     My Commission expires:  /  /
24
     Registration No. _____
25
```

1  COMMONWEALTH OF VIRGINIA AT LARGE:

2

3       To wit:  I, Lori McCoin Jones, RPR, CCR, Notary

4  Public in and for the Commonwealth of Virginia at large,

5  and whose commission expires January 31, 2028, do certify

6  that the aforementioned appeared before me, was sworn by

7  me, and was thereupon examined by counsel; and that the

8  foregoing is a true, correct, and full transcript of the

9  testimony adduced.

10      I further certify that I am neither related to nor

11 associated with any counsel or party to this proceeding,

12 nor otherwise interested in the event thereof.

13      Given under my hand and notarial seal at Richmond,

14 Virginia, this 13th day of March, 2025.

15

16

17     *Lori McCoin Jones*

18 _____

19     Lori McCoin Jones, RPR, CCR - Notary Public
                Commonwealth of Virginia
20              Registration No.: 115740

21

22

23

24

25

**0**

**000111** 52:10

**004** 97:10

**1**

**1** 22:16,19 102:23,24 103:5,6 140:8

**10** 132:9

**100** 26:23

**102** 22:11

**10:47** 141:25

**10:48** 65:16

**10:58** 65:16

**11** 17:24 20:21 21:6,19 23:3 25:23 45:8 51:18 54:24 55:3,9 62:13 93:20 94:15 149:16,17 151:11 166:13

**110** 26:25

**111** 52:9

**115** 27:6

**11th** 22:9 31:23 55:21 99:6 151:8

**12** 151:16 166:13

**120** 27:2,6 32:6 63:11,15

**12:17** 132:24

**12:23** 132:24

**13** 151:10,23,24 166:13

**14** 152:19 166:13

**146** 156:24

**15** 8:18 37:21,24 44:9 94:25 102:1,10 104:2,4,7 109:25

**16** 153:24 154:12 166:13

**17** 62:1 63:7 98:1 130:22 131:12

**17-year-old** 64:12 68:8,15,22 130:18

**18** 139:6 155:3 164:24

**192** 141:6

**193** 141:17

**194** 143:3

**195** 143:8

**1:08** 169:8

**1:13** 169:8

**1:31** 142:22 143:1,2

**2**

**2** 99:12,17 102:25 103:1 104:13 118:19,20 121:5,6,7 139:11,13 140:8 166:13

**20** 8:18 29:25 37:21 44:9 109:25

**2010** 9:18

**2015** 10:24 11:24,25

**2021** 12:2

**2023** 17:24 20:21 21:6,19 23:3 25:24 52:7 54:11,19,24 55:3,9 70:22 93:21 94:15

**206** 148:25

**207** 149:5

**20s** 68:19,20

**220** 89:17

**23** 45:8 52:23 166:16

**25** 104:9,12

**26:34** 143:8

**27** 155:15 166:22,23,25

**28** 52:9 155:25 156:24 167:7

**29** 167:9

**3**

**3** 102:1 104:13 118:21 121:7,24 139:15 140:8 141:5 166:13

**30** 15:4,5 46:10 47:6 52:23 54:11, 19 104:9,12 120:5 134:22,23

**30s** 68:19

**30th** 52:7

**31** 99:20,21 104:19 137:12,13 169:12

**310** 101:13

**312** 101:13

**32** 169:10,11,18

**33** 133:1 163:16

**33B** 164:9

**33E** 164:18

**34** 97:8 120:8 139:5 164:23 165:8

**35** 120:6,7

**38** 40:20 41:3

**3rd** 22:23

**4**

**4** 97:9 123:2,10,20 141:17

**40** 46:10 47:6

**5**

**5** 120:6,7,8 127:19 128:8 147:22 165:8 166:13

**6**

**6** 130:11 148:14 166:13

**60** 22:12 30:4

**63** 166:24 167:1

**7**

**7** 130:17 149:13 166:13

**70** 32:2,5

**8**

**8** 52:11 63:15 130:25 131:11

**80** 30:4 32:2,5

**8:56** 141:18

**9**

**9** 52:13 63:16

**9/30** 52:16

**9/30/2023** 52:12

**9/30/23** 53:5,10

**95** 19:5 22:20,21 30:3

**97** 154:12

**9th** 100:25 101:2 107:21 108:14, 16 109:7 112:25 113:2 137:10,14

---

**A**

**a.m.** 65:16

**abandoned** 43:10

**ability** 61:15

**absolute** 6:8

**academy** 12:5,15

**accessed** 71:22

**accident** 28:1 85:7

**accidents** 30:10

**accuracy** 94:11

**accurate** 97:23 141:3

**actions** 28:8,9

**activated** 26:7

**activity** 30:8 59:10 60:9 61:5,6

**actual** 136:10 150:9,12

**actuality** 134:22

**addition** 8:6

**additional** 30:23

**address** 5:12 61:4

**adults** 69:1

**affidavit** 52:22 97:7,11,17 164:4, 7

**affiliated** 60:12

**affirm** 164:7

**affirmatively** 86:7,10,13 87:14, 25 112:6 167:19,25

**African-american** 79:2 80:10, 21 125:25

**age** 15:2 18:25 90:11,12 145:23

**Agency** 156:4

**ahead** 144:25 145:5

**air-conditioning** 9:22 10:10,20

**alights** 37:7 39:12

**allegedly** 161:15

**alley** 22:24 81:18 82:12 101:13

**alleyway** 107:18

**allowed** 141:7

**almond** 146:13

**analyses** 71:5

**analysis** 77:5 87:8

**and/or** 11:6 20:21,24 71:5

**angle** 162:3

**announcement** 142:4

**apartment** 37:5 81:22 110:18,19, 20,23,25 111:12 112:19,25 123:4 127:20 128:1,5,15,16 135:10,14 136:2,5,24 149:11,23 150:2,8,9, 12,17,22 151:4 161:19,20,25 162:12 163:4,8 165:3,4,10,13,16, 25 167:4 168:5,6,20 169:23

**apartments** 35:25 100:11 101:13 108:19 109:14 149:6 163:2

**apologize** 57:5 121:6

**appreciably** 68:10

**approach** 29:17

**approached** 112:1 165:3

**approaching** 29:4 108:15 138:23

**appropriateness** 32:11

**approve** 98:6,15

**approved** 31:8

**approximate** 15:2 111:5

**approximately** 13:12 29:8 38:17 44:9 111:6,8 136:22,25 169:21

**area** 8:14 12:21 23:4,6 36:23,24 50:23 74:3 102:3 106:25 109:11 135:17 150:5,8 164:13

**argumentive** 115:21,25 116:9 126:24 160:15 162:16,19

**Army** 44:24 83:12

**arrest** 14:20 20:24 61:25 83:4 93:14 97:20 114:12,13,17 115:12, 13,17,20,24 116:1,2,8,18,22 117:16,19 118:2,5,9 128:18 157:17,19 159:15,22 160:10,14,

**allegedly** ...

**arrested** 50:2,6 63:7 83:23 93:7, 9,21

**arresting** 14:21,23 98:23 132:11 159:20 160:8

**arrive** 51:4

**arrow** 100:24 101:4,10,17

**arrows** 106:4

**artist** 147:9

**Asian** 161:3,11

**asks** 123:13

**asserted** 95:19 148:10

**assigned** 23:3,7,11,17,20,25 24:13 30:22

**assignment** 23:21,22

**assumption** 85:6

**attached** 97:14

**attempt** 132:1

**Attorney** 155:19,21

**Attorney's** 80:2

**audio** 16:11,14,16 148:17

**authority** 31:10

**authorize** 31:4

**avoid** 85:1

**aware** 62:19,20,22,24 65:5,6 77:21 88:2 94:9 95:21,22 98:9

---

**B**

**B-A-I-N** 11:14

**back** 16:7 22:23 32:22,23 34:1 36:5,19 41:17 47:5 48:11,23 49:8 60:15 61:2,3,7 65:21 71:22 81:17, 21 82:10,11,18 84:13,23 86:23 87:24 91:5 95:20 98:24 99:23 100:10,15,16 101:18,21 103:12, 15 104:11 107:2,13 109:11,20 110:18,19 111:12 112:23 121:5 127:20 128:1,4 130:3 133:19 137:22 139:10 142:9 153:1,3,5,16 155:4 156:10,19,22 157:8,11,14

**bag** 36:21 37:2 84:4

21,22 161:7,15

Index: Bain..charges

**Bain** 11:12

**bang** 46:14

**Bartlett** 10:3,6

**based** 44:20 114:16 117:5 128:19

**basic** 12:8,13

**basically** 72:9 80:20 143:5

**basis** 69:2

**Bates** 141:6

**bathroom** 35:18 65:15

**bear** 158:12

**began** 26:13 133:3

**begin** 139:2

**beginning** 15:7 148:11

**begins** 139:6

**believed** 132:11

**believing** 116:7

**belt** 16:19

**bending** 89:12

**benefit** 85:11,16

**benefited** 85:13

**big** 10:17 111:3 143:23 160:20 163:21

**binder** 6:17,19,22

**bit** 90:2 104:7 134:16

**black** 14:24,25 17:1 40:8 41:16 44:24 51:11 53:25 54:3 83:12 122:3,5,8,13 134:11,15 141:22 147:13,18 153:1,10,14 154:5,16, 18 161:3,4,11,12,13 166:18

**bleeding** 35:2

**block** 139:2

**blood** 66:9

**blue** 20:22 22:11 51:11,13,14 54:23 55:2 83:7 104:23,25 106:2 111:2 141:20

**body** 16:15 129:22

**borders** 133:14

**bothers** 140:25

**bottom** 52:10,11 97:10 128:7 130:17 135:7 147:24

**bowling** 20:10

**boy** 124:3

**breadth** 23:6

**break** 65:15 132:19,22

**breathing** 128:16

**brick** 137:16 164:18

**briefly** 167:8

**brought** 7:22

**Brown** 32:16,22

**Brown's** 32:17

**buddies** 124:6 125:18

**building** 30:25 137:7 164:20 165:4 167:4

**buildings** 29:13

**bulbous** 146:17

**bumper** 75:18

**bunch** 40:19

**business** 13:23 14:1

**C**

**CA** 61:12

**CA's** 77:25 78:2

**CAD** 65:25

**call** 61:16 65:9 112:13 127:11 159:10

**called** 53:12 98:25 99:6 156:12

**calling** 56:2 126:17

**calls** 148:25

**cam** 16:15 27:19 32:11 36:4 138:6 144:21

**camera** 53:16 74:8 77:23,24 78:22 79:20 80:1,5,21 87:12,20 88:3,22 89:9 140:18 142:9 145:11,12,14

**cameras** 33:7 54:6

**cams** 129:22

**candor** 6:8

**cap** 40:10 41:16 42:10,13

**caps** 155:25

**captured** 16:11 53:16 142:10 145:11,12 148:17

**captures** 134:10 144:22

**car** 18:10,20,21 19:1,6 21:20 22:4 25:13,16,21,24 27:19 28:3 29:20, 23 30:14 33:2,5,9,13,14 34:24,25 36:19,20 37:7 39:13 44:15 48:24 49:3,4,13 50:10 51:21 53:16,17, 21 55:7,13,25 56:7,9,11,12,18,20, 22,23 57:2,3,8,9 58:8,12,22 64:3 65:20 66:21,23 69:1,12,24 70:2,8, 10,14 71:12,14,17 72:13 77:9,10, 11 84:7,8,17,23 85:11,12,20,24 86:4 87:23 89:19 90:7,17 96:20 100:16 101:22 105:23 106:3 109:23,24 113:5 114:25 115:1 120:20 123:25 124:9,18 125:13 138:3,23,24 142:11,15,18 146:5 148:18

**card** 73:17

**cars** 18:16,17 27:21 30:23 55:17 68:17

**case** 17:19 140:24 162:10 165:21

**cases** 7:22 59:17

**catch** 39:1 110:1

**catching** 145:9

**caught** 22:12,14

**Cause/affidavit** 97:14

**caused** 13:19

**center** 62:19

**chance** 111:22 126:14 151:17

**Chapel** 20:5

**charged** 58:7,12,17,20,24 59:13 62:12 70:24 83:20

**Charger** 20:23 22:11 25:25 26:2, 8,10,14,22 27:5 28:4,6,8,11 29:21 33:3,6,25 34:4,9,13,17 35:5,8,22, 23,24 43:17 44:2,20,23 51:11,19 54:23 55:2,20 65:21 77:19 82:25 83:7 84:8 86:8,11

**Charger's** 30:19

**Chargers** 54:1

**charges** 59:6 78:2,7 167:20

**charging** 20:25

**chase** 18:21 20:21 21:6,9,11,14, 16,18,24,25 24:3,17 25:24 28:3 29:20,23 31:3,5,8 33:2,5,9,13,14, 20 37:23 41:23 44:1 45:19 50:1 51:21,24 84:7,11,18 85:20 86:20, 22,24 100:5 128:10

**chased** 35:24

**chasing** 30:10,15 34:10,12,15, 17,19,21 63:10,17 81:8,11 82:4,7 83:16,21 85:12 86:14 89:4 101:25 112:16 119:18,20,24 120:1,3 122:2 128:14 133:2 147:17 153:4, 20 154:18 157:15 167:20 168:1

**check** 29:10 34:3,8,22 35:7 55:19 60:5,8 76:2

**checked** 28:16 75:23

**checking** 75:20

**Chester** 20:7 84:13

**Chesterfield** 5:10 9:9,12 20:8 23:8,12 30:23 84:13

**chin** 146:24

**Chippenham** 22:10,20

**Christmas** 149:6,10,23 150:1,5, 9,10,11,17,23 151:3

**chuckling** 147:10

**church** 20:2,3,4 69:21

**circle** 102:8,15 105:7 163:21

**circumstance** 16:1 17:18 79:21 116:17 117:10 128:13 134:10 147:7 149:18 162:23

**circumstances** 19:10 112:13 115:5 116:15 117:8 123:3

**citizen** 147:23

**city** 5:9 84:11,12

**claim** 82:25

**clarify** 21:23 106:6 138:8

**clear** 107:5

**client** 147:3

**clock** 22:9

**close** 38:3,6,8,11,12 66:12 81:11

**closely** 146:5

**closer** 169:11

**closest** 37:22 39:10

**closing** 71:18

**cloth** 40:3 41:17

**clothing** 76:7

**club** 56:11,12,18,20,22,23 70:8, 10

**clubs** 19:15

**clue** 122:17

**clues** 128:8,9,12

**coincidence** 85:19,22,24 86:2

**college** 9:14

**color** 40:5,7 152:21,22

**comments** 32:22,23

**Commerce** 23:1 29:12 33:22 35:24 36:23 55:22 99:21 100:20 110:7,15 133:14,18

**common** 15:11 16:3,5 68:16,25 69:9 124:22 125:11,12 126:13

**Commonwealth** 155:19,20 167:21

**Commonwealth's** 80:2

**community** 19:13

**company** 9:22,23 10:2,10,15

**compared** 89:3

**comparison** 77:7 88:19 156:10

**complains** 141:6 142:22

**complaint** 139:17 147:23

**computers** 61:9

**concern** 13:14 16:22

**concerned** 46:24

**conclusion** 124:16

**conduct** 71:5

**conducting** 113:22

**confinement** 62:21

**confirm** 87:22 88:3

**conformed** 122:20

**connect** 76:21

**connection** 24:16 66:8 68:2,7,21 69:11,13,15,23 70:23 71:6 73:12 91:18,25 100:5 165:20

**considered** 30:5

**contacts** 19:13

**contained** 7:2

**contemporaneously** 41:11

**context** 52:15,17 70:19 94:17 115:9

**continue** 24:21 32:6 35:21 168:24

**continued** 17:12 22:25

**conversation** 14:12 54:4 56:4 92:9,12 103:3 140:21 144:22 148:15 151:18 155:7

**conversations** 6:10

**Conversely** 39:7

**convicted** 59:13

**corner** 29:16 33:22 164:20

**correct** 5:17 6:5,8 14:9 21:25 25:3,25 26:3,11,20 27:22 28:1,4, 9,12,14 29:14 30:5,8,15,20 31:8 33:3,15,18,20 34:1 35:8 39:14 40:14 43:7,8,10,14,15 44:25 45:3, 4,5,6,13,15,17,21,25 46:2,3 47:5, 7,10,11 51:16,22,25 55:17,18 56:7 57:3,4,9 58:24,25 59:2 60:9 63:1,4,8,9,12,17,18,21 64:10,12, 17 68:4,6 69:17,19,21,24 70:1,3, 5,14,20,25 71:3,4,19,23 72:2,11, 14,15 73:7,15,18,23,25 74:20,24 75:9,10,18,19,24,25 76:25 77:12 79:3,21,23 80:2,3,11,18,23 81:2, 5,15,18,19,25 82:2,10,13 83:7,9, 25 84:9,12,15,16 86:5 88:17,20 89:1,4 90:22 91:2,5,23,24 93:7,8, 25 94:4,15,16,20 95:1,5,7 97:14, 21,22 99:14 100:25 101:8,19,20, 22,23 104:13,14,16 105:9,10,21 106:12 107:11,14,18,22 108:10, 19 109:8,14,21,22 110:8,11,15 111:9,10,13,16 113:3,12 114:8,11 115:1,6,9,15,24 116:12 117:19 119:3,6,8,9,11,20 120:3,4,18,22, 25 121:4,15,18,25 122:1,3,5,9,13, 18,19,21,22,24 123:4,5 124:13, 14,24 125:7 127:21 128:1,5,6 129:1,9,23,25 130:4,8,10,15,16, 19,22,23,25 131:3,4,5,7,9,12,13,

15,18,19,20 132:12,13 133:10,14 134:12,18 135:23 136:6,7,11,12, 13,15,16 137:7,17,18 138:6,18, 20,24,25 139:3 140:1,11,12,13,16 141:9,10,23,24 142:1,7,8 143:6,7, 15 144:22 146:10,11,18,19,22,23, 25 147:1 148:4,11 149:1,3,4,24 151:21 152:9,22 153:16,17,20,22 154:3,5,10,19 155:1,5,6 156:10, 11 157:16,17,23,24 159:7,8,10,11 161:16,20,25 162:7,15 163:8,25 164:2,20 165:6,7,10,11,13,14,16, 21,25 166:1,19,20 167:4,10,13,16 168:12,20,25

**corrections** 7:16,18 8:7

**correctly** 18:2 141:25

**counsel** 147:2

**counseled** 18:10 19:9

**counseling** 12:25 13:4,8,11 16:21 17:20,22 18:6

**counties** 30:24

**county** 5:9 23:8,9,10,12,18,20 52:4 84:13

**couple** 169:5

**courses** 12:11

**court** 5:17,20,25 15:8 20:16 69:3 115:19 129:4 137:2 162:10 168:21

**cover** 42:11 43:2

**covering** 42:9,18,19

**covers** 40:3

**coworkers** 161:2

**Crafters** 9:24

**crash** 18:10,13,14 19:3,5 21:12 22:4 25:21 30:14 33:20,22 35:4,8, 14 55:21 80:11 84:17 85:12,24 86:4 87:24 139:7 164:25

**crashed** 18:15 34:23 84:8 85:2

**crashes** 18:12

**created** 97:7 167:9

**crime** 58:24 59:13,14 70:25 83:20 129:14

**criminal** 34:12,19,20 59:6,10,18 60:22 61:5,8,10,15 62:5,9,15 70:25 73:12

**criticism** 32:21

**crossings** 108:8

**cruiser** 50:24

**current** 7:10

**custodial** 113:6,11,22 114:7,16 115:15

**custody** 35:15 48:15,16 98:24 113:11 115:23 117:2 118:2,5,8 140:10 152:14 153:14 156:19 157:20 158:1 159:3

**cut** 13:16,19,21 16:7 100:10,11 101:13 107:25 108:2 146:5

**cuts** 162:3

**cutting** 105:15

---

**D**

**dad** 8:24

**danger** 31:14,16

**dangerous** 30:8 32:8

**dark** 51:13,14 106:1 141:20 154:20,22,24

**dark-colored** 20:22

**dash** 27:19 32:11 87:12 106:22 107:24 138:6 144:21

**dashes** 107:10,16

**data** 60:14 67:15,23

**databases** 60:8

**date** 52:11 155:22 157:1,2,3

**day** 5:23,25 6:1,2,3 17:13,23 21:19 23:20,22 24:1,13 52:24 53:1,3,13 56:15 67:16 70:6 122:17

**days** 54:23 55:2 98:23 99:5,8 157:8

**dealership** 53:13 56:2

**December** 17:24 18:3 20:20 21:6,19 22:9 23:3 25:23 31:23 45:8 51:18 54:24 55:3,8,21 62:13 70:22 93:20 94:15

**decide** 32:6

**decided** 32:1,4

**decision** 49:18

**deep** 146:13

**demanded** 117:10

**demotion** 12:20

**Department** 7:18

**depending** 116:14

**DEPONENT** 121:11

**depose** 126:17

**deposed** 5:2

**deposition** 5:15 6:12 7:7 15:7 88:14 126:9 129:3,7,9,13,18

**deputies** 140:22

**describe** 41:21 161:3

**describing** 147:8 151:7

**description** 26:19 43:23 44:23 45:2,5 54:2,6,7 83:10,16,17 89:19 90:6,17,22 94:20 105:12 119:10, 11,16,17,20,23 120:22 121:14,15, 25 122:8,12 147:12,17 148:3 166:17

**detailed** 35:13

**detain** 118:23,24

**detained** 48:23 58:23 141:7

**detention** 20:24 62:1,18 64:20, 21,23 114:3,4 115:12 116:19 117:15

**determination** 62:11 114:6

**determine** 24:21 33:15,17 43:1 82:7 85:9 87:14,19,25 91:17 117:5

**determined** 31:13 51:18,22

**determining** 49:24

**dictated** 28:9

**difference** 143:23

**direction** 81:4 100:17,25 101:5, 11,19 106:5 107:5 161:15

**discarded** 42:20

**disciplinary** 12:23

**discipline** 12:18

**disciplined** 16:4 19:9

**discontinue** 32:1,4

**discontinued** 31:3

**discussing** 99:18

**discussion** 35:19 100:2

**dispatch** 61:16

**dispatched** 30:24

**distance** 38:17,18 39:5,7 100:7 110:11 148:18 164:19

**DNA** 72:8 131:14 141:2

**doctors** 140:4

**doctrine** 45:9

**document** 53:6 99:18 139:16 165:6,9,24

**documents** 6:14,16,17,24 7:3 65:18,19,22,24 75:1 98:7,10,17 165:20 168:15

**Dodge** 20:22 22:11 25:24 26:2 34:13 43:16 51:11 54:23 55:2,20 83:7

**door** 46:14,15,17,18 47:10,12 48:4,6,9,12 71:18,19 73:6,23 77:10 79:8 81:15,17 82:10,11,12, 16,18,20 86:23 95:20 111:12,23, 25 112:18,22,23,24 135:18 136:2, 4,9,10,12,15 137:9,10,14,22,25 149:24 152:18 154:13,25 157:14, 22 162:15,17,23 163:6,12,17,20, 24 164:5,15,17,20 165:4,25 166:6,8 167:3 168:10,16,19,22,23 169:23

**doors** 74:10 112:21

**doorway** 137:6,17 163:14 165:12,16

**doubled** 101:18

**doubt** 80:14 167:22

**downtown** 158:1

**Dozens** 5:20

**draw** 169:19

**drive** 130:25 131:3,5,6 158:1

**driven** 64:3

**driver** 20:22,23 26:22 27:24 28:8, 11 29:21 30:3 33:15,18 34:4,9 38:20,23 39:11 42:20 43:16,20 44:2,19,23 50:14 56:7 57:3,8 58:5

63:12,14,19,20 66:21,24 67:2,5, 11,16 68:3,25 69:6 70:3 71:14,17, 21 73:20 77:19 82:25 83:6,11 84:8,18,22 85:11 86:8,11,19 87:9 90:7,14 124:13,24 143:10,15 152:25

**driver's** 33:10 63:3,7 131:7

**drivers** 63:25

**driving** 27:19 28:9 29:12,24,25 30:4 51:25 64:7 69:1 120:14 146:5

**dropped** 78:2 105:22 167:20

**drove** 26:22 27:5,15 63:15 84:22

**ducked** 153:2

**due** 28:16,19,23 140:14

**dues** 19:22

**dumpster** 36:6,8,9,12 37:1,2,4 43:13,14 74:20,21,22,24 75:2,3,4, 8,12,16,18,21,23 76:3,4,5,9 84:3, 5,6 91:23 99:22 101:8 104:18,19, 23 105:9,10 109:7,12 110:14 111:7 134:8,9 135:13,23,25 136:17,18,19 154:9 155:4 162:11, 21 169:12,15,20

**Dundas** 22:17

**durag** 39:23 40:1,2 41:16

**dust** 71:7 72:1,5 73:1,9

**duty** 9:10

---

**E**

**earlier** 67:15 129:9,13 157:21

**early** 13:16,20

**ears** 42:3

**east** 22:22,23 108:14,16 109:7

**east/west** 100:21

**Edmonds** 11:16

**effect** 44:6 56:8 145:19,21

**effort** 55:24

**eight-to-nine-minute** 25:16

**electronically** 55:17

**eleven** 89:15

**employed** 7:17,20

**employer** 7:10

**employment** 9:19 10:8

**encounter** 70:6 111:11 132:7

**encountered** 96:13 102:9 125:6 137:19,21

**encourage** 83:3

**encouraging** 97:4

**end** 25:21 36:19 38:1 105:9,10,21 132:7 154:1 164:17

**ended** 33:20 85:20

**enforcement** 7:14 13:24 37:11 45:7 50:9 78:23 156:4

**engaged** 27:7,10 43:5

**enter** 46:9,12 47:2,15 81:8,10,12, 14 96:6 110:18 165:15 166:8

**entered** 46:1,8 47:5 82:18,20,21 110:23 111:8 136:23 165:9,12

**entering** 48:9

**enters** 46:21 110:17,18

**entire** 43:3 107:13

**entrance** 137:6 162:2

**entranceway** 48:11,12 135:21 163:1,2,5,10,15,18,19,25 164:4, 15 166:3,5,9 168:8,19

**escorted** 119:5

**essentially** 45:18

**estimate** 104:8

**estimation** 135:2

**evening** 48:16 72:23 93:20 97:1 112:10 118:16 151:7

**event** 13:8 15:18 72:22 79:23 116:21

**events** 12:24 94:15 105:13 148:3 151:11

**eventually** 63:7 160:22

**Everett** 22:24,25 29:12 101:7 105:14 113:12 137:11 154:1

**evidence** 55:24 64:2 83:19 84:2, 17 93:17,18,19,20,25 94:2 131:2 139:12

**exact** 9:6 23:13 29:9 38:18 43:22 82:8 89:22,25 90:1 126:12 134:25 135:1 143:10,17,18,24 144:4,10, 16 145:16 149:1 152:17 155:22 157:3 161:1 164:13,19

**EXAMINATION** 5:3

**examine** 67:14 70:13

**examples** 55:6

**excess** 26:23,25 27:2

**excessive** 26:3 85:2

**exchange** 48:19,20

**exchanges** 48:24 49:2,12,15

**exculpatory** 93:19

**exhibit** 41:3 52:8 97:8 99:12,17, 20,21 104:19 118:20 120:6,7 121:5,6,7 133:1 135:3 136:18 137:1,12 138:2 139:5,11,13,15 147:22 148:13 149:16 151:11,16, 23,24 152:19 153:24 155:3,15,25 156:23,24 163:16 164:9,17,23 165:8 166:16,21,23 167:7,9 169:10,18

**exhibits** 40:19 166:12

**exit** 166:6

**exited** 111:12 168:23

**expected** 73:21

**experience** 7:15 8:10 15:12 151:25

**experienced** 63:12,20

**experiences** 8:8

**explain** 48:13 147:21

**expression** 125:20

**eyebrows** 41:22,24,25

**eyes** 146:12

---

### F

**F-U-C-K** 142:19

**face** 33:10 39:15 41:8,20 42:5,9, 11,18,19 82:25 83:22,23 103:15, 17,19 113:2 137:10 146:8,9 147:25

**Facebook** 66:17

**faced** 137:14

**faces** 81:18 112:25 113:2 137:11

**facial** 41:4 42:14 147:16

**facing** 44:10,12,13 86:25 87:1 137:9

**fact** 73:20 92:18 124:24 128:19 132:11 151:3 153:23 154:9 167:18

**factor** 148:19

**facts** 7:2

**false** 70:19 165:21

**familial** 66:8

**familiar** 7:23 8:20

**family** 8:15 80:1

**farther** 37:25 151:4

**fast** 21:19 29:8 31:25 103:11

**faster** 39:2

**features** 41:19

**feel** 16:3 66:22 67:21 96:4 117:6

**feet** 37:24 44:9 46:10 47:6 94:25 102:1,10 104:2,4,7,9,12 109:25 134:23 164:19,22

**felt** 112:17

**fence** 36:25 37:3,4 103:23 133:13,19,22 134:20,21

**fenced** 36:23,24

**fences** 103:24,25

**Ferguson** 11:7

**Fifteen** 132:16

**figure** 47:25 72:18

**filing** 132:9

**filled** 52:22

**finally** 21:12

**find** 64:3 66:7,11,14,17 67:15 88:4,10 93:17,19

**fine** 135:5

**finger** 149:21

**fingerprint** 59:8 77:4 130:7,13 142:23

**fingerprinted** 59:2

**fingerprints** 59:4 71:7,11,21 72:8,10,13 73:11 77:3,14 129:22 156:9 157:10

**finish** 72:16 132:18 145:2

**firearm** 91:4,5,7 95:21 155:3

**firearms** 91:13

**fit** 124:23

**five-minute** 56:3 65:15 132:22

**fleeing** 45:12

**flip** 19:6 99:17

**focused** 41:25 82:3

**follow** 46:4,11,18 66:5 110:24

**follow-up** 66:1

**foot** 34:7 36:22 42:23 43:5,20 44:1 81:12 86:20,22,24 105:8,20, 22,24 106:2,9 120:15

**footage** 53:20 80:4,21

**football** 15:19,24 38:14

**form** 21:23 29:18 30:12 32:7 34:11,18 38:2 39:3,21 41:7,14 43:11 44:17,21 45:16,22 47:1,23 50:8 54:13,20 55:4,10,14 56:1,10, 16 58:13 59:15,22 62:3,16,23 63:13,22 65:1,4 67:25 68:5,12 69:8,25 70:4,11 71:24 72:6,19 73:13 74:12 76:17,23 77:20 78:15 79:4 80:12,24 82:1 83:1,8 84:19, 24 85:8,14,21 87:16 88:21 89:5,8 90:23 92:13,24 93:3,23 94:5,21 96:8,17 98:11 99:3 108:11 112:20 113:7,13,19 114:9,18 115:10,16, 21,25 116:9,24 117:7,20 118:10, 14 122:10,14,25 124:19,25 127:7, 13 129:24 131:8,22 134:13,19,24 135:9,24 139:23 140:6,17 142:2 143:19,25 147:14,19 148:5 149:8 152:16 153:12,21 155:13 160:25 163:9 164:1,6,21 165:18,22 166:4 167:5 168:2,7,13,21

**formal** 96:19

**Fort** 9:10,11

**found** 42:21 43:6,13 75:8 78:5 84:3,6 104:20,22,24 105:1,19 155:3

**four-story** 29:13

---

**Fraternal** 19:24

**Fredericksburg** 53:5 54:12,18

**frequently** 5:23

**friend** 127:8,10

**friends** 66:18 124:5,8,17 125:19

**front** 6:22 35:25 40:20 49:4,9,14 65:21 77:23 81:15 85:25 87:13 88:16 99:24 101:8 110:20,21,23 111:9 112:18,22,24 118:7 135:14, 18 136:2,4,24 139:10 161:19,20 165:3 167:3 168:16,19

**full** 5:5 6:1 146:5,21

**fully** 6:4

---

**G**

**gain** 39:5

**gait** 38:24

**game** 15:19,24 125:2,3,5,9

**gang** 60:9,13 61:5

**gap** 46:7 67:7 121:3 122:16

**gathering** 56:20

**gave** 89:19 117:1 160:23

**gender** 33:15

**generally** 73:11 99:24 157:6

**gentleman** 43:22,24

**give** 55:6 64:14 115:8 116:7 126:16,19 156:25

**glance** 34:24 37:3

**good** 32:20 35:17,18 54:5,6 62:14 65:14 104:15

**governor's** 72:22

**GPS** 67:14

**grab** 84:4 138:5

**grade** 9:5,6 69:16

**graduate** 9:17

**graduated** 9:16

**graduation** 9:20

**gray** 42:10 154:1,2,5 166:19

**great** 137:3

**greeted** 147:25

**groups** 19:20

**grow** 8:14

**guess** 10:2

**guided** 150:6

**gun** 46:21,25 74:20 75:8,12 76:8, 11,14,16 77:2,3 84:3,5 91:22 92:1,5,12,18 95:25 96:2 147:25 151:25 152:8 155:11 156:9

**guns** 76:22 77:15 152:4

**guy** 67:6 70:2,17,18 71:2 76:20 86:14 90:4 120:21 121:3 122:3,5, 13,16,23 129:23 140:12 147:3,13 157:19

---

**H**

**hair** 43:2 146:6

**half** 6:3 110:7 139:2

**halfway** 149:20 151:19,24 152:24 153:25

**Hall** 91:5,19 92:1,9 93:5 155:5

**HAMMER** 5:13 21:22 22:6 29:18 30:12 32:7 34:11,18 38:2 39:3,21 40:23 41:1,7,14 43:11 44:17,21 45:16,22 47:1,23 50:8 54:13,20 55:4,10,14 56:1,10,16 58:13 59:15,22 62:3,16,23 63:13,22 65:1,4 67:25 68:5,12 69:8,25 70:4,11 71:24 72:6,19 73:13 74:12 76:17,23 77:20 78:15 79:4 80:12,24 82:1 83:1,8 84:19,24 85:8,14,21 87:16 88:21 89:5,8 90:19,23 92:13,24 93:3,23 94:5, 21 96:8,17 98:11 99:3 102:5 105:2 106:6,15 107:4 108:11 112:20 113:7,13,19 114:9,18 115:10,16,21,25 116:9,13,24 117:7,20 118:10,14 120:7,9,11 121:7,9,16 122:10,14,25 123:16, 19,22 124:19,25 126:20,24 127:7, 13 129:24 130:9 131:8,22 132:16, 18,21 134:13,19,24 135:4,9,24 138:5,8 139:23 140:6,17 142:2 143:19,25 145:2,5 147:5,7,14,19 148:5 149:8 152:16 153:12,21 155:13 158:16,19 159:24 160:15, 25 161:21 162:1,5,13,16,18,25 163:9 164:1,6,21 165:18,22 166:4 167:5 168:2,7,13 169:5

**Hana** 152:5,12,15

**hand** 71:15 154:1

**handcuffed** 115:1

**handcuffs** 49:5,9 57:22 98:25 119:2

**handful** 27:14 118:11

**handle** 73:6

**hands** 15:9 71:18

**hang** 68:22

**hanging** 68:15

**happened** 14:3 17:10 36:23 49:13 59:3 77:6 85:25 95:7 105:24

**happening** 68:22

**hard** 97:9 128:16 147:21

**hat** 40:10 138:15 142:6

**head** 10:25 39:23,24 40:1,3,9 41:16,17 42:22 43:3 118:6 158:11

**headquarters** 30:25

**health** 34:3,9 35:7

**hear** 49:1 149:22

**heard** 72:21 145:15

**heating** 9:21 10:9,20

**hedges** 136:5 164:11

**height** 43:19,22 82:8 87:9,13 88:20 89:3,19

**helicopter** 51:7

**helicopters** 50:17,19,23 51:1,4

**helpful** 73:11 99:18

**helping** 17:2

**hey** 65:9 70:17 159:22

**high** 9:3,12,16,21 17:13,23 22:19 24:16 26:13 27:8,11 31:4 68:23 87:14,19,22,25 88:5

**Hispanic** 161:11

**history** 59:18 61:8,11,15 62:6,9, 15

**hit** 23:1 87:24 88:6

**home** 45:15,20 46:1,4,8,9,12,22 47:5,16,19 62:21 80:18,22 81:2,4,

6,8,10,12,15 85:20,25 86:4 96:6 111:9

**homeboy** 126:7,11 127:4,11

**homeboys** 125:16,17,20,23 126:3,16,17

**hoody** 141:18,19,22 166:18,19

**Hopkins** 22:10

**hot** 45:9

**hour** 17:15 22:12 26:23 30:4 32:3 63:11,15

**house** 46:11 47:2 48:18 73:5 80:25 82:10,21 99:23 130:2 151:19

**hundred** 17:15 20:7

**Hundreds** 5:20

**hyphen** 20:17

---

**I**

**ID** 94:3

**idea** 109:21

**identification** 147:4

**identifications** 94:11

**identified** 48:18 65:20 70:2 71:3 83:6 86:8,11,17 111:15 120:14 133:20 139:7,8 166:21 167:18

**identifiers** 60:25

**identify** 44:19 48:22 66:24 80:15 86:13,19 94:3 127:3,15 131:2 149:5 161:14

**identifying** 128:4

**identity** 163:15

**illegal** 70:20

**immediately** 22:18 45:19 157:14

**impediment** 159:20

**impression** 84:22

**improve** 12:21

**inability** 140:5

**incident** 14:2,8,11,12,19 15:22 16:20,21 20:20 21:1,5 31:23 51:20 52:25 53:2,3 62:4 71:6 145:10

**incidents** 17:21 65:25 145:11

**include** 98:13

**including** 26:16

**incriminating** 93:17,19,20

**independently** 65:9

**indication** 54:22 55:1

**individual** 82:4,6 138:3,10 140:21

**individually** 145:8

**individuals** 7:6 57:7,11 66:2 67:24 68:3,8 70:14 79:1,2 80:6,10 81:10,20 94:12

**inform** 115:19 118:22

**information** 97:20 160:23

**initial** 70:23

**initially** 100:18

**initiate** 22:16

**initiated** 51:24

**injured** 18:23

**injury** 38:24

**innocence** 72:10

**innocent** 143:6

**inquire** 59:17 66:7

**inquiring** 6:10

**inside** 73:7 75:2,4 76:3,5 77:10 123:4 137:6 154:9

**Instagram** 66:17

**instance** 42:10 44:5 56:21 71:6 74:8 146:9 148:24

**Institution** 60:22

**intending** 19:14

**intentional** 84:18 85:9

**intentions** 85:4

**interaction** 13:16,20 15:13,17 16:6,11 104:4,5

**interrogation** 113:6,23 114:8,16 115:15

**interrogatories** 123:11 131:11

**interrogatory** 118:19

**intersection** 19:4 36:12

**interstates** 84:13

**interview** 57:11,13,19 64:6,15,25 65:10

**interviewed** 44:14

**interviews** 57:15

**investigation** 21:13 51:10,15 52:15,18,19 66:2 70:20,23 72:17 73:12 78:14 95:11 99:10 113:12 139:17 142:12 155:10

**investigations** 77:13,16 156:7

**investigative** 64:20,21,23 65:19 114:2,4 115:11 116:18 117:15

**involved** 25:24 50:10 87:24

**issued** 95:21

---

**J**

**jacket** 154:1,3

**Jada** 91:5,19 92:1,9 93:1,5 155:5

**jail** 7:21,23 8:7 11:20,22 12:9 44:6 147:3 148:17,21

**jailer** 12:13

**jailers** 12:8

**Jeffrey** 11:2

**jeopardy** 28:1

**job** 32:20

**Joe** 32:22

**jog** 103:11

**join** 10:22 11:23 12:3

**joined** 11:24 12:6

**Joseph** 32:18

**joyride** 62:13

**judge** 89:3 167:23

**judged** 26:3

**jumps** 37:7 39:13

**jurors** 19:16

**jury** 19:15 168:4

**juvenile** 49:22 50:3,5 69:1,3 93:11,15 97:1,10 125:13 132:10 157:21,23 158:4,6,8 159:4,14,16,

23 160:10,14,21 161:7,15

## K

**K9** 152:1

**keys** 47:16,19,21

**kid** 68:15,22

**kind** 11:21 14:4 17:11 21:20 63:14 97:9 100:6 106:9 128:11 144:12

**knee** 139:21 140:15

**knew** 34:21 45:8 65:3 69:23 73:15 113:10 114:23 115:13 124:21 132:4

**knob** 73:6 136:13

**knock** 47:10

**knowing** 159:20

**knowledge** 33:7 50:10 60:4 66:4 74:19 78:4 92:21 97:25 98:19 112:7

**KRUDYS** 5:4,11,14 20:16,18 22:1,2,7 30:13 35:17,20 40:21,25 41:2 45:23 47:24 54:14 65:2,14, 17 76:24 84:25 85:15 87:17 89:6 90:20 93:4 94:6,22 96:9 99:4 100:3 102:7 105:4 106:13,17,19 107:8,9 113:14 114:10,19 115:22 118:15 120:8,10,12 121:8,17 122:11 123:18,20,23 126:21,25 129:6 130:11,12 131:23 132:17, 20,23,25 134:14 135:6 137:4 138:7,9 139:12,14 142:3 144:1 145:3 147:6,11 148:6 153:13 155:14 158:18 160:1 161:23 162:6,14,20 165:19 166:11,14 169:4,7,9

## L

**lab** 77:4

**Lakita** 95:19 96:13 111:16 112:24 130:18 139:17 147:23 151:18

**language** 119:22,23

**large** 146:12,17

**latent** 156:19

**laughing** 147:2,5,8

**law** 7:14 13:24 30:8 37:11 45:7 50:9 156:4

**lawyers** 6:11,13 7:8

**Layton** 111:22 152:1,25 153:9

**leads** 163:12

**league** 20:9,10

**leagues** 20:9

**LEAMS** 98:15,16 155:23,25 167:7

**learn** 52:15 53:9 61:25 94:10 161:6

**learned** 52:20,22,24 53:1,3

**learning** 52:14 114:20

**leave** 10:7 11:23 12:1 115:3 118:25 119:8

**led** 166:5 168:10

**Lee** 9:10,11

**left** 10:9 22:23,24 23:1 29:11 80:22 81:1 101:21 135:10 136:12 137:17,25

**length** 43:1

**letters** 12:20

**license** 33:3 55:17 63:4,7 131:7

**lies** 70:24

**Lieutenant** 11:8

**lieutenants** 11:6

**life** 64:4 122:18

**light** 154:25

**light-colored** 141:18,19

**lighter** 152:21,22

**lighter-colored** 153:15

**lights** 26:7 27:20 84:14 149:6,10, 23 150:1,5,9,10,11,17,23 151:3

**limit** 26:5 30:1 63:17

**lines** 106:11,22 107:7,24 108:7,9 146:22

**link** 69:12 128:13

**linked** 83:19 84:2 93:1 128:9 129:14

**lips** 146:20

**list** 158:16

**listen** 142:11 163:7

**listened** 142:14

**listening** 31:6

**live** 5:9

**lived** 8:17,19 66:11 86:4

**living** 9:7

**local** 10:15

**located** 20:6 80:23 82:12 153:25

**location** 111:5

**Logan** 20:17 139:7

**Logan-patterson** 18:5 20:15,25 139:21 167:19 168:1

**long** 10:13 12:11,16 14:15 17:16 25:5 37:6,16,17,20,25 51:1 87:3 92:9 154:13

**longest** 25:7

**looked** 6:16,19 40:8 56:19 75:4, 5,18 90:24 133:18 134:18 143:14, 24 144:9,11,14,16 145:21,23 167:7

**lose** 37:13 107:17 109:3,7,13

**losing** 167:13

**lost** 36:3,19 37:16,19 95:6 106:20,23 107:10,22 108:3,10,13, 14,18 110:2 133:6 138:18 167:15

**lot** 36:14 53:17 108:15

**lunch** 132:19

## M

**M-E-L-L-S** 11:10

**M-O-U-N-D-S** 11:18

**made** 22:18,23 29:1 49:18 94:3 101:2,12,21 105:14 111:6 139:17

**Madison** 24:6,7,10 31:7 32:15,22

**magazine** 156:9

**magic** 104:23 106:2 111:2 163:22 169:19

**maintain** 60:8

**make** 29:2 87:23 88:5,11 91:25 111:3 127:25 141:11 166:11

**makes** 88:12

**making** 29:11 70:18 109:6

**male** 14:25 17:1 24:8,9 44:24 53:25 83:12 147:18 161:13

**males** 54:3

**Mall** 56:21

**man** 141:1 152:6,7 161:8,9,10

**Management** 156:5

**mark** 10:2,4,5 106:6 111:7 138:2

**marked** 30:4 110:19 133:17 141:5

**marker** 104:23 106:2,22 111:3 163:22 169:19

**mask** 39:13,15,17,19,20,23,25 40:5,6,11,13,14,17 41:8,11,12,15 42:8,14,20,21 43:7,10,13 44:24 83:12 138:13 142:1,7

**masks** 41:4

**match** 73:21 89:22,25 119:10,13, 16,17,20,23 120:21 121:13,15,25 143:10,18,24 144:4,10 145:16 153:19

**matter** 18:9 78:22 94:3 115:13 126:2 167:24

**matters** 19:8

**Maury** 22:21,22 33:23 55:21 99:21 100:9,18 101:21 107:14 108:13,24 109:20

**Meaning** 165:12

**means** 45:18 53:11

**measure** 134:25

**medical** 140:4

**meet** 56:14

**meeting** 6:13

**Mells** 11:8

**member** 20:2

**members** 19:18

**mention** 46:24

**mentioned** 20:13 153:2

**met** 7:24 56:6 57:9 70:10

**mic** 14:9 15:12,17 16:7

**Michael** 10:17 11:7

**microphone** 13:15,19 14:13 16:17 17:7

**middle** 127:19 130:11 131:11 147:24 153:25

**Mikel** 152:5

**mile** 22:12

**miles** 17:15 26:23 29:25 30:4 32:2 63:11,15

**military** 8:10,15,22

**mind** 160:18,21

**minor** 64:15,23

**minute** 14:17

**minutes** 17:17 25:2 37:9,14 51:2 57:3 63:16 90:18 92:10 155:8 169:6

**Miranda** 113:17,24 114:6,7,15 115:9,14,19 116:7 117:2,11

**Mirandize** 116:21 117:24

**Mirandized** 117:18

**misplaced** 92:20,21

**missed** 74:13

**missing** 91:13

**model** 87:23 88:5,11

**mom** 48:20,21 59:5 62:5 64:9 65:10 73:18 80:9,18 82:9,22 86:3 98:25 99:6 123:3 130:3 132:4,5

**moment** 35:14

**monitor** 24:20

**month** 5:24,25

**months** 12:16 54:23 55:2,8 78:10

**morning** 117:6

**mornings** 56:21

**Morris** 111:22 140:22,23,24 149:17 151:17

**mother** 49:17,19 82:19 111:15 131:17 137:24 140:14

**motivation** 62:14

**mouth** 131:24

**move** 27:20 81:1,3 139:12

**moved** 8:17 27:25 92:16 134:2,3

**movements** 106:8

**moving** 21:19 80:22,25

**muddying** 106:10

**multiple** 18:12,14 30:10,14 67:5 84:15

**N**

**named** 140:22

**names** 51:7 57:18 65:20,22 158:10

**narrative** 124:23

**nature** 42:5

**needed** 67:21 95:16 112:17

**neighbor** 55:7 78:23

**neighborhood** 55:8,20

**neighboring** 30:24

**neighbors** 55:12 64:6 131:6

**Network** 60:22

**Newton** 11:2,3,4

**Nicole** 155:5

**nine-minute** 31:4 84:7

**non-law** 78:23

**nonetheless** 64:17 131:20 162:11

**north/south** 100:21

**northbound** 22:18,20,21

**nose** 42:1 146:16,17

**notebook** 139:11

**Notes** 6:17

**notice** 38:23,25 69:9

**number** 23:13 38:13 40:20 52:9 63:1 97:8 99:12,20,21 104:19 118:19,20 120:5,6 133:1 139:5 141:6 148:14 149:13,16,17 151:16,23 152:19 153:24 155:15 156:24 164:18,23 167:9 169:18

**numbers** 52:9

## O

**oath** 6:5 126:14 127:3 128:22 129:8,18 150:16 162:9 165:5 166:2

**object** 37:1 75:13,14 76:4 77:1 84:5 85:8 92:13 135:9 154:8

**objection** 21:22 29:18 30:12 32:7 34:11,18 38:2 39:3,21 41:7, 14 43:11 44:17,21 45:16,22 47:1, 23 50:8 54:13,20 55:4,10,14 56:1, 10,16 58:13 59:15,22 62:3,16,23 63:13,22 65:1,4 67:25 68:5,12 69:8,25 70:4,11 71:24 72:6,19 73:13 74:12 76:17,23 77:20 78:15 79:4 80:12,24 82:1 83:1,8 84:19, 24 85:14,21 87:16 88:21 89:5,8 90:19,23 92:24 93:3,23 94:5,21 96:8,17 98:11 99:3 108:11 112:20 113:7,13,19 114:9,18 115:10,16, 21,25 116:9,13,24 117:7,20 118:10,14 122:10,14,25 124:19, 25 126:20 127:7,13 129:24 131:8, 22 134:13,19,24 135:24 139:23 140:6,17 142:2 143:19,25 147:14, 19 148:5 149:8 152:16 153:12,21 155:13 160:15,25 161:21 162:1,5, 13,16,19,25 163:9 164:1,6,21 165:18,22 166:4 167:5 168:2,7, 13,21

**obligated** 6:8

**obligations** 6:5

**observations** 32:19

**observed** 153:1

**obtain** 55:24 62:25 74:2 79:15 95:10 140:4

**obtained** 76:8 78:22 166:19

**obvious** 128:8,9,11,12

**occupant** 18:20

**occupants** 18:18 19:1 53:25 140:9,11 141:6 143:9

**occur** 18:1 86:15 102:2

**occurred** 18:7 21:6 34:3 35:15 62:2 102:4 103:4

**occurs** 80:11

**office** 77:25 78:2 80:2

**officer** 32:10 152:5

**officers** 43:6 126:15 158:7,9

**official** 70:20 167:3 168:12

**oftentimes** 27:21 55:16

**older** 68:10,14

**OLP-5** 120:9

**OLP005** 120:10

**ongoing** 14:9

**Ontario** 18:5,8 20:13,14,17,25 35:15 44:14,19 50:24 54:10,22 55:1 57:23 58:11,17,23 59:1,10, 13 60:2,3,5 61:15,18 62:1,8,12 64:3,7 66:24 67:1,10 68:8,10 69:13,24 70:18 71:3 72:4 73:20 76:22 78:2 79:10 80:9,16 81:7,24 82:9,17,18 83:4,6,19 84:3 86:3,7, 10,25 89:22 91:18,22 93:1,7,22 94:14 96:25 98:24 113:5 117:10 118:16 121:3 122:5,16 123:2 124:12,24 128:10,13 129:21 130:18 131:15 132:11 133:20,21 137:19,21,24 139:7,21 140:12 142:10 152:14 154:13 156:21 157:13 167:18,19 168:1

**Ontario's** 55:20 60:24 62:25 64:9 73:17 85:20 90:12 99:23

**open** 46:17 47:13,16,19 48:5 163:24

**opened** 95:20

**opening** 71:18 136:10

**opens** 136:15

**operating** 85:5 116:6

**opposed** 105:14

**opposite** 101:19

**orange** 99:22 169:19

**Order** 19:24

**organization** 19:18,22 50:9

**original** 97:20

**originally** 53:4,10 97:7 100:24, 25 107:21

**oval** 42:6 146:9

**overhead** 50:17

**owner** 10:2 53:13

## P

**p.m.** 22:9 132:24 169:8

**pages** 97:9

**pants** 44:24 83:12 141:20 154:13,16,18,20,22,24,25

**paper** 59:8 105:3

**paragraph** 120:13 127:20 139:6 140:8,20 149:21 151:23 164:24 165:2 167:12

**paraphrasing** 90:2

**parent** 64:24 141:1

**parents** 8:22

**parked** 35:23 55:7

**parking** 36:14 108:15

**part** 21:6 31:4 44:20 48:14 81:18 94:9 113:21 127:25 132:9 142:11

**particulars** 60:25

**parts** 89:11

**pass** 33:6 161:19

**passed** 21:20 26:2 78:5 156:21 157:6

**passengers** 56:6 58:1 76:12,14 90:17 144:9

**passes** 37:8

**passing** 27:21

**past** 7:23 60:12 105:20 117:17 162:15

**patrol** 22:8

**patrolling** 21:18

**Patterson** 20:17 81:7,24 95:19 96:13 111:16 130:18 139:8,17 143:10 147:23 151:18 156:13 167:18

**Patterson's** 112:24 149:11 150:2,17

**pay** 19:22

**pen** 169:25

**people** 13:6 40:4 53:21 57:2,17, 20 66:21 68:15,18 69:24 80:21

89:19 90:13 96:20 123:14 124:17 125:7 141:12 151:12 161:12

**perceive** 85:17

**perform** 87:8

**period** 37:10 48:25 49:3 99:10

**permission** 64:14

**permitted** 119:8

**perpendicular** 108:9

**person** 13:3 14:20,22 18:25 30:4 34:16 53:12,16 59:18 63:6,10 70:16,17,24 73:5 75:23 83:16,23 86:14,25 88:16,20 94:17 113:18, 23 115:20 116:8,21 117:24 119:18,19,24 120:1,2,14 122:2,8, 9,13 124:11,12 126:10,16 128:4 140:10 146:5 151:20 153:19 161:6,14 162:11 167:25

**person's** 43:2 60:12

**personal** 13:23,25 14:3,4 15:13, 17

**personally** 91:10

**persons** 35:5 65:20 71:2 117:18 118:8 122:20 123:10

**petition** 132:10

**pf** 81:1

**Phillips** 13:7 16:21 17:22 18:10

**phone** 91:11

**phones** 67:14 70:13

**photo** 135:3 136:1,9,10,18,19 137:20 138:3,8,14,16 149:13 169:11

**photograph** 153:25

**physically** 56:14

**pick** 19:14

**picture** 42:10 104:18 133:16 134:4,12 136:14 149:13 169:13

**pilots** 51:8

**place** 8:19 57:20 64:22 70:10 89:11

**places** 77:8 106:20

**plain** 153:1,10

**plaintiff** 123:21

**plaintiff's** 111:15

**plan** 69:5 132:20

**plate** 33:3

**plates** 55:17

**play** 38:14 142:9

**pleading** 130:14 143:5

**plump** 146:21

**point** 11:21,22 46:21 49:5 111:11,19 116:3 125:4 135:20 138:17,20

**pointed** 146:17

**pointing** 95:20 152:1

**pointy** 146:25

**police** 7:11 12:3,15 19:25 20:21 24:17 44:15 45:12 50:24 55:16 59:1

**porch** 48:23 49:8

**port-a-john** 36:6,9,13

**portion** 6:2 23:17,18

**posed** 99:14

**positive** 94:3

**positively** 80:15

**possessed** 54:23 55:2

**possession** 153:18 166:18

**possibility** 86:2 117:4

**possibly** 79:24 98:12,13,14 141:19

**posted** 22:12 26:5 30:1

**preceding** 54:24 55:3 116:21

**preparation** 6:11 7:7

**prepared** 155:16

**presence** 64:15

**present** 64:9,25 65:10 159:8,10, 15

**pretty** 54:5 132:21 134:20

**prevent** 132:10

**preventing** 159:13 160:8

**previous** 7:14 59:10

**previously** 6:25 25:12 27:7 32:5

83:12

**primary** 25:15,17

**principle** 45:11

**printout** 148:24

**prints** 72:1,5 73:2,9,17,21,22 77:9 156:19,22

**prior** 55:8,21 57:9 59:6,18 94:14

**prioritize** 34:15

**private** 45:12

**probe** 19:14

**problem** 17:7

**process** 93:11 125:5 157:21 158:4,6,8 159:4,14,21

**profiled** 142:19

**propensity** 59:21

**property** 45:13 58:18 62:12 166:17

**prossed** 78:3,7

**protruding** 146:13

**prove** 72:10 167:21

**provide** 32:19 43:23 83:10,15 113:23 117:10 122:13 147:12,16

**provided** 13:3 26:19 59:5 73:17 115:15 122:7 160:24

**providing** 113:17

**proximity** 81:11

**public** 31:14,17

**pull** 26:10

**pulled** 42:13,15 75:17

**punishment** 69:3

**purchased** 60:3

**purchases** 60:6

**purpose** 76:16

**purposefully** 84:22

**pursue** 45:12

**pursued** 26:8 34:7

**pursuing** 25:13,15

**pursuit** 14:21,23 16:23,24 17:1, 12,14,23 18:5 24:20,21,22,25

25:2,5,7,17 26:13,17,20 27:5,8, 10,15,19 31:11,14,20 32:1,5,12 34:13 36:22 42:23 43:6,20 45:9 81:13 105:8,23,24 106:3,9 125:13 155:17

**pursuits** 25:12

**put** 27:25 38:13 39:7 49:5 50:24 53:11 76:1 91:20,23 97:17 98:24 100:24 101:4,10,17 102:4,8,12, 15,22,23,24,25 103:1 104:23 105:1,5 106:4,22 107:10,16 108:7 110:13 111:2 131:24 137:2,20 163:21 164:3 168:11 169:12,25

## Q

**question** 56:24 70:23 83:14 123:7 126:18 158:21 159:25 160:20 163:7

**questioning** 20:24 114:5

**questions** 19:13,17 99:14 113:11 115:6 118:19 169:4

**quick** 21:22

## R

**race** 14:22 16:24 33:17 126:2 161:11

**racially** 142:19

**radar** 22:10,11

**radio** 26:19 39:17 41:10 43:24 122:12,15 141:25 142:1,4 148:25 149:22 159:10,11 160:13

**radioed** 26:16 33:3 138:24

**railing** 136:6

**railroad** 106:23 108:8

**raise** 15:9

**rammed** 33:25 34:4,9,25

**ran** 28:11,22 38:19 47:12 80:17 81:22 85:3 100:5,24 105:13 108:20 110:6 127:20,25 128:4,15 133:7 151:19 165:3,24 167:3

**rank** 12:20

**rate** 22:19 27:8,11

**reach** 124:15

**read** 114:7 115:19 118:17

**rear-ended** 34:16

**reason** 59:24 61:23 80:14 93:9 97:2 130:21 159:2

**reasonable** 167:22

**reasons** 46:13,20

**recall** 6:16 10:12 11:5,11 12:22 13:12 14:6,16 15:3,25 18:25 19:4, 9 21:11,12,14,17 23:13 24:4,5 25:9,20 40:15,16 42:15,16 48:17 51:6 56:18 62:7,10 68:20 72:7 78:8 82:11,14,16,20 88:7 89:21 90:15 91:16 93:16 94:13 96:18 105:16 118:1,6 141:4,13,15,16 144:15 150:19,25 151:5,11,12 152:11,17,18 158:20 169:15

**received** 18:6 78:6

**receiving** 58:17 62:12

**recently** 139:21

**recess** 65:16 132:24 169:8

**recessed** 137:6

**reckless** 29:23,25 30:5 51:25

**recognition** 83:22

**recognize** 99:24 128:14 147:20 157:14

**recognized** 83:21 86:12 109:24 119:18 128:19 129:14

**record** 5:11 15:8 35:19 55:19 79:18 100:2 106:7,17 107:4 135:4 147:5

**recorded** 15:20

**records** 55:17 60:3,5 140:4

**rectangular** 42:6

**red** 100:4 104:25 106:22 169:13, 25

**reddish** 99:22

**redirect** 169:6

**refer** 125:22 126:6,11,15 127:4 156:3

**referred** 155:23

**referring** 56:22 128:9

**refers** 130:18 147:22

**regard** 28:23 60:2

**Regency** 56:21

**Regional** 7:21,22 8:7 11:20 12:9

**registered** 92:1

**Regularly** 5:25

**related** 66:9 69:14 95:10

**relation** 150:24

**relationship** 58:5

**release** 49:18,25 97:5

**released** 49:16 58:22 96:25

**releasing** 48:16

**relevant** 56:25 78:13,17 79:21

**remain** 50:23 51:1

**remember** 18:2 35:12 67:6 128:17,20 143:9,13 150:4 152:3 153:8 154:20,22

**removed** 152:25

**replies** 130:2

**reply** 124:1 148:22

**report** 76:2 97:11 98:3 144:8 149:17 155:17,18 157:8 167:3,8

**reported** 52:2,5 53:12,14 92:22

**reporter** 15:8 20:16 129:4 137:2 166:12

**reports** 98:15,16 156:7 168:12

**require** 113:17

**required** 160:4,5,19

**requirement** 14:8

**respects** 97:24

**responded** 30:20

**response** 26:7,13 30:19

**responses** 99:13

**results** 156:14,17

**retained** 141:22

**retired** 8:25 9:3,5,8

**retrieved** 141:22

**reveal** 60:3

**revealed** 51:10,15

**review** 32:24

**reviewed** 7:3 32:10

**Richmond** 20:21 55:16 77:25

**right-hand** 138:10

**rights** 113:18,24 114:6 117:11 118:17

**Ring** 74:8 77:23,24 78:21 79:20, 25 80:4

**Riverside** 7:21,22 8:6 10:21,23, 25 11:20 12:9,18

**road** 20:7 22:10,17 23:21,22,25 29:12 57:21 134:16

**roads** 22:24 84:14

**Robert** 149:17

**role** 24:16,19 49:24

**roughly** 23:14 25:4 81:21

**round** 146:10

**route** 22:16,19 108:9

**routine** 22:8

**run** 47:9 60:12,14,24 61:8,10,15, 16 100:21 105:20 130:1 136:5 139:1 140:5,14 162:7 168:5

**running** 22:9 36:3 38:11 77:23 88:16,25 95:3,5 101:19 103:9 108:24 112:16 133:3

**runs** 37:5 139:1

**rush** 72:16,20

**S**

**safe** 29:1,2

**safety** 34:16 35:7 46:13,20,25

**sat** 44:14 49:14 142:10

**satisfaction** 167:22

**Saturdays** 56:21

**scene** 37:11 43:7 50:15 51:1 57:21 64:9 93:7,9 96:12 99:24 111:18 130:24 139:25 141:8,23 149:14 158:13,14,20 169:11

**school** 9:3,12,17,21 66:15 68:23 69:19

**Scott** 5:1,6

**screen** 81:2,3 138:5

**search** 20:23 50:14 56:20 95:10, 18 154:9

**searching** 75:2

**seat** 49:4,14 65:21

**seated** 57:4

**seconds** 37:18,21 87:3,4,6,7 94:18,19 102:1,18 104:13 106:10 133:25

**section** 11:19

**Security** 62:25

**seek** 46:17 95:10

**seeking** 12:21 102:5

**segments** 21:10

**seized** 74:20

**seizure** 20:24

**sense** 27:4 43:19 88:12

**sentence** 165:2

**sentences** 121:19

**separately** 32:25 33:1

**September** 52:7,23 54:11,19

**sergeant** 11:7,12,16 13:7,10 16:21 24:4,5,7,10 32:16,17

**sergeants** 11:6

**set** 146:13 148:20

**Seth** 111:22 152:25

**sets** 36:1,2

**sharp** 146:25

**Sharpie** 100:4

**shirt** 44:24 67:7 83:13 121:3 122:17

**short** 10:10 45:2 146:5

**short-term** 20:14

**shortly** 48:22 78:1

**shoulder** 27:16

**show** 56:7,9 59:5 78:13,21,24 79:23 97:8 99:17 100:4 104:25 106:2,5,23 107:10 108:7 129:23 135:8 136:22 143:6 145:7

**showed** 98:18 135:22

**showing** 101:4

**shown** 166:12

**shows** 41:3 53:6 77:23 78:25 99:21 135:10 137:5 144:8 145:6, 14

**sic** 78:3

**side** 36:25 37:2 53:11 57:21 105:25 133:13,22 135:11 136:10 138:11 164:11

**sidewalk** 100:9

**sight** 36:3,20 37:13,17,20 95:6 106:20,23 107:11,17,22 108:3,10, 13,14,18 109:1,2,7,13 110:2 133:6 138:18 167:13,15

**sign** 28:15,17,19,22 29:4,10,17

**signs** 28:11 29:7 84:14

**single** 165:9

**singularly** 82:3

**sir** 119:25 121:6 145:15 149:21 166:15 167:1

**siren** 26:8

**site** 109:3

**sitting** 59:12 114:15 115:18 116:3 167:23

**situated** 150:3

**situation** 32:8 34:20

**size** 42:1,3

**sketch** 147:9

**ski** 39:13,15,17,19,20,23,25 40:5, 6,10,13,14,17 41:4,8,11,12,15 42:8,10,13,20,21 43:7,9,13 44:24 83:12 142:1,7

**skinny** 45:5

**slow** 26:10 29:9,10

**small** 146:13,17

**Smith** 13:7,10 15:18 24:4,7,10 31:7 32:15,22 93:2

**Smith's** 24:5

**snitch** 124:3,5,16 125:15,18

**Social** 62:25

**softball** 20:9

**sole** 94:2 97:1 159:19

**solely** 83:22

**son** 10:17 64:15 130:19,25 151:20 156:13

**sought** 28:3,6 70:9

**sounded** 44:15

**sounds** 147:8

**south** 22:17

**southbound** 22:10

**speak** 6:8 129:5 140:3

**speaking** 46:20

**specific** 5:12

**specifically** 33:25 72:4 96:25 98:18

**speed** 17:14,23 22:19 24:16 26:3,5,13,20 27:4,6,8,11 29:9 30:1 31:3,4,14,16 63:16 85:2 158:19

**speeders** 30:11

**speeding** 29:22 30:7,19

**spell** 5:7 11:9,13

**spent** 147:3

**split-second** 94:11

**spoke** 44:2 83:11

**spoken** 7:6

**square** 42:6 146:9,25

**Stafford** 52:4

**stage** 152:1

**stand** 60:21

**standing** 102:19 110:22 111:3 135:12 136:23 150:21 162:10,21, 24 163:2 164:12,14 169:22

**star** 99:23

**start** 71:7 132:3 138:22

**started** 100:8,14 132:2,3

**state** 5:5 7:11 12:3,15 18:14 44:15 55:7 66:4 67:1 116:4 117:23 149:22 165:9 167:25

**stated** 91:9,12 154:8 165:5

**statement** 96:20 120:18 123:13 127:19,21,25 130:3,7 140:16 141:3,11 167:2

**statements** 70:19 96:23

**states** 106:17,18

**stating** 32:20 72:7

**station** 9:10

**stationary** 22:10

**steal** 54:18

**stealing** 53:16,21 58:7,12

**steering** 73:22

**stepped** 48:23

**stocky** 45:5

**stole** 55:25

**stolen** 51:16,19 52:2,5,11,16,23, 24 53:1,4,5,10,12,14,17 54:11 58:17 62:12 68:17 92:12,18,22 125:13 141:7

**stood** 75:17

**stop** 17:2 22:3,16 28:11,15,16,19, 22 29:4,7,10,17 36:24 37:2 84:14

**stoplight** 84:9

**stopped** 103:20,21 110:5,8

**street** 22:21,22,23,24 55:21 80:17 88:25 99:21,22 100:9,18, 20,25 101:2,21 107:14,22 108:24 109:21 110:7,15 112:25 113:2,3 137:11,14 138:18 154:1 168:25

**Street all** 22:25

**streets** 84:15

**student** 62:15

**stuff** 14:3,4 72:8 125:16,17

**subject** 12:17 139:7

**submission** 98:9

**submitted** 77:4 80:1

**subsequent** 20:23

**subsequently** 59:2

**such-and-such** 21:18

**suffered** 12:23

**suggest** 132:17

**summary** 97:13 147:24 148:25

**superintendent** 11:1,2

**supervisor** 9:25 24:1,2,16 31:2, 3,6 32:10 65:9 93:14,16 98:9 159:8,9 160:13

**supervisors** 24:13 26:17 93:12 98:6

**support** 97:20

**supposed** 64:24 113:23 115:8 117:24

**surgery** 139:21 140:5,15

**surrounded** 29:13

**surrounding** 79:9

**surveillance** 74:2,6 77:15

**suspect** 15:20 16:6,25 17:4 18:15 34:7,13,16,22 35:22,24 36:5,21 37:14,22 38:6,9 41:6 44:16 45:12,20 46:1 47:15 51:3 77:23 78:25 80:5,17 81:8,11,12, 14,22 87:1 89:4 90:14 102:6 106:13,16 107:6 113:10 119:11, 14 132:12 133:3,20 135:13 138:12,23 139:1 141:19 144:12, 16 147:17 148:16 152:21 153:4 154:18 157:15 161:18 167:19 168:5 169:22

**suspect's** 18:13

**SUV** 34:1 87:13,14 88:8 134:11, 15 138:3

**swab** 131:14,24

**sweater** 152:20

**sweating** 128:16

**sweatshirt** 152:21 153:1,3,10, 15,18,19 154:2

**sworn** 5:2 99:13 120:18

**System** 156:5

**systems** 69:4

---

**T**

**tab** 154:12

**table** 37:25 38:1

**tag** 54:8

Index: takes..twelve

**takes** 36:18 37:4

**taking** 48:15 159:3

**talk** 20:19 91:9 93:12 128:8 139:15 153:24

**talked** 17:11 49:12 53:12 77:14 80:16 92:16 139:11 161:6

**talking** 13:23,25 14:2,3,5,6 15:18,19,21 16:14 17:20 20:14,20 51:11 60:16 78:10 103:8 134:4 145:7,14 151:17

**talks** 141:18 143:8 167:12

**tall** 43:24 45:2 82:6 88:11 89:14 90:7,21

**taller** 43:22

**telling** 41:11 62:5 92:2,3,4 114:14 116:20 159:2,19 160:7

**tells** 131:10

**ten** 17:17

**term** 126:3

**terminate** 24:21,22 31:11,13

**terminated** 24:25 31:15,19 84:18

**terms** 32:11

**test** 114:14,16

**testified** 5:17,19 106:8

**testify** 5:23

**testifying** 145:15

**testimony** 75:11 76:3 106:11 128:22 143:13 148:21 160:9 161:7 162:9,22 163:23 166:2 168:18 169:24

**testing** 130:15 143:6

**tests** 71:5 130:7,13 142:23

**theory** 68:14 85:23 91:22

**thermal** 154:13

**thin** 90:21 146:21

**thing** 15:11 16:3,5 21:20 40:3 68:16,25 69:9 73:12 99:22 125:11,12 126:13 128:20 144:3,5 159:13 160:7,20

**things** 66:20 121:1 129:1 132:12

**thinking** 63:20 105:20

**Thirty-two** 8:13

**thought** 31:7 57:5 79:20 90:3 96:7 159:17 160:6

**threat** 96:5,7

**three-** 29:13

**threshold** 48:4,5,6,10 162:15

**throw** 77:1

**thrown** 37:1 74:23 75:12 76:4,6 154:8

**thug** 151:7,12

**til** 78:6

**time** 9:7 10:25 11:22 14:11 15:6, 8,12,13 20:12,19 21:19 23:12 24:2 29:19,20,23 31:22 32:8 34:7, 21 35:4,8 37:8,10,16,19 39:22 43:3 48:25 49:2 51:22 52:19 57:1 59:16 62:1,4 65:7,8,14 78:5,7,8 80:5,6 81:21 82:22 86:7,10,21 87:3,5 89:16 94:25 95:4,25 96:3, 16 99:10 102:13,17,23 103:10,19, 20 104:3,6,10,11 107:13,18 108:14,20,25 109:18,20 112:4,10, 17 113:6,15 114:2,4,13,21 115:11 116:2,18,25 119:3 129:5,19 132:15 139:20 148:4 150:15 152:8,15,18 156:21 157:4,6,17,23 159:1,18 160:4,5,18 162:22 167:13

**timeframe** 25:9

**times** 5:19,20 13:1 26:22,25 27:2, 13,14,15 30:15,17 31:19 37:13,15 38:5,8,10,12,20 39:4 86:25 87:2 94:18 117:1,18 118:8,11 133:2,9, 12 160:16

**tired** 95:4

**today** 7:7 59:12 114:15,21 115:18 116:3 160:9 166:13

**toes** 47:4

**told** 24:22,24 31:2 35:12 44:15 53:14 63:3 82:13 86:16 89:21 90:24 94:10 115:14 116:22 117:17 119:10 123:3,8 124:21 126:15 130:24 131:17 132:4,6 139:20,25 140:9,11 151:21 156:13

**tolls** 33:6

**top** 27:4,6 118:6,22 127:18,19

130:24 141:5 149:5 155:25 158:11 166:23 167:2

**total** 5:22 84:12

**totality** 83:25 94:19 104:15 128:18 129:13 155:10

**touch** 73:6

**townhome** 37:8 51:4 109:5 150:12

**townhomes** 35:25 36:1,2,4,15 37:5

**townhouses** 74:11

**tracks** 106:23

**traffic** 17:2,13 22:19 27:11 63:11, 16

**trained** 27:20 113:22 114:11

**training** 94:10 113:21 117:23,25 118:1,3 151:25

**trash** 91:8

**Travel** 5:6

**traveling** 107:5,6

**TRAVIS** 5:1

**trial** 167:24

**trooper** 15:14,18 17:2,5 18:14 25:15,17 52:11 66:4 70:19 75:7, 24 76:20 82:24 95:10 102:6 106:7 107:5 116:4 117:23 125:10 126:6, 19 147:25 148:15 149:17 152:1, 25

**troopers** 16:4 23:11 25:13 26:16 30:20,22 34:22 37:11 49:24 72:21 74:15 83:3 96:12 97:4 111:18 112:3 125:22 126:4,16 127:5,9 152:4 158:17 159:6,15,21 160:12

**truck** 53:24 54:1,8

**true** 141:9

**trunk** 36:21,22 73:23 77:10

**turn** 14:9,15 15:12 59:9 93:22 155:18,20 156:13,18,22 157:7 160:22

**turned** 14:13 16:10 17:6 57:5 59:1 101:7 103:17 110:5

**turning** 15:16

**twelve** 132:16

**type** 32:19 34:24 38:24 43:23 53:15 54:7 58:4 59:5 61:6 66:1,8 70:9 73:6 87:8 90:16 91:25 98:4 117:22 130:15 143:6 147:12,13, 16

**types** 93:18

---

**U**

**U-TURN** 22:18

**Uh-huh** 12:14 15:10

**unable** 33:14,17 131:2

**unaware** 7:3

**underlying** 14:19

**understand** 6:4,7 21:3,5 24:19 75:11 115:14 140:25 148:10

**understanding** 24:15 45:24 106:11 115:23 117:9 144:9 159:14

**understood** 30:7 45:11 55:16 64:22 70:18,22 72:11 80:9 113:15 115:8 169:20

**undertake** 6:11 88:24

**undertaken** 73:25

**unholster** 112:9,15,17

**unholstered** 46:21,25 95:25 96:2,15 112:4 151:25 152:4,8

**uniform** 16:18

**unintentional** 85:6,10

**unit** 72:25 79:9,11,13 81:21 165:9

**units** 34:14 79:9

**unloaded** 112:3

**unsure** 93:11

**utilize** 169:19

**utilized** 165:20

**utilizing** 100:1,4 104:23

**uttered** 44:8

---

**V**

**V-C-E-N** 60:19

**V-C-I-N** 60:20

**variety** 41:3

**VCIN** 60:14,17,18

**vehicle** 18:13,14,15 21:24 22:12, 14,17 23:2 27:22 30:15 34:23 35:23 52:2,23 53:4,9 54:11,18 58:2,5 63:17 68:4 69:6 71:22,23 73:21 75:17 83:11 86:19 87:9,12, 25 88:4,5,10,17,20 90:13 98:25 119:5,6,8 120:15 123:14 124:12 141:7 155:4

**verbal** 12:25 16:21 18:6

**video** 27:18 32:11,24 70:9 74:2,6, 8 77:15,23 78:6,12,13,18,21,22, 23 79:5,9,11,13,15,19,20,21 80:1, 6,11 87:11,12 89:1 138:6 142:9, 10,14 144:8,22 145:6

**videos** 129:21

**view** 63:12 133:17,20

**Violation** 97:11

**Violation/probable** 97:13

**violations** 62:18,21

**Virginia** 7:11,17 12:3 20:22 60:22 116:4

**voice** 44:20

**volume** 17:13

**VSP** 7:12 9:20 12:24 15:11 50:10, 11,19 52:10

---

**W**

**W-Y-A-T-T** 5:8

**wait** 157:10 162:18

**wake** 117:6

**walk** 9:19 35:16 36:20 37:3 48:15 100:6 139:2 141:8

**walk-throughs** 35:13

**walked** 48:24 49:3 73:5 107:2

**walking** 36:3,4,18,19 38:12,20 95:4 100:15 103:11,13 104:11 107:13 109:20 133:3,10,12 138:20 145:7

**wall** 137:16 164:17,18

**wanted** 14:12 29:21 131:14

**warnings** 115:9

**warrant** 45:15 95:10,18

**watch** 130:2

**watched** 112:21 130:1,2

**waters** 106:10

**ways** 116:14 134:9

**weapon** 60:3,6 104:20,22,24 105:1,19 112:10,15

**weapons** 96:15 112:3

**wear** 40:4

**wearing** 41:5,6 141:19 152:21 154:13

**Weather** 9:24

**weaving** 27:11 63:11

**week** 5:23 18:3

**weeks** 12:13 55:8 58:23 78:10,11 147:3 157:8,9

**weigh** 89:16

**weighed** 90:9

**weight** 89:18

**whatsoever** 69:13,23 90:22

**wheel** 71:15 73:22

**white** 44:24 83:12 125:25 126:3, 6,15 127:4 154:13 161:3,4,11,12, 13

**wild** 85:19,24

**wind** 133:7

**window** 79:12 150:22,23

**woman** 24:7 111:12,15 152:6 161:8

**word** 89:25 114:17 119:13,15 127:4 144:19 151:6,7

**wording** 149:1

**words** 18:13 44:8 70:18 89:24 90:1 121:18 143:20,22 144:12,13 151:12

**work** 8:7 10:19 11:19 23:19 147:9 161:12

**worked** 7:12 9:21 10:1 11:6,21 24:10

**working**  8:6 11:5 99:7,9

**works**  125:3,5

**wrecked**  23:2

**write**  96:24 135:7

**writing**  153:3,15,23

**written**  96:19 155:25

**wrong**  140:9

**Wyatt**  5:1,6,7 102:6 106:7 107:5
  140:9 147:25

———————————————
            **Y**
———————————————

**yards**  134:23

**year**  9:17 10:14,22

**years**  7:12,13 8:18 9:22 13:13
  45:8 62:1 116:4,7,12,20

**young**  141:1

**younger**  69:6

———————————————
            **Z**
———————————————

**Z-A-Y**  70:3

**Zay**  70:3,6 71:3 89:20 90:18
  124:22

**zone**  22:12