# Exhibit 9

Declaration of Travis Scott Wyatt

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| ONTARIO LOGAN-PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-526 |
| | ) | |
| TRAVIS SCOTT WYATT, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF TROOPER TRAVIS SCOTT WYATT**

I, Travis Scott Wyatt, declare under penalty of perjury that the following is true and correct

to the best of my knowledge and belief:

1.      I am a Trooper employed by the Virginia State Police.

2.      On the evening of December 11, 2023, while I was running radar on southbound

Chippenham Parkway (State Route 150) at Hopkins Road, a blue Dodge Charger sped past me

traveling 102 miles per hour in a posted 60 mile-per-hour zone.

3.      Given the dangerous and reckless speed at which the Charger was traveling, I left

my position as quickly as possible to try to catch up to the Charger and execute a traffic stop.

4.      When I reached Route 1 and Dundas Road, I activated my emergency lights and

siren and attempted a traffic stop. The Charger, however, didn't stop.

5.       I continued my pursuit of the Charger on northbound Interstate 95, following the

Charger as it continued at a high rate of speed, at times over 120 miles per hour. As I followed,

the Charger weaved in and out of traffic, drove on the shoulder, and once off the highway, ran stop

signs.

6.      The Charger exited Interstate 95 at Maury Street in Richmond and pressed on through the streets of Manchester until rear-ending an SUV stopped at a red light at the intersection of Commerce Road and Maury Street.

7.      As I arrived at the wrecked Charger, the driver of the Charger jumped out of the Charger and ran up Maury Street. I jumped out of my vehicle and initiated a foot pursuit of the suspect.

8.      I chased the suspect around a row of duplex apartments off of East 9th Street. While chasing the suspect around the apartments, I briefly lost sight of him but regained a visual on him when he came out from behind a dumpster in the parking lot. I exchanged a glance with him for two or three seconds from 15 to 20 feet away and the suspect stated, "I'm not going to jail." The suspect had what I believed to be a ski mask or durag on the top of his head, but his face was not covered.

9.      The suspect took off again, and for a brief period, I again lost a visual on him. I regained a visual on him as I made my way back to the intersection where the crash occurred at Commerce Road and Maury Street. I observed the suspect remove a bag from the trunk of the Charger and resumed chase of him.

10.     I chased the suspect north on Commerce Road next to a fenced-in area. After the suspect rounded the corner at Everett Street, I saw him crouch behind the dumpster in the parking lot adjacent to the row of apartments. He grabbed an object from the bag he had removed from the Charger and tossed the object underneath the dumpster.

11.     At that point I exchanged a second glance with the suspect, again for about two to three seconds. We were separated by chain-link fencing surrounding a parking lot and approximately 25–30 feet apart.

2

12.     I pursued the suspect toward the apartments and observed the suspect run to the front entranceway of the apartment at 304 East 9th Street, whereby the suspect disappeared. I concluded the suspect had entered the residence.

13.     As I waited for backup to arrive, I monitored the apartment. I did not observe anyone enter or leave the apartment. Soon Trooper Chance Morris arrived. I told Trooper Chance Morris that the suspect had run into the apartment. Trooper Chance Morris and I continued monitoring the apartment to make sure no one entered or exited.

14.     The next trooper I encountered on scene was Trooper Seth Layton, who arrived with his K9 dog. I then saw a woman, later identified as Ms. Lakita Patterson, exiting the back door of the apartment at 304 East 9th Street. I approached her and asked her whether she was in an upstairs or downstairs unit, trying to confirm that she had just come out of the same apartment that I had observed the suspect enter through the front door minutes earlier. Ms. Patterson confirmed that it was all one unit, upstairs and downstairs.

15.     I told Ms. Patterson I had chased the suspect into her home. I then asked her who was in her house and she replied that only she and her son were home and that he had come in five minutes ago. I asked Ms. Patterson what her son had been driving and she answered, "My son don't drive." Ms. Patterson then stated that she had been outside watching them run and said that she and her son ran back into their house.

16.     I asked to see Ms. Patterson's son, who I later identified as Ontario Logan-Patterson, and she called for him to come downstairs. Mr. Logan-Patterson came to the door shirtless, breathing heavy, and sweating. I asked Mr. Logan-Patterson what he had been doing. He replied that he had been doing the dishes and watched me chase someone outside. I found this

3

explanation suspicious and did not believe him. I identified Mr. Logan-Patterson as the same person who had been driving the Charger and who I chased to 304 East 9th Street.

17.     I then placed handcuffs on Mr. Logan-Patterson and began escorting him to my vehicle. Ms. Patterson, who had become very upset, told me that her son was only 17. I placed Mr. Logan-Patterson in the front seat of my vehicle and told Mr. Logan-Patterson he was not under arrest. I then continued my investigation, which included questioning three passengers who had been riding with the suspect in the Charger, questioning Mr. Logan-Patterson in my vehicle, and gathering evidence.

18.     When I questioned the three passengers, all adults, who had been riding with the suspect in the Charger, I pointed to Mr. Logan-Patterson, who was behind me in the front seat of my vehicle, and asked them if he was the driver of the Charger. The passengers denied he was the driver. When I asked the passengers who was driving, one of them answered by providing the nickname "Zay," but none of them ever provided a real name.

19.     The passengers denied Mr. Logan-Patterson was the driver but one of them stated he had a "similar build." When I expressed my doubt about the passengers riding with someone they didn't really know, one of the passengers told me that in their community, they rode with "random people." The passenger told me they had met "Zay" through the internet and that they were headed to a car meet.

20.     I found the passengers' explanations regarding their connection to the driver suspicious and didn't think it was strange that a juvenile would be driving a car with three adult passengers. Trooper Robert Morris determined that the Charger's Vehicle Identification Number had been tampered with and confirmed the Charger had been stolen after performing a Department

4

of Motor Vehicles registration check. In my experience, it was common for juveniles to drive stolen cars with adult passengers because juveniles receive lesser punishment in the courts.

21.    Trooper Layton, Trooper Hana, and I went back to the dumpster to attempt to locate the object I had seen thrown underneath it and to search the dumpster itself for evidence, such as the suspect's clothing. I did not find anything inside the dumpster but Trooper Layton located a gun underneath the corner of the dumpster. I took possession of the gun and secured it in an evidence bag. As we walked back toward the crash scene, we observed a black hoodie on Mr. Logan-Patterson's back porch. I secured the hoodie as well in case it could provide DNA evidence.

22.    Knowing Mr. Logan-Patterson was 17, I decided to release him due to my lack of familiarity with the process for arresting and charging juveniles. Shortly after I released Mr. Logan Patterson, I attempted to obtain Mr. Logan-Patterson's DNA by a buccal swab. While Mr. Logan-Patterson had provided consent for me to conduct a DNA swab on him, his family members intervened and prevented me from swabbing him.

23.    During my time on the scene on December 11, 2023, no troopers expressed an opinion regarding Mr. Logan-Patterson's guilt and no troopers told me to release Mr. Logan-Patterson.

24.    Over the next two days, December 12 and 13, 2023, I was off duty. After conferring with shift partners regarding how to file a juvenile petition, I went to the Chesterfield County Juvenile and Domestic Relations District Court on December 14, 2023, intending to seek issuance of petitions for the crimes I believed Mr. Logan-Patterson had committed, namely, unlawful failure to stop for a police officer after being given an activated light and siren signals; unlawful possession of a firearm while under the age of 18; and unlawful receipt of stolen property. The

5

Chesterfield intake officer, however, informed me that the petitions should be filed in the City of Richmond given that the majority of the event had taken place there.

      25.    On December 15, 2023, I went to the Richmond Juvenile Detention Center to seek issuance of the petitions. I provided the intake officer with my affidavit and gave her a brief oral summary of what happened on the evening of December 11, 2023. Finding probable cause was established, the intake officer issued the petitions and a detention order for Mr. Logan-Patterson.

      In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

      Executed on May 9 , 2025, at Chesterfield , Virginia

_____
Travis S. Wyatt
Trooper
Virginia State Police