```
1              UNITED STATES DISTRICT COURT
2                       for the
3              Eastern District of Virginia
4    - - - - - - - - - - - - x
5  ONTARIO                      :
6  LOGAN-PATTERSON,             :
7         Plaintiff,            :    Civil Action No.
8    v.                         :    3:24-cv-526
9  TRAVIS SCOTT WYATT,          :
10         Defendant.           :
11   - - - - - - - - - - - - x
12              Deposition of MIKEL HANA
13               Conducted Virtually
14              Wednesday, April 30, 2025
15                 3:16 p.m. EST
16
17
18
19
20
21
22
23
24    Pages: 1 - 51
25    Reported By: Megan Kurwitz
```

1    Deposition of MIKEL HANA, conducted virtually.

2

3

4

5

6

7

8

9

10

11             Pursuant to agreement before Megan

12    Kurwitz, a notary public, in and for the

13    Commonwealth of Virginia.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3       MARK J. KRUDYS, ESQ.
 4       THE KRUDYS LAW FIRM
 5       919 East Main Street
 6       Suite 2020
 7       Richmond, VA 23219
 8       (804) 774-7950
 9       mkrudys@krudys.com
10
11   ON BEHALF OF DEFENDANT:
12       R. COOPER VAUGHAN, AAG
13       STANLEY W. HAMMER, AAG
14       OFFICE OF THE ATTORNEY GENERAL (Richmond)
15       202 N. 9th Street
16       Richmond, VA 23219
17       (804) 786-2071
18       cvaughan@oag.state.va.us
19       shammer@oag.state.va.us
20
21
22
23
24
25
```

```
 1                    I N D E X

 2                                          PAGE

 3   EXAMINATION OF MIKEL HANA BY:

 4      MR. KRUDYS                          5

 5      MR. HAMMER                          44

 6   FURTHER EXAMINATION BY:

 7      MR. KRUDYS                          45

 8

 9

10                  E X H I B I T S

11             (Retained by Counsel)

12

13   PREVIOUSLY MARKED EXHIBITS            PAGE

14      Exhibit 13     Mikel Hana Statement    8

15      Exhibit 28     LEAMS Report            16

16      Exhibit 33K    Photographs             41

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2          THE REPORTER:  Do you solemnly swear or
 3   affirm under the penalties of perjury that the
 4   testimony you shall give will be the truth, the
 5   whole truth, and nothing but the truth?
 6          THE WITNESS:  I do.
 7                    EXAMINATION
 8   BY MR. KRUDYS:
 9      Q  Could you state your full name, please.
10      A  Mikel Hana.
11      Q  All right.  And how do you spell Hana?
12      A  H-A-N-A.
13      Q  And do you have a middle name?
14      A  N, Nasef.
15      Q  Okay.
16          MR. KRUDYS:  And same question for counsel
17   as before, that if we were to subpoena Special
18   Agent Hana for the trial, you would accept service
19   of his subpoena?
20          MR. HAMMER:  Yes, we would.  Thank you.
21          MR. KRUDYS:  Okay.  All right.
22      Q  Special Agent, have you ever had your
23   deposition taken before?
24      A  I have not.
25      Q  All right.  But you have testified in
```

1    court before?

2        A  I have.

3        Q  All right.  This is the same process.  We

4    don't have a judge present here, but the same

5    rules of truthfulness apply.

6            Do you understand that?

7        A  Yes.

8        Q  Okay.  In connection with your deposition,

9    did you do any type of preparation, look at any

10   documents prior to today's deposition?

11       A  I did.  I reviewed my memo, the statement

12   that I wrote to IA when we interview with Internal

13   Affairs.

14       Q  All right.  Was that a typical thing to

15   have an interview by Internal Affairs?

16           MR. HAMMER:  Objection to form.

17       Q  You seem --

18       A  I don't understand.

19       Q  -- surprised by the question.  You

20   prepared a report for Internal Affairs at their

21   request, correct?

22       A  Yes.

23       Q  Had you ever done that before?

24       A  Only for use of force.

25       Q  And why did you understand that you were

```
 1   being asked to prepare, I'll call it, an incident
 2   report in connection with the circumstances of
 3   December 11, 2023?
 4       A  I received an e-mail, I believe, from my
 5   supervisor saying that I need to go interview with
 6   Internal Affairs.  They asked me about the details
 7   of what happened, and then I'm certain after I
 8   left, they said, "Whatever we talked about, can
 9   you have in writing and send it to us."  I believe
10   that's how it went down, not beforehand.
11       Q  All right.  And when you prepared it in
12   writing and sent it to them, did they make any
13   modifications or make any suggested modifications?
14       A  I have not heard back from IA since.
15       Q  In other words, once you sent in your
16   report, that was the end of it with regard to
17   them?
18       A  Yes.
19       Q  All right.  And I will bring up --
20   actually, let me share the screen first.  You're
21   able to see this document?
22       A  I am, yes.
23       Q  I can make it a tad larger if you need
24   that.  Okay.  There we go.
25           Is this the report that you prepared?
```

```
 1              (Whereupon, Exhibit 13, previously marked,
 2     was proffered to the witness.)
 3         A   That looks like it, yes.
 4         Q   And why was IA involved in connection with
 5     this matter?  What was your understanding?
 6              MR. HAMMER:  Objection to form.
 7         A   I don't know why IA was involved.  Usually
 8     after a pursuit, they don't -- we don't interview
 9     with IA after every pursuit.  So I don't know.
10         Q   All right.  This purports to be prepared
11     on January 19th.  It talks about circumstances on
12     December 11th.  Do you know when you met with IA,
13     approximately?
14         A   I don't recall the exact time I did.
15         Q   Well, how about in relation to your
16     report?  How many days or weeks before your
17     report, the completion of your report, did you
18     meet with IA?
19         A   I want to say I wrote it either the same
20     shift or the shift after.  It would have been the
21     same week that I sent the letter in.
22         Q   Okay.  What did you utilize in order to
23     prepare Exhibit 13, your report here?  In other
24     words, did you use notes?  Did you use an NCIC
25     report?  What did you use in order to prepare
```

1    this, or did you just use memory?

2        A   Whatever was in my mind then, that was

3    still fresh in my head, and I believe I also

4    looked up the incident history to see the exact

5    timing and location of when I responded, when I

6    marked on scene just to be exact for the memo to

7    be written.

8        Q   All right.  When you referred to the

9    incident history, is there a particular type of

10   report that you would look at to see that?

11       A   No.  It would be the DIV, and then the

12   number of the incident, and then that's on our CAD

13   database.  It shows the time of the dispatch, who

14   responded, what time you marked on scene, and

15   stuff like that.

16       Q   All right.  The IA officer, do you recall

17   who that was?

18       A   There were two sergeants:  Sergeant Jamell

19   Johnson and, I want to say, Sergeant Putnam.

20       Q   For the reporter, Jamell is spelled

21   J-A-M-E-L-L.

22       A   I believe so.

23       Q   And did you understand that

24   Logan-Patterson's mother, Lakita Patterson, had

25   made a complaint about Trooper Wyatt's actions

1   that evening?

2      A  I'm not sure if I knew that day, but being

3   called into IA raised some concerns on why we

4   would go to IA after such a pursuit.

5      Q  And did they explain to you -- did IA

6   explain to you that that's what occurred, that a

7   woman by the name of Lakita Patterson made a

8   complaint about the actions of Trooper Wyatt and

9   that's why IA was involved?

10     A  I can't be certain that they told me

11  exactly why I was there except to be questioned

12  about the incident.

13     Q  All right.  But does that name ring a

14  bell, Lakita Patterson?

15     A  Not -- looking at the memo, it does, but I

16  don't remember being told that name.

17     Q  All right.  I was going to go through this

18  document in detail, but let me first ask you to

19  recall the events of that evening, what you

20  specifically recall occurring from the moment you

21  hear over the radio that there's a pursuit going

22  on.

23     A  So I was in the far east end by Airport

24  Drive around the 198 mile marker, heard the

25  pursuit coming from Area 6 from Trooper Wyatt -- I

```
 1   don't recall his badge number -- Trooper Wyatt
 2   from Area 6.  That's Chesterfield/Amelia/Powhatan
 3   area -- coming north towards my area, Richmond
 4   City/Henrico.  I started making my way there.  It
 5   was -- I believe it was rush hour traffic, around
 6   1700.  And by the time I made my way there --
 7   there was no shoulders on the Shockoe Valley
 8   Bridge -- took me a little bit -- about 15,
 9   20 minutes to get there.  Midway there, I heard
10   over the radio that either Richmond or multiple
11   units from state police had been on scene with
12   them.  So I slowed my response, still headed down
13   there.  I went to the last location heard, which
14   was Everett Street, and didn't see anybody there,
15   didn't see any blue lights, drove around, saw blue
16   lights around Commerce and Maury, and that's where
17   I had -- I headed that way.  I went to the back --
18   to the front of the -- where I saw the troopers'
19   lights were.  That was -- I believe that would be
20   9th Street, saw K-9, with Trooper Layton there,
21   parked my vehicle out front, he had his dog.  So I
22   assume we're going to do a dog track, didn't know
23   if any contact was made yet, unholster my gun,
24   point it down as if we're going on a track.  We
25   stayed there for a little bit, and then after
```

```
 1   that, I saw at a distance two troopers walking a
 2   gentleman out.  I don't recall 100 percent, but I
 3   remember that the person was shirtless at the time
 4   and then walked back towards the crash scene,
 5   which was on Commerce and Maury.
 6        Q   What happened then?
 7        A   Then -- so, yeah.  By the crash scene,
 8   from there, I think they -- I don't know which
 9   troopers exactly brought the person of interest
10   there that they were pursuing.  Trooper Wyatt was
11   newer, a newer trooper, compared to myself and
12   Trooper Layton.  So we were advising him that we
13   can do a consent swab, buccal swab, and midway
14   through that, there's a gentleman there.  Well,
15   first, there was about three ladies there and a
16   gentleman I believed to be the family of the
17   person because at some point, they were saying
18   it's not -- it's not their son or "You've got the
19   wrong person."  But midway through, the gentleman
20   stops Trooper Wyatt from doing the buccal swab and
21   said, "We're done here."  Then I went to -- told
22   Trooper Wyatt, tapped him on the shoulder and
23   said, "Hey" -- just to give him advice on the job
24   because I've done it for a little bit longer.
25   It's -- like Trooper Layton said, it's consensual.
```

```
 1    We have the gun.  We have the hoodie.  And he
 2    could send it to the lab and get a match later.
 3    Actually, a little bit before that, we took my car
 4    before the -- I believe before the swab, we took
 5    my vehicle back towards that alleyway and put my
 6    Taurus in front of the dumpster.  And Wyatt and
 7    Layton got on my hood to check if anything was
 8    tossed in the dumpster.  And then Trooper Layton
 9    bent down and looked under the dumpster and
10    located a firearm in the corner of the dumpster
11    underneath it, which then he handed to Wyatt to
12    secure, and we went back to the scene.
13        Q   What happened at the scene?
14        A   That was pretty much all my involvement
15    besides -- oh, actually trying to identify the
16    three -- he had three people in the vehicle that
17    was being pursued, tried to separate them and see
18    if they can identify who was driving.  And
19    collectively when we gathered -- not sure who
20    talked to who.  I'm not sure which specific
21    passenger I talked to, either.  They said they
22    knew the driver by nickname from a car club.  They
23    really didn't know him well.  They couldn't give
24    us a name.  And at first, the family was irate --
25    or the people that were on scene that I suspected
```

1    to be family were irate until a few minutes later,

2    everybody calmed down.  One of the females was

3    being very flirty and laughing with us, especially

4    with Trooper Morris, who's no longer with the

5    department.  I believe his first name is Chase --

6    Chase Morris.  And then I -- I left the scene -- I

7    didn't leave the scene, actually.  I stayed until

8    the sergeant worked the crash or provided the

9    traffic control, and then everybody went on their

10   way after that.

11       Q  Why is Trooper Morris no longer with the

12   department?  Do you know?

13       A  I don't --

14           MR. HAMMER:  Objection to form.

15           Sorry.  You can answer, Trooper Hana.

16       A  I think he went and got a job in private

17   sector.

18       Q  Was he under investigation prior to doing

19   that?

20           MR. HAMMER:  Objection.

21       A  I wouldn't know.

22       Q  So the report that you prepared that is

23   Exhibit 13, it's a two-page report,

24   single-spaced -- was your memory of events better

25   at the time that you created the report or is it

```
 1   better sitting here today?
 2       A  Probably at the time of the report.  It
 3   was near the incident date.
 4       Q  Okay.  All right.
 5           Would you -- how long did it take for you
 6   to actually prepare the report?
 7       A  I don't recall the exact time it took me.
 8       Q  Like an hour?  Something like that?  An
 9   hour or two?
10       A  That sounds about right.
11       Q  All right.  Did you -- in connection with
12   your interview of the passengers in the car, what
13   are the names of the passengers that were in the
14   car?
15       A  I don't know their names.
16       Q  Did you ever write it down at some point?
17       A  I believe I did not, and we have the LEAMS
18   -- the LEAMS report, which if they were
19   identified, they would be put as either victims,
20   witnesses or involved in the LEAMS report by the
21   agent or the officer in charge.
22       Q  Who was the officer in charge?
23       A  Trooper Wyatt.
24       Q  Well, what do you understand to be -- what
25   that means with regard to his duties and
```

1    responsibilities being the officer in charge?

2       A  Can you repeat that?  I don't understand

3    what you mean.

4       Q  Yeah.  What did you understand -- you

5    stated Wyatt was the officer in charge.  And so my

6    question to you was:  What was your understanding

7    at the time as to his duties and responsibilities

8    in connection with this investigation as the

9    officer in charge?

10      A  So, typically, whoever is initiating

11   whatever investigation or traffic stop, that

12   person gets help from whoever as units working

13   together, partners, but then that person prepares

14   the report, uploads it into our LEAMS database,

15   inputs all the information for the supervisors to

16   review.  So that would be the person that

17   initiated the traffic stop.

18      Q  All right.  So I'm going to share with you

19   and pull up Exhibit Number 28.  So is this the

20   LEAMS report that you're referring to?

21          (Whereupon, Exhibit 28, previously marked,

22   was proffered to the witness.)

23          MR. HAMMER:  Can you make it a little

24   larger?

25      Q  Is that the LEAMS --

1      A   That's the outline of it, yes.

2      Q   Okay.   It goes on for a number of pages.

3          So did you have any part in the

4   investigation yourself?

5      A   Besides being on scene, I don't believe I

6   was on -- added to the LEAMS.

7      Q   Okay.   So do you know of any person that

8   was involved in the investigation other than

9   Trooper Wyatt?

10     A   In terms of being on the LEAMS?

11     Q   Well, no, having any type of investigative

12  action.   Can you identify -- you took no further

13  action.   Do you know of anybody other than Wyatt

14  that took further action with regard to this

15  matter?

16     A   No, I don't.

17         MR. HAMMER:   Objection to the form.

18     Q   I'm sorry?

19     A   I said, "I don't."

20     Q   All right.   Do you know -- can you recall

21  what the description of the driver that was

22  provided over the radio was?

23     A   I don't recall that.

24     Q   Did anybody actually see the driver?

25         MR. HAMMER:   Objection to the form.

```
 1        A  Anybody as in us on scene or -- I don't
 2   understand.
 3        Q  Yeah.  Were there any witnesses that came
 4   forward as to who the driver was --
 5            MR. HAMMER:  Objection to form.
 6        Q  -- and identified the driver?
 7        A  Not that I'm aware of.  Nobody told me
 8   personally.
 9        Q  How about the passengers?  Did they
10   identify any person as being the driver?
11            MR. VAUGHAN:  Objection to the form.
12        A  Yes.  They said the -- so obviously
13   somebody was driving the vehicle.  They couldn't
14   give us a name.  They said they met at a car club.
15   They knew him by a nickname, and that's all they
16   can give us.
17        Q  What was the nickname?
18        A  I don't recall that.
19        Q  All right.  Well, an individual was
20   brought back to the car by Trooper Wyatt.  What
21   did the passengers say with regard to that
22   individual, whether or not he was the driver?
23            MR. HAMMER:  Objection to the form.
24        A  I didn't question them, and I didn't hear
25   anybody else asking them that.  I'm not sure
```

1    what --

2        Q   Why not?   That seems like a rather obvious

3    thing to ask the passengers of the car if the

4    person being taken into custody was the driver,

5    doesn't it?

6        A   Correct.   I personally did not ask them

7    that.

8        Q   Did anybody else?

9            MR. HAMMER:   Objection to the form.

10       A   I don't know.

11       Q   All right.   Well, you identified yourself

12   as the more senior person in addition to Layton.

13   Is there any other person that was senior there

14   besides yourself and Layton?

15       A   The other -- I believe it was only the

16   three or four of us:   Morris -- both Morrises,

17   both troopers, and then Wyatt.   So, no.

18       Q   All right.   Well, with regard to the three

19   individuals in the car, what was their

20   relationship with each other?   How did they know

21   each other?

22           MR. HAMMER:   Objection to the form.

23       A   I don't know.

24       Q   Did they go to school together?   Did they

25   work together?   Did they live in the same

```
 1   neighborhood?
 2       A  I don't know.  I didn't ask them any of
 3   those questions.
 4       Q  Why not?
 5       A  I don't know.
 6       Q  Did you ask them where they got in the
 7   car, at what place they got into the car?
 8       A  I believe those questions have been asked,
 9   just not by me, and if they were answered, I don't
10   remember what their responses were.
11       Q  Okay.  If it's not by you, who was it,
12   then, that asked these questions, like where they
13   got in the car, how they knew each other?
14       A  Multiple people talked to them.  Multiple
15   of the troopers on scene talked.  I can't --
16       Q  Okay.  I just took the deposition of
17   Morris.  He didn't ask him any of these questions.
18   You didn't.  Do you know -- can you identify
19   anybody that did?
20           MR. HAMMER:  Objection to the form.
21       A  I believe we were in a small vicinity.
22   I'm not sure who talked to who.  I talked to
23   somebody from those three.  I just don't know
24   which one and what they said except that what I
25   stated, that they knew him from a car club.
```

1      Q   Which car club?

2      A   I don't know.

3      Q   Did you ask them which car club?

4      A   If I did, I don't recall what they said.

5      Q   Are there more than one car club in the

6   area?

7          MR. HAMMER:  Objection to form.

8      A   I don't -- I don't know.  I know of some

9   that are in Richmond, like RVA, Cobras (phonetic),

10  and others online, but I'm not sure if that's

11  specific to a city or what.

12     Q   If you knew there were more than one car

13  club in the area, why did you not ask which one?

14     A   I don't recall if I did.  And if I did, I

15  don't know what they told me.

16     Q   All right.  Well, you don't have it in

17  your report, anything about the name of the car

18  club.  If you had asked that information, wouldn't

19  you have included that in your report?

20     A   I probably would have.

21     Q   Okay.  And you put in your report that

22  they had recently just met the person and knew him

23  by a nickname because they were in the car club

24  together.  So where did they just meet him?

25         MR. HAMMER:  Objection to form.

1    A  I don't recall where they met him or if

2  they told me where they met.

3    Q  Did they have any type of phones on them?

4      MR. HAMMER:  Objection to form.

5  A  I don't recall that.

6    Q  Did you ask them that question?

7  A  I don't think I did.

8    Q  Would the phones have -- to your

9  understanding, would the phones have showed where

10  they were earlier that day?

11      MR. HAMMER:  Objection to form.

12    A  I don't -- possibly if they texted each

13  other.  I don't know.

14    Q  Did you understand at the time that phones

15  have location data that would show where they were

16  earlier that day?

17      MR. HAMMER:  Objection to form.

18    A  I do know that.

19    Q  Okay.  But these passengers were in the

20  car for a high-speed chase that took place for

21  over nine minutes and ended in a crash, correct?

22    A  I know it ended in a crash.  I don't know

23  how long it was.

24    Q  All right.  Well, you heard over the radio

25  that Trooper Wyatt reported speeds in excess of

```
 1    100 miles an hour, correct?

 2        A  I don't recall that.

 3        Q  All right.  Was there any reason for this

 4    chase other than speeding?

 5            MR. HAMMER:  Objection to form.

 6        A  I don't know what the reason for the

 7    pursuit was.  If it was aired over the air, I

 8    don't recall what it was.

 9        Q  Did any of the passengers call 911 when

10    they were involved in a car chase --

11            MR. HAMMER:  Objection.

12        Q  -- as passengers in the back of a car that

13    was fleeing police for nine minutes?

14            MR. HAMMER:  Objection to form.

15        A  Are you asking if they called, those

16    three --

17        Q  Yes.

18        A  -- individuals called?

19            I wouldn't know that.

20        Q  So you guys just released those three

21    individuals that evening; is that correct?

22        A  Yes.  They were released.

23        Q  Did you ever put them in handcuffs at any

24    point?

25        A  I don't recall if they were handcuffed or
```

1    not.

2        Q  One of them had a handgun, correct?

3        A  I do remember one having a handgun, yes.

4        Q  Which one?

5        A  I don't recall that.

6        Q  If you saw a picture of them, could you

7    identify them by picture?

8        A  No, sir.

9        Q  And so the Virginia State Police just gave

10   back the handgun to this unidentified

11   individual --

12           MR. HAMMER:  Objection to form.

13       Q  -- is that right?

14       A  I didn't hand them the gun personally.

15   Typically the gun would be ran to make sure if

16   it's stolen or not, if it's clear or not, if the

17   person is allowed to have the gun or not, then

18   they would be handed their gun back.  I didn't do

19   that personally.

20       Q  All right.  So who's the person whose name

21   was run?  Are you able to identify that person?

22       A  I don't -- I don't know who that person

23   was.

24       Q  All right.  Were any latent fingerprints

25   taken at the scene?

1       A  I don't believe so.

2       Q  Why not?

3       A  Not by me at least.  I'm not sure if

4  anybody else did.

5       Q  Okay.  And the person that was running the

6  investigation was Wyatt, correct?

7       A  Yeah.

8       Q  He would have the responsibility of doing

9  that, correct?

10       A  Correct.

11       Q  All right.  Was the driver of the car

12  wearing a ski mask?

13          MR. HAMMER:  Objection to form.

14       A  Of the car that was in the pursuit?

15       Q  Yes.  The driver fleeing Wyatt, was he

16  wearing a ski mask?

17          MR. HAMMER:  Same objection.

18       A  When I got on scene, I didn't see the foot

19  pursuit.  I didn't see any of that action taking

20  place.  So I don't know what he was --

21       Q  Well --

22       A  -- wearing.

23       Q  All right.  I'll represent to you over the

24  radio it was "Black male, Army pants, ski mask on,

25  white shirt."  Did the person ever take their ski

```
 1   mask off --
 2          MR. HAMMER:  Object to the form.
 3      Q  -- to your knowledge?
 4      A  When I saw him at the car, I don't
 5   remember seeing a ski mask.
 6      Q  That's not my question to you.  Did any
 7   person -- did Wyatt say or any of the passengers
 8   say that the driver of the vehicle had the ski
 9   mask on or ski mask off?
10      A  I don't recall being told any of that.
11      Q  So are you learning for the first time
12   right now that the description of the driver was
13   ski mask on?
14          MR. HAMMER:  Objection to form.
15      A  I don't recall hearing that over the air.
16   If I did, I don't remember it.  I was in the
17   process of driving there from the far east end.
18   So I was focusing mostly on driving until I got on
19   scene.  And if I was told on scene what the
20   description was, I probably would have remembered
21   it then.
22      Q  Well, did anybody identify Ontario
23   Logan-Patterson, my client, as the fleeing
24   suspect?
25          MR. HAMMER:  Objection to form.
```

```
 1      A   Anybody from the troopers, from witnesses?
 2   Is that what you're asking?
 3      Q   Either troopers or witnesses.  Did anybody
 4   identify him as the driver of the vehicle?
 5          MR. HAMMER:  Objection to form.
 6      A   Not to me, but if -- yeah.  I was on there
 7   after the fact.  All I saw was somebody handcuffed
 8   being escorted out, but I don't know if -- they
 9   didn't tell me specifically, "Hey, we identified
10   him.  This is him," not verbatim.
11      Q   Well, did the passengers of the vehicle --
12   they were standing right there when Ontario
13   Logan-Patterson was brought to the car.  Did they
14   say, "Oh, yeah, that's the guy," or did they say,
15   "That's not the guy"?
16          MR. HAMMER:  Objection to form.
17      A   I don't recall if they said anything or
18   what they said.
19      Q   Did you ask them?
20      A   I personally did not.
21      Q   Did anybody else?
22      A   I don't know.
23          MR. HAMMER:  Objection to form.
24      Q   You understood that Wyatt was in hot
25   pursuit of the fleeing suspect, correct?
```

```
 1        A   Yes.
 2        Q   And that Wyatt says that the individual
 3   entered an apartment?
 4        A   I don't remember the part about entering
 5   an apartment.
 6        Q   Okay.  You understood that the car was
 7   stolen.  It was determined to be stolen?
 8        A   Yes.  On the scene, I advised Trooper
 9   Morris to run the VIN to verify because knowing
10   from my training and experience, the events get
11   altered.  And I advised him, "Hey, run the VIN,"
12   and I believe it did come back stolen.
13        Q   Yeah.  It was stolen on September 30th,
14   2023.  Do you know if Wyatt did any type of
15   investigation to see if Ontario Logan-Patterson
16   could have been involved with that theft?
17            MR. HAMMER:  Objection to form.
18        A   I don't know.
19        Q   You didn't do any type of investigation as
20   to who stole the vehicle, correct?
21        A   I did not.
22        Q   That would all have been on the shoulders
23   of the newer officer, Wyatt, to do, correct?
24        A   Not exactly.  On scene, like I said, we
25   delegate.  Everybody does something to help out on
```

```
1    the scene.  And I told Morris, Robert Morris, to
2    run the VIN to make sure -- because the tags
3    wasn't coming back, I believe -- run the VIN,
4    which came back stolen.  So he was handling that
5    part, towing the vehicle.  And I was just part of
6    that.
7        Q  Did you -- when did you learn that Ontario
8    Logan-Patterson was arrested by Trooper Wyatt for
9    fleeing him -- allegedly fleeing him in a stolen
10   car?
11           MR. HAMMER:  Objection to form.
12       Q  When did you learn that?
13       A  This meeting is the first time I'm hearing
14   his name.  I don't remember being told that he was
15   arrested.  I know he wasn't arrested the day of.
16       Q  Because you and the other troopers
17   encouraged him to release him?
18           MR. HAMMER:  Objection.
19       Q  You encouraged Wyatt to release him,
20   correct?
21           MR. HAMMER:  Objection to form.
22       A  I don't remember encouraging him to
23   release him.
24       Q  Did you -- did you gather with the other
25   troopers and suggest that he be released?
```

```
 1            MR. HAMMER:  Objection to form.
 2       A  I don't recall that.  All I recall is
 3  giving advice, saying we can send the things to
 4  the lab.
 5       Q  "I said that you already have the hoodie
 6  and you can send that along with the gun to the
 7  lab to see if any matches come back.  Trooper
 8  Wyatt immediately said, 'Oh, okay,' and let go of
 9  the subject."
10            Is that the events?
11       A  Yes.
12       Q  All right.  Did you know that there was
13  Ring camera video that showed the fleeing suspect
14  in the same frame or close in the same frame as
15  Mr. Ontario Logan-Patterson and his mom?
16            MR. HAMMER:  Objection to form.
17       A  I did not know of any cameras or any of
18  that.
19       Q  Did you do any type of investigation to
20  see if there were any cameras?
21       A  I personally did not.
22       Q  Why not?
23       A  I was there to assist with whatever was
24  asked of me.
25       Q  All right.  But I'm asking all of you the
```

```
 1   same questions, and none of you are saying that
 2   you did any type of investigation, for instance,
 3   to look for the Ring cameras to take latent
 4   fingerprints.  Who did you understand was going to
 5   do this investigation if you were not?
 6          MR. HAMMER:  Objection to form.
 7      A  I don't know.
 8      Q  Did you know that my client sat in a
 9   detention center for over 30 days and then had an
10   ankle monitor at home, couldn't go to school
11   because he was arrested by Wyatt at the same time
12   there was Ring camera video affirmatively showing
13   that he was not the driver?
14          MR. HAMMER:  Objection to form.
15      A  I did not know that.
16      Q  Did you know that Ontario
17   Logan-Patterson's phone shows that he was never in
18   a vehicle driving around town, the very charges
19   for which he was arrested by Wyatt?
20          MR. HAMMER:  Objection to form.
21      A  I did not know that.
22      Q  Did you guys take into possession
23   Wyatt's -- I mean, Ontario Logan-Patterson's phone
24   to check that?
25      A  I did not.  I'm not sure if another
```

1    trooper took it or if Wyatt did.

2        Q   They did not.

3            Did you know that Ontario had no prior

4    criminal history?

5        A   I did not know.

6        Q   Did you know that he had -- did you know

7    where he had lived at any point prior to living

8    one block away from where this crash occurred?

9        A   I did not.

10       Q   Did you know that Fairfield Court is a

11   high-crime area?

12           MR. HAMMER:   Objection to form.

13       A   Did I know Fairfield Court is what?

14       Q   A high-crime area.

15       A   I worked the area, not necessarily just

16   Fairfield being high crime.

17       Q   All right.   But you understand Fairfield

18   Court to be among the highest crime areas in the

19   city?

20       A   Not statistically, but I know there's a

21   lot of crime around this area, yes.

22       Q   Okay.   And did you know that that's where

23   Ontario grew up and had no prior criminal history

24   whatsoever?

25           MR. HAMMER:   Objection to form.

```
 1        A   I didn't know that.
 2        Q   Did anybody run Ontario's criminal history
 3   that evening?
 4             MR. HAMMER:  Objection to form.
 5        A   I did not run the criminal history myself.
 6        Q   All right.  Ontario was questioned while
 7   in handcuffs in the back of the car by Wyatt,
 8   custodial interrogation.  He was not read Miranda.
 9   Is that typical practice for the Virginia State
10   Police to do a custodial interrogation and not
11   provide Miranda?
12             MR. HAMMER: Objection to form.
13        A   I don't know if it's protocol, but I don't
14   remember him being in the back of a police car.
15        Q   I'm sorry.  Front seat of the car and
16   questioned by -- do you remember Wyatt sitting in
17   the car with him and questioning him?  Do you
18   remember that?
19        A   I remember Wyatt being outside of the
20   vehicle with him.  I don't remember Wyatt being
21   inside the car at any point.
22        Q   He was, and he questioned him.  So getting
23   back to my question to you:  Did you know at the
24   time that when you're conducting a custodial
25   interrogation, it requires Miranda Warnings?
```

```
 1            MR. HAMMER:  Objection to form.
 2       A  I did not.
 3       Q  Ontario was only 17 at the time.  Why was
 4  he questioned without his mother present?
 5            MR. HAMMER:  Objection to form.
 6       A  I don't know.
 7       Q  So no -- and you can't tell me why no
 8  fingerprints were ever taken of the car, the car
 9  that -- the Dodge Charger that was fleeing Wyatt?
10       A  Typically with what I do now, the only
11  time our forensics would come out is if it's a
12  shooting or homicide.  That's when forensics --
13  the forensics agents would come out and do a
14  forensic scene and all that.  Normally on a --
15  with a stolen vehicle or pursuit, I personally
16  have never taken any prints off of a vehicle.
17       Q  Well, my client was, like I said, detained
18  in an ankle monitor for over 40 days because he
19  was charged with this circumstance even though the
20  video shows the fleeing suspect coming back to the
21  car, opening the trunk, and closing the trunk, not
22  wearing gloves at the time.  Wouldn't you expect
23  there to be latent fingerprints on the car?
24            MR. HAMMER:  Objection to form.
25       A  I didn't know that happened, but if he
```

1    touched, then probably.

2        Q   So do you have any explantation why nobody

3    bothered to take those fingerprints?

4            MR. HAMMER:   Objection to form.

5        A   My explanation would be that we don't -- I

6    don't think -- I wasn't aware personally of what

7    you just told me happened, that somebody ran back

8    to the vehicle and touched the trunk.

9        Q   It was seen by Wyatt.  He testified as to

10   it.

11       A   I didn't know that.

12       Q   Wyatt never told you that, right?

13       A   No.

14       Q   Were you operating under the assumption

15   that the crash that occurred at Maury and Commerce

16   was an accidental crash?

17       A   What do you mean "accidental crash"?

18       Q   As opposed to being intentional.  Your

19   understanding was that the fleeing driver in the

20   Dodge Charger was going at high speeds, was trying

21   to avoid Wyatt, got into an accident, and fled

22   from the scene, correct?

23       A   That's my understanding.

24       Q   And so it was just by coincidence that the

25   person taken into custody by Wyatt lived within a

```
 1   block of that crash?
 2        MR. HAMMER:  Objection to form.
 3      A  I don't know.
 4      Q  Well, did you know that that's where
 5   Ontario Logan-Patterson lives?  He lives one block
 6   away from that crash?
 7        MR. HAMMER:  Same objection.
 8      A  I didn't know that's where he lives.
 9      Q  Did you know that him and his mom
10   initially came out because they heard the crash,
11   and when they saw the fleeing suspect, they went
12   into the apartment and closed the apartment?
13        MR. HAMMER:  Objection to form.
14      A  I did not know that.
15      Q  You put into your report:  Trooper and
16   myself, along with the other officers -- others on
17   scene were very professional with all involved and
18   no altercation took place.  You opted to include
19   that in your report because you knew that there
20   was a complaint against Wyatt by a member of the
21   public, correct?
22        MR. HAMMER:  Objection to form.
23      Q  Correct?
24      A  I believe that was after the --
25        MR. HAMMER:  Objection.
```

```
 1        A  -- go ahead.
 2           MR. HAMMER:  You can answer.  Same
 3    objection.
 4        A  I believe -- like I said, this report was
 5    ran after the investigation, and based on the type
 6    of question that was being asked, I guess that's
 7    my answer to what was in the interview.
 8        Q  All right.  Going back to your report, and
 9    I can bring it up here.  This is Exhibit Number
10    13.  Let me close this out.  All right.  So you
11    state here that -- you're able to see the document
12    I have in front of you?
13        A  I am, yeah.
14        Q  Okay.  It says, "Per my training and
15    experience, I unholstered my gun and kept it
16    pointing down as I saw the K-9 trooper, Layton,
17    staged there as well."
18        A  Yes.
19        Q  So at the same time that you have
20    un-holstered your gun, Layton is in close
21    proximity to you, correct?
22        A  Yes.
23        Q  All right.  So just as comparison here is
24    Layton's -- so you're saying that you have your
25    gun unholstered and you're in close proximity to
```

```
 1   Layton, correct?
 2       A   Not staying next to him, but in close
 3   proximity, yes.
 4       Q   Okay.  All right.
 5           And then if we go to Layton's report,
 6   Exhibit 14 -- oh, this is the one.  Sorry.  I
 7   don't have that page.  Oh, here.  I'm sorry.
 8   There's a report -- one that was originally
 9   produced.  Let's see if this one has it.  Just one
10   second.  All right.  I'm trying to find a
11   document, but it wasn't among the documents.  I'll
12   stop that inquiry.  Let me show you -- well,
13   further on in your report -- again, back to
14   Exhibit 13 -- it said, "A few seconds later I
15   observed from afar as two troopers, possibly
16   Trooper Wyatt and another unknown trooper, were
17   escorting a male out of the apartment front porch
18   towards the crash scene.  I believe that" -- I'm
19   trying to find -- just bear with me for a second.
20   Do you know the apartment that Mr. Logan-Patterson
21   lived in with his mother?
22       A   I do not.  I know the one that we were
23   standing outside of -- in front of was the first
24   one in that building.
25       Q   All right.  But you don't know what the
```

1    number of it was?

2        A  I do not.

3        Q  Okay.  It says on your report, "As Trooper

4    Wyatt was asking for advice," what advice was he

5    seeking from you and Trooper Layton?

6            MR. HAMMER:  Objection to form.

7        A  As, like:  What's next or what should be

8    done? what else can I do?  And then --

9        Q  And what did you say to him in response to

10   "What else can I do"?

11       A  That's when I referred to Layton as -- he

12   came from a background interdiction, and we asked

13   him, and Layton suggested to take buccal swabs and

14   then we can take things to the lab for matches.

15       Q  Okay.  On next page, you talk about

16   "Trooper Wyatt took possession of the hoodie as he

17   remembered the person he was chasing was wearing a

18   similar hoodie."

19            What did he say about the hoodie?  Did he

20   say anything to you?  Did he say, "This is the

21   same hoodie.  This is similar"?  What was his

22   statement when he took possession of the hoodie?

23       A  I don't remember verbatim.  That's kind of

24   the gist of what was said that the person he --

25   was wearing.

1      Q   All right.  When you state over here, "The

2   mom and the two other females and the male showed

3   up on the scene and stated that their son was not

4   one of the" -- "not the one in the car and that

5   y'all have the wrong person," so did you ask the

6   passengers, the three passengers, if they had the

7   right person or the wrong person?

8      A   I personally did not.

9      Q   Well, we just -- I just took the

10  deposition of Trooper Robert Morris, and he said

11  that the passenger said that he had -- the subject

12  had a similar build; however, his facial

13  characteristics were incorrect and is basically

14  not the same person.

15      MR. HAMMER:  Object to form.

16      Q   Are you just learning now that the

17  passengers said that the person taken into custody

18  was not the same person as the driver?

19      MR. HAMMER:  Objection to form.

20      A   I don't remember --

21      Q   Are you learning that -- are you learning

22  that for the first time now, Trooper Hana?

23      MR. HAMMER:  Same objection.

24      A   I don't remember them saying that.  If

25  they did, I don't recall that at all.

1    Q  But are you also saying you never recalled

2  asking them that question?

3    A  Not that specific question.  I do recall

4  asking them who the driver was, or at least one of

5  them who the driver was, and that's when they told

6  me they didn't know him except from a car club.

7    Q  But you -- I'm going to Exhibit Number

8  33K.  All right.  So this is a photo of the three

9  individuals that were passengers in the car --

10  correct? -- on the top?

11        (Whereupon, Exhibit 33K, previously

12  marked, was proffered to the witness.)

13        MR. HAMMER:  Objection to form.

14    A  I couldn't be for sure.

15    Q  So you don't even recognize those three

16  individuals that are shown in the photo?

17    A  I don't.

18    Q  All right.  And the picture below, is that

19  the individual that was taken into custody by

20  Wyatt?

21    A  I don't remember what he looks like.

22    Q  All right.  And so even though you

23  questioned the three individuals or at least one

24  of the three individuals, even though Ontario

25  Logan-Patterson was taken into custody and brought

```
 1    right past the three individuals, you never asked

 2    any of them if the guy that is being taken into

 3    custody is, in fact, the driver of the car?

 4       A  I did not because I was not the one that

 5    brought the person back.

 6       Q  All right.  But you're standing there when

 7    that occurred, right?

 8       A  When they were walking the person back, I

 9    saw them at a distance.  I then came to the scene

10    where everybody was there, yes.

11       Q  All right.  But you're interviewing these

12    three passengers and you know that Logan-Patterson

13    or a person is in custody sitting in the car right

14    next to these three passengers, right?

15       A  I don't know how close they were to the

16    car, but I do know that he was detained at that

17    time, yes.

18       Q  Well, this photo, 33K, is taken from the

19    dash-mounted camera that is in the same car that

20    Ontario Logan-Patterson was sitting in.  These

21    three individuals are being questioned just feet

22    away from where Logan-Patterson was being kept in

23    the car, correct?

24       A  If that's the front camera, then, yes.

25       Q  All right.  And you never bothered to say
```

1    to any of these three individuals, "Hey, does that

2    guy -- was that the driver of the vehicle?"  You

3    never got around to asking that question, correct?

4         MR. HAMMER:  Objection to form.

5        A  I don't know if I did.

6        Q  Well, if you did, you would have noted it

7    in your report, correct?

8        A  Correct.

9         MR. HAMMER:  Objection to form.

10       Q  And you don't note it in your report, do

11   you?

12       A  In the other report that you had up, I

13   don't --

14       Q  Yeah.

15       A  -- believe that's in there, no, sir.

16        MR. KRUDYS:  I have no further questions

17   for the witness.  I appreciate your time and

18   attention.

19        THE WITNESS:  Yes, sir.

20        MR. HAMMER:  Mark, give us just a moment.

21        THE WITNESS:  Do I sign out or ....

22        MR. HAMMER:  No, not yet.  Not yet.  We

23   may have a couple of questions for you.  In fact,

24   I think we do.

25        MR. KRUDYS:  Let's ask the questions.  Go

1    ahead.

2          MR. HAMMER:  We'll ask the questions when

3    we're ready.  Thank you.

4                        EXAMINATION

5    BY MR. HAMMER:

6      Q  Trooper Hana, where were you when you

7    unholstered your firearm?

8      A  In the front of the building, not on

9    Commerce and Maury.  That would be, I guess, 9th

10   Street, in the front of the house.

11     Q  Okay.  And who, if anyone -- who was

12   around you at that time?

13     A  The only one I remember would be Trooper

14   Layton with the K-9.

15     Q  Okay.  And do you have any memory of how

16   far away from you he was?

17     A  Not exact, but close.

18     Q  Was he right up on you, or was he a

19   little --

20     A  A little further out is typical.  I

21   wouldn't be right on the K-9 dog.

22     Q  Okay.  And is it possible, given what was

23   going on at the time, that Trooper Layton didn't

24   see you with your gun unholstered and --

25          MR. KRUDYS:  Objection.

1      Q  -- pointed down, as you testified?

2          MR. KRUDYS:  Objection as to form,

3   foundation.

4      Q  You can answer.

5      A  I'm not sure.  I may -- I mean, I can't

6   recall 100 percent, but I may have reholstered

7   when he was talking to me.  I don't know exactly

8   if he would see or did not see me.

9      Q  Okay.

10         MR. HAMMER:  No further questions.

11                   FURTHER EXAMINATION

12  BY MR. KRUDYS:

13     Q  I've got some follow-up in connection with

14  that.  So let's go back to your report, which is

15  Exhibit 13.  So -- all right.  Do you see where my

16  cursor is?  "Per my training and experience, I

17  unholstered by gun."

18         What do you mean by "Per my training and

19  experience I unholstered my gun and kept it

20  pointed down"?

21     A  So kept it pointing down as in sul

22  position where it's like so, pointed down.

23  Usually with any -- since I've been a trooper with

24  any K-9 track -- if I see a K-9, we're obviously

25  going on a track -- there would be one person, if

1   we're going through the woods, or whatever -- one

2   trooper, one unit, with a gun down and then

3   following wherever the K-9 is.

4       Q   Okay.  So did you, in fact, do that?  Did

5   you follow the K-9 where it went with your weapon

6   unholstered?

7       A   No.  I don't think there's -- I don't

8   remember a track even happening from where I was.

9   I stayed up front in the front of the building.

10      Q   You said in response to your question from

11  the other lawyer where you were and you said you

12  were close to Trooper Layton, correct?

13      A   Correct.

14      Q   All right.  And it says, "Per my training

15  and experience, I unholstered my gun and kept it

16  pointing down as I saw the K-9 trooper (Layton,

17  Badge 1349) staged there as well."

18          What did you mean by "he's staged there as

19  well"?

20      A   When I got on scene -- if I recall

21  correctly that Layton was already there in the

22  same street, in the front -- he was outside, or

23  his vehicle was there, and then I parked my

24  vehicle a little behind and then got out of my

25  vehicle.  That's when I unholstered my gun and

```
 1   pointed it down.  I don't know how long I kept it
 2   out or if I reholstered then within seconds.  I
 3   don't remember that.
 4       Q  It doesn't say that you reholstered it
 5   seconds, does it?
 6          MR. HAMMER:  Objection to form.
 7       A  No.  It doesn't.
 8       Q  And, indeed, you go out of your way to
 9   say, "I do not remember seeing any other troopers
10   with their guns drawn," correct?
11       A  Correct.
12          MR. HAMMER:  Objection to form.
13       Q  Right?
14       A  Correct.
15       Q  Right.  So you talk about it being
16   unholstered.  You note that no persons had their
17   guns drawn at the time.  You don't mention
18   reholstering your weapon, do you?
19          MR. HAMMER:  Objection to form.
20       A  Not on the report, no.
21       Q  And then if we go to Exhibit Number 39 --
22   all right.  This is the report of Trooper Layton,
23   State Trooper Layton.  And when he says "No
24   firearms were ever removed from anybody's
25   holster," that's incorrect, correct?
```

```
1              MR. HAMMER:  Objection to form.
2         A  I don't know what he saw.
3         Q  I asked you the question of not what he
4    saw but the statement "No firearms were ever
5    removed from anybody's holster."  That's
6    incorrect, correct?
7         A  Correct.
8              MR. HAMMER:  Objection to form.
9         A  Mine was unholstered.
10        Q  Yours were unholstered.  And he's not
11   saying, "I did not see anybody un-holster their
12   firearm."  He's affirmatively saying no firearms
13   were ever removed from anybody's holster, correct?
14             MR. HAMMER:  Objection to form.
15        A  That's how I'm reading it, yes.
16             MR. KRUDYS:  Thank you for your time and
17   attention, sir.
18             THE WITNESS:  Yes, sir.
19             MR. HAMMER:  We'll have him read and sign.
20             (Off the record at 4:14 p.m.)
21             MR. KRUDYS:  We'll order standard.
22             THE REPORTER:  Mr. Hammer, did you need
23   copies of the transcripts for both?
24             MR. HAMMER:  Yes, for both.  Thank you.
25
```

```
 1                    ERRATA SHEET

 2          Please make any changes/corrections on

 3    this sheet.  Please do not write in the

 4    deposition.

 5

 6    PAGE NO./LINE NO.                    EXPLANATION

 7

 8

 9

10

11

12

13

14

15

16

17

18

19    DATE: _____    _____

20                                  DEPONENT

21

22    DATE: _____    _____

23                                   NOTARY

24

25
```

1              **ACKNOWLEDGMENT OF DEPONENT**

2              I, MIKEL HANA, do hereby acknowledge that

3    I have read and examined the foregoing testimony,

4    and the same is a true, correct and complete

5    transcription of the testimony given by me and any

6    corrections appear on the attached Errata sheet

7    signed by me.

8

9

10

11

12

13    _____        _____

14      **(DATE)**                      **(SIGNATURE)**

15

16

17

18

19

20

21

22

23

24

25

1    **CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC**

2    I, Megan Kurwitz, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the foregoing transcript is a true

5    and correct record of the testimony given; that

6    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; that reading and signing was

9    requested; and that I am neither counsel for,

10   related to, nor employed by any of the parties to

11   this case and have no interest, financial or

12   otherwise, in its outcome.

13   IN WITNESS WHEREOF, I have hereunto set my hand

14   and affixed my notarial seal this 9th day of May,

15   2025.

16

17   *Megan Kurwitz*
     _____

18                Megan Kurwitz

19

20

21

22

23

24

25















